**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF ALABAMA**
**NORTHERN DIVISION**

| | | |
|---|---|---|
| **MICHAEL HARDY,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 2:08cv15-MHT** |
| | ) | |
| **J. WALTER WOOD, JR.,** | ) | |
| **individually and in his official** | ) | |
| **capacity as Executive Director** | ) | |
| **the Alabama Department** | ) | |
| **of Youth Services,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT BY J. WALTER WOOD, JR.

The Defendant J. Walter Wood, Jr., individually and in his official capacity, submits the following brief in support of his Motion for Summary Judgment.

### STATEMENT OF THE CASE

The Plaintiff, Michael Hardy, filed this complaint in the Circuit Court of Montgomery County, Alabama, on November 9, 2007. The Plaintiff sued J. Walter Wood, Jr., Executive Director of the Alabama Department of Youth Services, individually and in his official capacity. The complaint alleged that Wood had fraudulently terminated Plaintiff's employment in violation of the standards of due process and freedom of speech.[1] The Complaint states no facts specifically identifying when the misrepresentation[s] were made, to whom they were made, or

---

[1] There is one count in the complaint–Fraud. However, paragraphs 16 and 17 under the heading "Factual Background" allege that the Defendant failed to give the Plaintiff adequate notice and that his discharge was in violation of the Due Process clause. In addition, paragraphs 23 and 24 allege that the Plaintiff was discharged in violation of the Free Speech clause.

what the misrepresentation[s] were.

On January 7, 2008, the Defendant removed the case to the United States District Court for the Middle District of Alabama. (Doc.1).    On January 28, 2008, the Defendant answered the complaint. (Doc.8).

## UNDISPUTED FACTS

Michael Hardy was an employee of the Alabama Department of Youth Services until the Department terminated his employment on January 6, 2006. (Exhibit 1: Wood's January 6, 2006 Letter to Hardy). Mr. Hardy was a Youth Services Counselor I, which is a supervisory position.

Tera McMillian is a Youth Services Aid[2] currently employed by the Department of Youth Services.    Beginning approximately October 2002, Ms. McMillian worked under Mr. Hardy's supervision.   She continued under his supervision until June 2005.   (Exhibit 2: McMillian depo. P. 281, lines 14-15).

On or about June 14, 2005, Ms. McMillian reported to DYS Personnel Director Debra Spann that Mr. Hardy had sexually harassed her, creating a hostile working environment. (Exhibit 3: McMillian depo. P. 287).   Ms. Spann made notes of her conversation.   (Exhibit 3)[3]. Among Ms. McMillian's hostile working environment allegations, Ms. McMillian claimed Mr. Hardy had asked her to "suck his dick" (Exhibit 3: Spann's notes), told her that he "liked big titties" (Exhibit 4: McMillian Declaration p. 2), and on one occasion reached around from behind her and grabbed her breasts while saying that he wanted to "get a little feel" (Exhibit 4: McMillian declaration p. 2, Exhibit 3: Spann' notes).   Ms. McMillian also claimed that Mr.

---

[2] Youth Services Aid is the entry level basic care staff.  (YSA job profile).

[3] Ms. Spann also took a recorded statement from other witnesses and made notes, and she took a recorded statement from Mr. Hardy.  The transcript is attached as Exhibit 5.

Hardy went to Ms. McMillian's house, pulled up his shirt, rubbed his chest and asked her to lick it.  (Exhibit 3: Spann notes; Exhibit 2: McMillian depo. P. 130 lines 14-16).

On July 12, 2005, Ms. McMillian filed an EEOC Charge of Discrimination detailing the alleged sexually hostile working environment. (Exhibit 6: Millian's EEOC Charge of Discrimination).  Immediately thereafter, on July 14, 2005, Mr. Hardy filed a "grievance" against his subordinate employee Ms. McMillian, claiming that Ms. McMillian continued to make "unsubstantiated derogatory statement" against him and that she had encouraged past and present employees to interfere with an ongoing investigation and file false claims.  Mr. Hardy stated that he was filing the "grievance" "due to the fact that this [sexual harassment] investigation is ongoing."  (Exhibit 7: Hardy's Personnel Transcript, p. 281)

On November 3, 2005, Ms. Spann delivered to the DYS Legal Division a memo directed to Mr. Wood, the Defendant, finding Ms. McMillian's allegations **valid**.  (Exhibit 8: Spann's July 19, 2005 Memo to Wood).[4] On November 3, Mr. Davis, DYS Deputy Director, also recommended to Mr. Wood that Mr. Hardy's employment be terminated.  Mr. Davis specifically advised Mr. Wood that he had conferred with DYS Legal Counsel regarding the recommendation to terminate Mr. Hardy's employment based on Ms. Spann's finding.  (Exhibit 9: Davis' November 3, 2005 Memo to Wood).

On November 4, 2005, Mr. Wood informed Mr. Hardy of the recommendation he had received for disciplinary action against him.  The letter specifically informed Mr. Hardy of the

---

[4] **Error! Main Document Only.**The memo was addressed to Walter Wood, Jr. and was dated July 19, 2005.  The memo had not been delivered to Mr. Wood previously. (Exhibit 7: Wood testimony, Personnel Hearing transcript p. 401-402).

3

basis for the recommendation:

> . . . you were alleged to have made sexual advances and/or to have created
> a sexually hostile working environment for your subordinate employee,
> Tera McMillian, who filed a harassment complaint against you. In
> response to Ms. McMillian's harassment complaint you are alleged to have
> attempted, among other things, to cause an investigation against her for
> having filed a sexual harassment complaint against you.

The letter also informed Mr. Hardy of the specific work rules which Mr. Hardy was accused of

violating and informed Mr. Hardy that he would be entitled to a hearing on November 10, 2005[5],

at which time Mr. Hardy would be allowed to "present verbal and written information, produce

witnesses and be represented by counsel". (Exhibit 10: Wood's November 4, 2005 Letter to

Hardy).

On November 15, 2005, a pre-termination hearing was conducted. This hearing was in

compliance with the routine procedure at DYS designed to give the subject employee an

opportunity to present his side of the issue pre-termination. (Exhibit 7: Hardy's Personnel

Transcript p. 442 lines 18-23). Mr. Hardy appeared with his attorney Theron Stokes, General

Counsel for the Alabama Education Association. (Exhibit 11: DYS Hearing Transcript). Marcia

Calendar, DYS Assistant Director, was the Hearing Officer. The entire transcript of Mr. Hardy's

lengthy pre-termination hearing at the agency level (DYS) is attached hereto. In summary, Mr.

Hardy denied all the allegations of sexual advances and claimed nothing occurred between

himself and Ms. McMillian.

Mr. Hardy also submitted evidence in the form of oral testimony that Ms. McMillian had

fabricated her allegation of sexual harassment. He provided a motive, claiming that Ms.

---

[5] The hearing was subsequently continued until November 15, 2005 at Mr. Hardy's
request.

4

McMillian needed a shift change to enable Ms. McMillian to get to her second, or part time, job on time. (Exhibit 11: DYS Hearing Transcript, p. 54, line 20 through p. 58 line 17).

After the DYS pre-termination hearing, and before the Hearing Officer made a recommendation, DYS Special Investigator Alan Staton conducted an investigation to confirm whether Ms. McMillian actually had a second job. (Exhibit 7: Hardy's Personnel Transcript, Wood testimony, p. 404-405, p. 473 line 20 through 474 line 12).

Ms. Calendar listened to the evidence and considered whether Mr. Hardy's defense held water. In the end she concurred with Ms. Spann's recommendation. Ms. Calendar acknowledged a question existed whether Ms. Spann's conclusion was correct because Ms. McMillian did in fact get a second job as Mr. Hardy claimed. Nevertheless, in light of Mr. Hardy's attempt to file a "grievance" against Ms. McMillian, the fact question whether Mr. Hardy's conduct created a sexually hostile working environment was insufficient to reverse Ms. Spann's finding. Ms. Calendar therefore recommended termination. (Exhibit 12: Calendar's December 8, 2005 Letter to Wood).

On January 6, 2006, based on the above recommendations and investigations, Mr. Wood terminated Mr. Hardy's employment. (Exhibit 1: Wood's January 6, 2006 Letter to Hardy). The letter identified the work rules previously provided to Mr. Hardy on November 4, 2005.

Mr. Wood did not conduct the investigations–neither Ms. Spann's nor Mr. Staton's (Exhibit 7: Personnel Hearing transcript p. 433 lines 2-14; 457 lines 5-6; p. 469 line 23 through 470 line 1), did not conduct the DYS pre-termination hearing, (Exhibit 7: Personnel Hearing transcript, p. 403 line 1-2), was not present at the hearing (Exhibit 7: Personnel Hearing transcript p. 403, line 19-21), and did not communicate with the Hearing Officer about the facts

of the case (Exhibit 7: Personnel Hearing transcript p. 403 line 22 through 404 line 15).[6]  The

hearing followed the standard DYS procedure whereby the  Executive Director appointed a

Hearing Officer to review the information and make a recommendation to the Executive

Director. (Exhibit 7:  Personnel transcript p. 445, lines 9-17).  Mr. Wood relied on DYS staff

who investigated the case, conducted the hearing, and recommended termination based on the

pre-termination procedure in place at DYS.  (Exhibit 7: Hearing transcript p. 407 lines 1-18; p.

461 line 16 through 463 line 1; Exhibit 7: Personnel transcript p. 464 lines 1-4; p. 476 line 19-20;

p. 489 lines 17-22).  As outlined above, the staff who made the recommendation to discharge Mr.

Hardy included DYS Special Investigator Alan Staton, (Exhibit 7:  Hearing Transcript p. 404

lines 19 through p. 405 line 7), Personnel Director Debra Spann (Exhibit 7:  Hearing transcript p.

407 line 23 through p. 408 line 2; p. 429 line 4 through p. 430 line 19), DYS Deputy Director

Tim Davis (Exhibit 7:  Hearing transcript p. 408 lines 3-4), and DYS Assistant Director Marcia

Calendar (Exhibit 7:  Hearing transcript p. 408 lines 5-6; p. 474 line 13 through 475 line 6).

Even DYS General Counsel approved the decision (Exhibit 7:  Hearing Transcript, p. 408 lines

7-9).  Mr. Wood did not question the recommendations or attempt to "investigate the

investigation".  (Exhibit 7: Hardy's Personnel transcript p. 450 line 14).

The January 6, 2006 letter also informed Mr. Hardy of his right, pursuant to the Rules of

the State Personnel Board, to request another hearing and the time period during which he must

request a hearing.  Mr. Hardy timely requested a hearing before the State Personnel Board on

January 12, 2006.  (Exhibit 13: Recommended Order, p. 6 of 32).  He received that full

---

[6] Mr. Wood's only involvement was in connection with Mr. Hardy's attempted
"grievance" against Ms. McMillian and Mr. Hardy's flurry of  activity immediately after Ms.
McMillian's sexual harassment complaint.  (Exhibit 7: Personnel Hearing Transcript p. 390 line

evidentiary hearing before the State Personnel Board on May 8, 2006 and July 10, 2006. (Exhibit 7: Hardy Personnel transcript. P. 2 line 1 through 4 line 5). In preparation for the hearing Mr. Hardy took the deposition of Ms. McMillian, her mother, Veronica Harris, Debra Spann and others. In addition extensive written discovery was exchanged. At his hearing Mr. Hardy again appeared with his counsel Mr. Stokes, and again presented evidence and testimony in his defense. The transcript of Mr. Hardy's hearing before the State Personnel Board is 690 pages long. A significant portion of that transcript was Mr. Hardy's evidence and witnesses.

At the conclusion of the hearing, Hearing Officer Julie Weller wrote a thorough and well reasoned 32 page Recommended Order to the State Personnel Board. (Exhibit 13). The Recommended Order recited the procedural background (outlined hereinabove), the factual background (in intricate detail), and discussed whether sufficient evidence existed to warrant dismissal. She concluded that there was sufficient evidence to warrant Hardy's dismissal.

The Personnel Board adopted Administrative Law Judge Weller's findings of facts and conclusions, and specifically found that although the testimony of the alleged victim (Ms. McMillian) was not credible and her complaints of sexual harassment were unfounded, the Employee's response to the allegations as a supervisor was inappropriate. (Exhibit 14: SPD Order, p 2).

Mr. Hardy appealed the Personnel Board's ruling. Montgomery County Circuit Court Judge Gene Reese reversed the Personnel Board's ruling. The Personnel Board then appealed Judge Reese's ruling. The case is currently pending before the Alabama Court of Civil Appeals. The correct standard of review for the Circuit Court was whether there was any evidence in the

12 through p. 391 line 13).

record to support the Personnel Board's order.

There is also pending in this Court before United States District Judge Watkins a lawsuit by Tera McMillian against DYS and Michael Hardy. Judge Watkins denied summary judgment against both DYS and Michael Hardy, and the case is set for trial on Tera McMillian's claims for sexual harassment and retaliation resulting from the alleged actions of Michael Hardy described above. (This Court may take judicial notice of that case and the pleadings therein.) DYS thus must stand trial to determine whether DYS has liability to Ms. McMillian based on Mr. Hardy's conduct.

## ARGUMENT

Statute of Limitations. This lawsuit was filed on November 9, 2007. That date was more than 2 years after Mr. Wood—the Defendant—terminated Mr. Hardy's employment with DYS. That letter was issued on November 4, 2005. The statute of limitations for all claims in this case is two years. The complaint is therefore due to be dismissed in its entirety because it is barred by the applicable statute of limitations.

Fraud and Misrepresentation. Summary judgment is also due to be granted on the fraud and misrepresentation claim.

Fraud must be specifically pleaded. Ala.R.Civ.P. 9(b). In the complaint the Plaintiff did not allege when any misrepresentation[s] were made, to whom they were made, or what the misrepresentation[s] were. In Answer to the Complaint the Defendant asserted the affirmative defense that the Complaint failed to adequately plead facts to support a fraud claim. (Doc. 8, p. 6, Affirmative Defense 10). The Plaintiff has neither amended the complaint nor conducted discovery. Summary judgment is therefore due to be granted on the basis of Rule 9(b) alone.

8

*But see Puckett v. McPhillips Shinbaum*, Slip Copy, 2008 WL 906569 (M.D.Ala., 2008).

Moreover, the Plaintiff has no evidence to create a material question of fact regarding any of the elements of a fraud claim. The elements of a fraud claim are: "(1) a misrepresentation of a material fact, (2) made willfully to deceive, recklessly, without knowledge, or mistakenly, (3) that was reasonably relied on by the plaintiff under the circumstances, and (4) that caused damage as a proximate consequence." *Brushwitz v. Ezell*, 757 So.2d 423, 429 (Ala.2000) (citing *Foremost Ins. Co. v. Parham*, 693 So.2d 409, 422 (Ala.1997). The undisputed facts raise no inference that Mr. Wood made a misrepresentation of a material fact, that he made the misrepresentation either willfully, recklessly, without knowledge, or mistakenly, that the Plaintiff relied on such misrepresentation, or that the Plaintiff was damaged thereby. In short, Mr. Wood made no representations to anyone, true or false, on which Mr. Hardy relied to his detriment.

Similarly, to establish a prima facie case of fraudulent misrepresentation, a plaintiff must show: (1) that the representation was false, (2) that it concerned a material fact, (3) that the plaintiff relied on the false representation, and (4) that actual injury resulted from that reliance. § 6-5-101, Ala.Code 1975; *Ex parte Novartis Pharmaceuticals Corp.*, --- So.2d ----, 2008 WL 1759109 (Ala.,2008). The plaintiff has likewise produced no evidence to create a material question of fact regarding any of the elements of a fraudulent misrepresentation claim. Specifically, the undisputed facts raise no inference of a false representation by Mr. Wood concerning a material fact relied on by the Plaintiff to his detriment.

The complaint, under the "fraud" count, specifically alleges that the investigations were "contrived to appear to be in accordance with policy when they were not recorded or in any manner notated." (Complaint, Doc. 1-2, p. 4, ¶ 19). Not only did Mr. Wood not conduct the

9

investigations, but the undisputed evidence raises no inference that the investigations were

contrived. There simply is no policy or procedure requiring the investigations to be recorded.

Nevertheless the entire investigation, including the hearings, were recorded. Ms. Spann's

recorded notes are attached hereto as Exhibit 3, Ms. Spann's recorded statement from Mr. Hardy

is attached into as Exhibit 5, Ms. Spann's recommendation is attached hereto as Exhibit 8, the

DYS hearing transcript is attached hereto as Exhibit 11, the DYS Hearing Officer's

recommendation is attached hereto as Exhibit 12, the cover page of the Personnel Board hearing

transcript is attached hereto as Exhibit 7, the Personnel Board Hearing Officer's Recommended

Order is attached hereto as Exhibit 13, and the Personnel Board Order is attached hereto as

Exhibit 14. There is no legitimate question of fact whether the "investigation" was "contrived."

Next the complaint alleges that Defendants willfully failed to document facts that were in

Plaintiff's favor and fraudulently concealed the existence of facts that were against the

Department. (Complaint, Doc. 1-2, p. 4, ¶ 20). The Plaintiff can present no evidence to support

this allegation because Mr. Hardy was represented by able counsel at each step and the transcripts

of his investigative hearings, which are attached hereto, show that Mr. Hardy's lawyers fully

explored the evidence and fully cross examined the witnesses both supporting Mr. Hardy and

contradicting the Department's position.

Next the complaint alleges that the "Defendant's further contrived charges of the use of

Abusive and Threatening Language in a Grievance to terminate the Plaintiff with full knowledge

that said charges were not true." (Complaint, Doc. 1-2, p. 4, ¶ 21). This allegation is difficult to

comprehend insofar as it references "Abusive and Threatening Language in a grievance to

terminate the Plaintiff". In any event, the evidence attached hereto establishes that no disputed

fact question exists whether Ms. McMillian alleged that Mr. Hardy had engaged in abusive and threatening language against her.   She claims he asked her to "suck his dick", told her he "liked big titties", and grabbed her breasts while stating that he wanted "a little feel."  Neither are there disputed fact questions whether Ms. Spann investigated the claim, whether a hearing was conducted at DYS at which Mr. Hardy was given the opportunity to state his side of the story, and whether a subsequent hearing was conducted before the State Personnel Board at which Mr. Hardy was ably represented by counsel.  At each stage Mr. Hardy's threatening and abusive language was reviewed and there is no evidence of any wrong doing by Mr. Wood, who made no representations about the subject.

Next the complaint alleges that the Plaintiff was not afforded due process.  (Complaint, Doc. 1-2, p. 4, ¶ 22).  That allegation was discussed below.  It is frivolous.

Insofar as Mr. Hardy attempted to retaliate against Ms. McMillian by filing a "grievance" against her, it is true that Mr. Hardy's employment was terminated.  However this averment does not appear to support any fraud theory and the complaint does not explain how this alleged Free Speech violation amounted to fraud.  The Defendant submits that this Court should not fashion from the alleged facts in the complaint a theory upon which a fraud claim might be based because it is not the Court's function or duty to create legal arguments.  *See, Gonzalez v. Blue Cross/Blue Shield of Alabama*, 760 So.2d 878 (Ala.Civ.App.2000).  Moreover the Plaintiff has not stated a cause of action under the Due Process Clause or under the First Amendment because there was no Free Speech violation.  For the sake of argument the following section will address the reference in the "fraud" claim to a Due Process and Free Speech violation:

Due Process.  The Plaintiff's claim that his employment was terminated without

11

sufficient notice and in violation of the due process clause is without merit and unsupported by the facts. Specifically, the Plaintiff has presented no evidence of a disputed material fact whether the process was flawed. *See, e.g. Thompson v. Bass,* 616 F.2d 1259, (11th Cir. 1980); *Nicholson v. Gant,* 816 F.2d 591, 598 (11th Cir. 1987) *citing Cleveland Board of Education v. Loudermill,* 470 U.S. 532, 546, 105 S.Ct. 1487, 1495, 84 L.Ed.2d 494 (1985) (stating that the tenured public employee is entitled to oral or written notice of the charges against him, an explanation of the employer's evidence, and an opportunity to present his side of the story). Moreover, under the law in existence including the Alabama Administrative Procedures Act under which the Plaintiff appealed his termination, he cannot under any circumstances present such facts. *See, McKinney v. Pate*, 20 F.3d 1550, 1561-65 (11th Cir.1994) (observing that the fact that Florida statutes offered a review procedure for pre-termination hearings satisfied procedural due process absent a showing that such processes themselves were inadequate)*; Mack v. Alabama Dept. of Human Resources,* 201 F.Supp.2d 1196 (M.D.Ala.,2002); *Wallace v. City of Montgomery*, 956 F.Supp. 965, 980-81 (M.D.Ala.1996).

With regard to the due process claim, the Complaint does not state a cause of action under 42 U.S.C. 1983, but Mr. Wood would be entitled to qualified immunity against any such claim if it existed. *See, e.g. Reeves v. Thigpen,* 879 F.Supp. 1153 (M.D.Ala.,1995).

Summary judgment is therefore due to be granted on the due process claim.

Free Speech. The "fraud" claim in the complaint states the following: "the termination was in retaliation for the filing of the grievance." "Plaintiff avers that his constitutionally protected freedom of speech has been violated because he was terminated for the filing of the grievance." (Complaint, Doc. 1-2, p. 4, ¶ 23-24). These paragraphs state no substantive claim,

either factual or legal, as discussed below.

A heightened pleading standard applies to claims for which an official's motive is a

necessary element, such as claims of termination of employment based on political affiliation in

violation of the First Amendment, as well as retaliation for the exercise of free speech or other

constitutional rights. The complaint woefully fails to plead a First Amendment claim with

sufficient specificity. No facts are suggested that would lead to an inference that Mr. Wood acted

with intent to violate Mr. Hardy's constitutional rights. Nevertheless, the Defendant assumes the

Court will not likely grant summary judgment solely on the basis of the heightened pleading

standard. The following discussion will therefore show (1) there was no constitutional violation,

and (2) Mr. Wood would be entitled to qualified immunity if a constitutional violation existed.

First, the Plaintiff has submitted no evidence of constitutionally protected free speech.

Apparently Mr. Hardy suggests that the "grievance" he filed against Ms. McMillian two days

after Ms. McMillian filed an EEOC Charge of Discrimination alleging that Mr. Hardy had

subjected her to a sexually hostile working environment is a matter of public concern. *See ,e.g.,*

*Pickering v. Board of Educ.*, 391 U.S. 563, 568, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968); *Mt.*

*Healthy City Board of Education v. Doyle*, 429 U.S. 274 (1977).[7] The Defendant is aware of no

---

[7] Under the *Mt. Healthy* framework a plaintiff establishes a First Amendment retaliation claim by showing:

(1) the employee's speech is on a matter of public concern; (2) the employee's First Amendment interest in engaging in the speech outweighs the employer's interest in prohibiting the speech to promote the efficiency of the public services it performs through its employees; and (3) the employee's speech played a "substantial part" in the employer's decision to demote or discharge the employee. Once the employee succeeds in showing the preceding factors, the burden then shifts to the employer to show, by a preponderance of the evidence, that "it would have reached the same decision ... even in the absence of the protected conduct. *Battle v. Bd. of Regents for Ga.*, 468 F.3d 755, 760 (11th Cir.2006) (quoting *Anderson v. Burke County, Ga.*, 239 F.3d 1216,

13

law to support the claim. Mr. Hardy's "grievance" was not a sexual harassment claim, but was a claim that his subordinate employee Tera McMillian should have been investigated because she filed a sexual harassment claim against *him*. Mr. Hardy's "grievance" against Ms. McMillian was a private matter in which he sought to have Ms. McMillian investigated because she caused *him* to be investigated. It was apparently an attempt to defend himself from Ms. McMillian's sexual harassment complaint by turning the table on her. There is nothing in it of public concern and Mr. Hardy acted in his capacity as an employee and not as a citizen. *See, Morgan v. Ford*, 6 F.3d 750, 754 n.5 (11th Cir.1993) (stating that the relevant determinative factor in the "public concern" test was not whether the topic of the speech might be one in which the public would have an interest, but rather the court had to determine whether the purpose of the speech was to raise matters of public concern, on the one hand, or to further the employee's own private interest on the other.); *see also, Stanley v. City of Dalton*, 219 F.3d 1280, 1288 n.13 (11th Cir.2000) ("When there is a personal element to the speech, complaints of wrongdoing within a public agency may not constitute speech on a matter of public concern."). "[W]hen public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." *Garcetti v. Ceballos*, 547 U.S. 410, 126 S.Ct. 1951, 1960, 164 L.Ed.2d 689 (2006). This analysis does not change whether the allegation is Free Speech or the Right to Petition the Government for Redress of Grievances. *See, D'Angelo v. School Bd. of Polk County, Fla.*, 497 F.3d 1203, (11th Cir. 2007); *Taylor v. Alabama*, 95 F.Supp.2d 1297, 1316 (M.D.Ala. 2000).

---

1219 (11th Cir.2001).

In addition, employees generally do not have the right under the First Amendment to file grievances or internal incident reports concerning their own employment conditions. *See Hang v. Bd of Governors*, 902 F. 2d 1134,1140 (4th Cir. 1990) (stating that a public employee's expression of grievances concerning his employment is not a matter of public concern).

The Plaintiff therefore cannot establish a First Amendment claim because he cannot satisfy the first element. As the following paragraphs will show, neither can he establish the second.

Assuming *arguendo* that Mr. Hardy's discharge was on a basis that infringed on his constitutionally protected right to free speech because it related to a matter of public concern and he acted as a citizen, *see, Rankin v. McPherson*, 483 U.S. 378, 383, 107 S.Ct. 2891, 97 L.Ed.2d 315 (1987), the balancing test would apply. To determine whether a constitutional violation had occurred, Mr. Hardy's interest "as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees" would be weighed. *Connick v. Myers*, 461 U.S. 138, 142, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983). Even if Mr. Hardy's "grievance" had been a matter of public concern, the state's interest in preventing its supervisors from retaliating against subordinate employees for filing sexual harassment complaints would outweigh Mr. Hardy's protected Free Speech interest.

Next, Mr. Wood submits that he would be entitled to the *Mt. Healthy* defense as a matter of law because there is no material factual dispute. The undisputed evidence shows that DYS discharged Mr. Hardy in part because *his* retaliatory grievance was an attempt (albeit unsuccessful) to interfere with Ms. McMillian's complaint about sexual harassment. (See Marcia

15

Calendar's memo). The other undisputed reason was the determination by DYS Personnel Director Debra Spann, after investigating Ms. McMillian's complaint, that Mr. Hardy had engaged in conduct prohibited by the DYS Sexual Harassment policy. Ms. Spann's recommendation, which was the first of many recommendations to Mr. Wood to discharge Mr. Hardy, was not based on Mr. Hardy's retaliatory "grievance" but was exclusively based on Ms. Spann's investigation. It is undisputed that two different hearing officers reviewed Ms. Spann's recommendation for Mr. Hardy's discharge and both found his conduct in relation to Ms. McMillian a sufficient basis for discharge.

Next, assuming Mr. Hardy's "free speech" claim related to constitutionally protected speech, which it did not, and that the balancing test established a constitutional right, which it does not, and assuming the *Mt. Healthy* defense did not apply, Mr. Wood would be entitled to qualified immunity. Qualified immunity protects government officials performing discretionary functions from suits in their individual capacities unless their conduct violates clearly established statutory or constitutional rights of which a reasonable person would have known." *Andujar v. Rodriguez*, 480 F.3d 1248, 1251 (11th Cir.2007).

The first step in the qualified immunity analysis is determining whether Mr. Wood acted within the scope of his discretionary authority. *Williams v. Bd. of Regents of Univ. Sys. of Ga.*, 477 F.3d 1282, 1300 (11th Cir.2007). The undisputed facts show that Mr. Wood acted in his capacity as the ultimate hiring authority with the duty to act on the recommendations to terminate Mr. Hardy's employment. He did not have any other involvement. His total involvement was thus to exercise judgment (a discretionary function) concerning the firing of an employee.

The Defendant having met the burden to show exercise of a discretionary function, the

16

plaintiff therefore has the burden of showing that Mr. Wood's conduct violated clearly

established law. *Id.* As discussed above, there was no constitutional violation at all–much less a

"clearly established" violation. Mr. Wood is therefore entitled to summary judgment because he

is protected by qualified immunity.

CONCLUSION

The Defendant J. Walter Wood, in his individual capacity and in his official capacity as

Executive Director of the Alabama Department of Youth Services, is entitled to summary

judgment on all claims. The Plaintiff did not comply with initial disclosures, conducted no

depositions, and submitted no discovery requests or other written discovery. The undisputed

facts do not create a triable issue of material fact.

The Due Process claim fails to state a claim for which relief could be granted. The

undisputed evidence shows that the process was more than sufficient to provide Mr. Hardy notice

of the charges against him, an explanation of the evidence, and an opportunity to present his side

of the story. Moreover, Mr. Wood would be entitled to qualified immunity if a triable issue of

fact existed whether a due process violation had occurred.

The fraud and misrepresentation claim fails because the undisputed evidence presents no

disputed question of material fact. The complaint fails to allege Mr. Wood made, and the

undisputed facts establish Mr. Wood did **not** make, representations–whether true or false and

whether intentional or otherwise– on which Mr. Hardy relied or which caused Mr. Hardy

damages.

Finally, the Free Speech claim fails to state a cause of action. The undisputed facts

establish that Mr. Hardy engaged in no speech protected by the constitution, Mr. Hardy's

17

constitutional free speech rights were not infringed, DYS would have made the same decision regardless of any protected speech, and Mr. Wood would be entitled to qualified immunity had a constitutional violation been shown.

WHEREFORE, the Defendant J. Walter Wood, Jr., demands a summary judgment dismissing all claims and granting fees and expenses against the Defendant for defending this lawsuit.

Done this 18th day of August , 2008.


**s/T. Dudley Perry, Jr.**
T. Dudley Perry, Jr.
Bar Number: 3985-R67T
General Counsel
Alabama Dept of Youth Services
Post Office Box 66
Mt. Meigs, AL 36057
Telephone: (334) 215-3803
Fax: (334) 215-3872
E-Mail: dudley.perry@dys.alabama.gov


Sancha E. Teele
Assistant Attorney General
Bar Number: 0103-H71T
Attorney for the Defendant
Alabama Department of Youth Services
Post Office Box 66
Mt. Meigs, AL 36057
Telephone: 334-215-3803
Fax: (334) 215-3872
E-Mail: sancha.teele@dys.alabama.gov

## CERTIFICATE OF SERVICE

I hearby certify that on the 18th day of August, 2008, I electronically filed the foregoing

**Brief in Support of Motion for Summary Judgment by J. Walter Wood, Jr.** with the Clerk

of the Court Using the CM/ECF system which will send notification of such filing to the

following:

> Gwendolyn T. Kennedy
> Attorney for Plaintiff
> 3000 Eagle Point Corporate Dr., Suite 300 A
> Birmingham, AL 35242
> (205)437-0160

> **s/T. Dudley Perry, Jr.**
> T. Dudley Perry, Jr.
> Bar Number: 3985-R67T
> Deputy Attorney General
> Attorney for Defendant
> J. Walter Wood, Jr.

# HARDY V. WOOD

## BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

# EXHIBIT

# 1



**BOB RILEY**
**GOVERNOR**

*State of Alabama*
*Department of Youth Services*
*Post Office Box 66*
*Mt. Meigs, Alabama 36057*

January 6, 2006

J. WALTER WOOD, JR.
EXECUTIVE DIRECTOR

Mr. Michael Hardy



Dear Mr. Hardy:

As you are aware, an administrative fact finding hearing was held on November 10, 2005, to determine what disciplinary action should be taken concerning your Youth Services Counselor I position with this department.

Based on the testimony and documents presented during the hearing, there was evidence to support that there was a violation of the Rules of the State Personnel Board (670-X-19-.01 (1g) – disruptive conduct) and/or violation of the Rules of the State Personnel Board (670-X-19-.01 (2 e) – use of abusive or threatening language) and/or violation of the Rules of the State Personnel Board (670-X-19-.01 (2 j) – serious violation of any other department rule) and/or violation of DYS Policy (3.13.2 – Prohibition of Sexual Harassment).

Based on the evidence and a review of your personnel file, I hereby order your dismissal from the Department of Youth Services effective at the close of business January 6, 2006. You will receive your last regular pay check on January 20, 2006. You will be paid for any unused annual, holiday, compensatory or personal leave you may have on February 3, 2006.

Your state employees' medical insurance will end on January 31, 2006. If you wish to purchase health insurance coverage you may contact the State Employees Insurance Board at 1-800-513-1384.

You may request a refund of your retirement contributions by completing a Form 7, Notice of Final Deposit and Request for Refund. The form may be obtained from the Human Resources Section. If you wish, you may leave your contributions on deposit for up to five years.

The Rules of the State Personnel Board state that you may, within ten (10) days after notification of dismissal, request a hearing by the State Personnel Board. The request should include a written answer to the charges. This request should be addressed to Ms. Jackie Graham, Personnel Director, State Personnel Department, 64 North Union Street, Montgomery, AL 36130. Please send a copy of the request to the Department of Youth Services.

Sincerely,

J. Walter Wood, Jr.
Executive Director

JWW/dis

c: State Personnel Department
   Mr. Davis
   Mr. Booker
   Ms. Coles



EXHIBIT

1

# HARDY V. WOOD

## BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

# EXHIBIT

# 2

TERA MCMILLIAN - 1/22/2008

1    IN THE UNITED STATES DISTRICT COURT FOR

2    THE MIDDLE DISTRICT OF ALABAMA

3    NORTHERN DIVISION

4

5    TERA A. MCMILLIAN            )

6        Plaintiff,            )

7                            )

8    VS.                    ) CASE NO.:  2:07-CV-01-WKW

9                            )

10   STATE OF ALABAMA DEPARTMENT )

11   OF YOUTH SERVICES, and      )

12   MICHAEL HARDY,              )

13       Defendants.          )

14       The deposition of TERA MCMILLIAN, taken by the

15   Defendants, pursuant to the Federal Rules of Civil

16   Procedure, before Kimberly B. Faucette, ACCR-309,

17   Certified Court Reporter and Notary Public in and for the

18   State of Alabama at Large, at the Alabama Department of

19   Youth Services, Mt. Meigs, Alabama, on the 15th day of

20   January, 2008, at 10:30 a.m., pursuant to notice, and

21   continued on the 22nd day of January, 2008, at 9:00 a.m.,

22   pursuant to notice.

23           *     *     *     *     *

EXHIBIT
2

TERA MCMILLIAN - 1/22/2008

2

1  APPEARANCES:

2

3  FOR THE PLAINTIFF:        FOR DEFENDANT MICHAEL HARDY:

4  MR. JIMMY JACOBS        MR. JAMES E. WILSON

5  Attorney at Law        Attorney at Law

6  Montgomery, Alabama        Montgomery, Alabama

7

8  FOR DEFENDANT ALABAMA DYS:

9  MR. T. DUDLEY PERRY, JR.

10  MS. SACHA TEELE

11  Attorneys at Law

12  Mt. Meigs, Alabama

13

14  ALSO PRESENT:

15  MR. GERRY LOVE

16                INDEX

17      EXAMINATION BY MR. PERRY............1

18          DYS EXHIBIT NO. 1............106

19      EXAMINATION BY MR. WILSON.........198

20          HARDY EXHIBIT NO. 1..........198

21          HARDY EXHIBIT NO. 2..........301

22          HARDY EXHIBIT NO. 3..........303

23

1     A    The three of us, yes.

2     Q    The three of you?

3     A    Yes.

4     Q    Now, Ms. Harris had left y'all alone?

5     A    The kitchen and den are connected.

6     Q    I understand.  So she is drinking in the other

7     room; y'all two are in this room drinking?

8     A    No.  She was putting the presents in boxes and

9     putting some paper on them.

10    Q    But she was in a different room?

11    A    With no door.

12    Q    Your house has two rooms with an open --

13    A    Yes.

14    Q    Then he did some really strange things and

15    raised his shirt and asked you to lick his chest; right?

16    A    Yes, sir.

17    Q    But, now, Ms. Harris, she didn't see that;

18    right?

19    A    Yes.  She saw him with his shirt up.  That is

20    why she asked me if I wanted her to leave.

21    Q    And in your affidavit there, I think you

22    changed what you said.

23    A    What did I say?

1    Q   He did what a supervisor would do, though, and
2  helped you out on other occasions, didn't he?

3    A   Helped me out?

4    Q   Other occasions, as a supervisor, in the next
5  year?  He was still your supervisor, wasn't he?

6    A   Yes.  He did what a supervisor was supposed to
7  do.

8    Q   He didn't abandon you, did he?

9    A   Abandon me?

10    Q   Abandon you.  He didn't ignore you when you
11  made requests to him for different things in terms of
12  whatever you need from a supervisor in 2005, did he?

13    A   I don't understand what you are saying.

14    Q   How long was he your supervisor in 2005?

15    A   Up until June.

16    Q   Six months.  Other than this occasion you have
17  testified about previous that he wouldn't let you off
18  when you wanted to go because your son hadn't urinated,
19  did he ever take another negative action against you in
20  that 2005 period?

21    A   Did he ever take another negative action?

22    Q   Right.  As a supervisor, did he ever deny you
23  time off?  Deny you a raise?  Did he ever do that?

TERA MCMILLIAN - 1/22/2008

287

1    Q    Yes.

2    A    That day?

3    Q    Uh-huh.

4    A    It is possible. I didn't want him to be mad

5    with me.

6    Q    All right. Did that happen on or about May

7    27th, 2005?

8    A    I don't know.

9    Q    Did it happen in 2005?

10    A    Yes.

11    Q    When did you report all of this alleged sexual

12    harassment that Mr. Hardy was allegedly perpetrating?

13    When did you report this?

14    A    In June.

15    Q    Why did you report it?

16    A    My goal was not to report it. My goal was to

17    go down there to get a transfer.

18    Q    This was a transfer for the same reasons you

19    had asked Hardy for earlier; right?

20    A    No, sir. I did not have a job.

21    Q    I am sorry. I misstated. Excuse me.

22    I am saying, you were still trying to get a

23    transfer?

# HARDY V. WOOD

## BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

# EXHIBIT

# 3

6-22-

Angela Williams)                           Oct. 2023
ō would help her. ˆcar I she would c ˆ her.
    Tera McMillian & Mike Hardy
ō her house ō took his shirt off. I ō fondled his nipples.
when Ms. Was c pole. → Dortch
    Dortch: messy.
bright c $300 z sweatsuits, purses.


    1225 on tape.

Veronica Harris                                                    6-23
6 much I would take → her -
   ° really I 2 Mr. H → I n were try. l date her,
       think ° 2 pretty well -
    ° I 2 give her response → hmmm —
  on campus → has l while ~ → Meten was st
   here -


998


... Mattillian) called right ᵈ she left I said lady was afraid → her job) she
   just told her l tell truth —

---

**PHONE CALL**

| | |
|---|---|
| FOR M | Vera Sparks   DATE 62305   TIME 8:19 A.M. |
| OF M | Targ. M. |
| PHONE/ MOBILE | 284-9559   FAX |
| MESSAGE | Ms. Hall     Att Webster |
| | blankets |
| | shots |
| | "en route" |
| SIGNED | Vera Capps 62505 |

| | |
|---|---|
| ☐ | TELEPHONED |
| ☐ | RETURNED YOUR CALL |
| ✓ | PLEASE CALL |
| ☐ | WILL CALL AGAIN |
| ☐ | CAME TO SEE YOU |
| ☐ | WANTS TO SEE YOU |

Questions:

1. Did you ask Ms. McMillian's friend how much it would take to get her?
   If so, why?
   Why do you think they would have said you said this?

2. Did you go to Ms. McMillian's house around the Christmas holidays, talk, have drinks and pull up and/or remove your tee shirt? Why?
   Why do you think they would have said you did go?

3. Did you offer to give Ms. McMillian a monthly salary if she would be your side woman?
   Why do you think they would have said you said this?

4. Did you talk to Ms. McMillian about the website "blackp"?
   What type of website is it? What does it mean?
   Why would you have talked to her about this?
   Why would someone have said you talked with her about this?

5. Did you/do you ask/coerce staff to purchase merchandise from you?
   What type of goods do you have? Where do you get them?
   What happens if they do not buy them?
   Why would people say they have to buy them or they have bought stuff from you?

6. Did you get behind Ms. McMillian when she was sitting at a desk and cup her breasts?

7. Did you ask Ms. McMillian to meet you at a hotel?

8. Have you ever asked Ms. McMillian to falsify the Chemical Book?

9. Did you ask Ms. McMillian to suck your dick?

10. Have you talked to Ms. M since this incident? Have you had anyone else talk to her for you since this incident?

11. What did you mean when you told Ms. M she couldn't transfer for 2 yrs?
    When did you tell her the only reason Chesko got to transfer was because he was wh
    What do you mean by the statement you are a member of the Man clique? That
    What do you mean by the statement you have gotten out of a lot of stuff because you could write good? Please give examples —

    Why did Mr. Eugene Smith transfer out of your dorm? Ms. M alleges you told he the rumors were true — what were the rumors?

    It is alleged you harassed Ms. Mary Moten — — is this true?
    "    "    "    "    "    " Denise Howard "    "    "

    Did you assign Ms. M to the 12-8 shift when 3 other men wanted the shift

*michael Harley    6-28-05*

- Have you talked to Ms. McMillian since this incident? Have you had anyone else talk to her for you since this incident?

- Did you assign Ms. McMillian to the 12-8 a.m. shift when three other men wanted the shift. Was it because she had talked to Mr. Bolling about a transfer?

- What did you mean when you told Ms. McMillian she couldn't transfer for two (2) years? Why did you tell her the only reason Chriske got to transfer was because he was white?

- Why did Mr. Eugene Smith transfer out of your dorm? Ms. McMillian alleges you told her the rumor(s) were true; what were the rumors?

- It is alleged you have harassed other female staff on campus who are no longer with the department (i.e., Ms. Moten and/or Ms. Howard). Is there any truth to this?

- Did you/do you ask/coerce staff to purchase merchandise from you?
  What type of goods do you have? Where do you get them?
  What happens if they do not buy them?
  Why would people say they have to buy them or they have bought stuff from you?

- Have you ever asked Ms. McMillian to falsify the Chemical Book?

- What do you mean by the statement you are a member of the Mt. Meigs Clique?

- What do you mean by the statement you have gotten out of a lot of stuff because you could write good? Please give examples.

- Did you go to Ms. McMillian's house around the Christmas holidays, talk, have drinks and pull up and/or remove your tee shirt? Why?
  Why do you think they would have said you did go?

- Did you talk to Ms. McMillian about the website "blackp"?
  What type of website is it? What does it mean?
  Why would you have talked to her about this?
  Why would someone have said you talked with her about this?

- Did you ask Ms. McMillian's friend how much it would take to get her?
  If so, why?
  Why do you think they would have said you said this?

- Did you get behind Ms. McMillian when she was sitting at a desk and cup or fondle her breasts?

- Did you ask Ms. McMillian to meet you at a hotel?

- Did you offer to give Ms. McMillian a monthly salary if she would be your side woman? Why do you think they would have said you said this?

- Did you ask Ms. McMillian to suck your dick?

_Michael Hardy_                                             6-28
Unit Manager 7 Paige Hall : approx 11 yrs
Ms. Mo : 2 yrs → went ∫ time ∫ ∫ y I
∫ one else has talked ∫ her ∫ I
5-05 : asked ∫ ~ - early → 2nd job FMLA
She talked w/ Bell : couple ∪ mos later
∫ ∫ tell her 2 yrs → told her ∫ was : wait : list.
does ∨ ) a idea why she ∫ ∫ start ∫ Chrisler.
a thinks a has ∫ ∫ ∫ trans ∫ : past down ITU ∫ : part a
   10-6.
Smith letters ∪ false → H ∫ ∨ support him).
   H says ∫ > ∨ true.
Ms. Moten ) / Ms. Howard → no.
said no to falsifying books → phone logs
   ~ ) had ∫ book ) : couple ∪ dys ∨ : couple ∪ mos
   ∫ stuff 4 → she > lys.
1½ - 2 yrs keeps ∫ himself → growth, focus → found wh p
   death ∪ mom ∫ grandma
   ∨ ∫ concerned ∫ : promotion )
does ∨ ~ ∨ she > talk : ∫ a far a writ : well
blacks ∫ ∨ ) oth ∫ ∫ ∫ him ) → McCollum
absolutely ∨ → she > fish : → a a file against her
going back ∫ ∫ Ginn : - order ∫ leave they ) ∫ file y ty
   her charge
∫ no hotel → prior to May 27 #5 they had were Enoperable
absolutely ∨

   Talk w/ Harvest, Ellis 12-8 shift → told a she would get H.

Jonathan Ellis –                                                    7-1

Mr. Dortch + Mr. Harvest wrote the memo → r r write r memo,

r r write r memo.

r r see 'c L' possible.

r r possibilities.

r r z M had r job,

M said she was r r leave r dorm –

r + wk Ↄ she left r dorm, → leave r wk a
period,

had wk'd r M since 2-3/05.

z ref bar – dorm –
" " " c campus –

board r P sit – Trustees stud / staff –

MM Clique → r r z who > –/.
r several –

Arthur Harvest

wk ≥ 13th they had a confontation - P - wk procedure she had done wron

ft changed sched - April / May - - she had $\int$ facts ever since - -
Phyllis

7:1

946

# HARDY V. WOOD

## BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

# EXHIBIT

# 4



# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA
### NORTHERN DIVISION

| | | |
|---|---|---|
| TERA A. McMILLAN | ) | |
| **Plaintiff** | ) | |
| | ) | |
| v. | ) | Civil Action No: 2:07-cv-00001-WKW |
| | ) | |
| ALABAMA DEPARTMENT OF | ) | (JURY DEMAND) |
| YOUTH SERVICES, et al., | ) | |
| **Defendants** | ) | |

## DECLARATION OF TERA McMILLAN

1.      My name is Tera McMillan. I am of more than nineteen years of age, a resident of Montgomery, Alabama, and the plaintiff in this lawsuit. I make this declaration for use in my lawsuit against Michael J. Hardy and the Alabama Department of Youth Services (DYS). I was initially employed by DYS at its Mount Meigs campus in October 2002 and have performed my duties and responsibilities in a satisfactory manner since that time.

2.      Beginning around May of 2003, I began to be subjected to unwelcome offensive sexual harassment and a hostile work environment by my supervisor, Michael Hardy. This conduct began shortly after we were transferred to work at the Paige Hall dormitory. Mr. Hardy began to tell me about his relationship with another female employee and to ask me questions about my personal life. He also asked me a lot of personal questions about a female co-worker that was my friend. This quickly became more direct and he would talk openly about his sexual preferences and activities. I let him know that I did not want to discuss this with him but he became more aggressive.



Mr. Hardy frequently told me that he "loved big titties" and asked me to let him suck my breasts. While I was sitting at my desk in the dorm on one occasion, he reached around me from behind and grabbed my breasts in his hands, stating that he wanted to "get a little feel" before another co-worker came into the office.

3.    In addition to his direct sexual overtures to me, Hardy talked on a regular basis about his sexual prowess and relations with other female workers at the Mount Meigs campus. For example, Hardy has stated to me that he can not "f--k all night like he used to" and that he could "only f--k real hard for 5 or 6 minutes" at this time in his life. Mr. Hardy told me that there could be "benefits" on my job, like getting to arrive late and leave work early, if I was his friend. Because of the many instances of sexual relationships among employees and between students and employees at Mt. Meigs, I understood Mr. Hardy was seeking a sexual relationship and he confirmed this very quickly.

4.    Mr. Hardy on one occasion requested that I "suck his d---k". When I refused his "request", he offered me money and other material objects if I would perform this act of oral sex on him. I was greatly offended by his conduct and told him that I was not interested. The next day he asked me if the reason I turned him down was because I had another boyfriend. I told him that I just wasn't interested. Hardy also commented to me regularly of his abilities with regard to oral sex and asked me to let him perform oral sex on me. I always declined this invitation and requested that he leave me alone. He told me that he had been having another relationship with an employee but that he really wanted me. He also told me that he had been accused of sex discrimination before and that he had "handled" it. I have asked, through my attorney, for records and other

2

# HARDY V. WOOD

## BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

# EXHIBIT

# 5

## TAPED INTERVIEW WITH MICHAEL HARDY

MS. SPANN: Michael Hardy of Paige Hall. Today is the 28th of June. And we're here today regarding a complaint of sexual harassment from Ms. Tara McMillan from the Mt. Meigs campus.

And first off, you are aware, Mr. Hardy, of the Department's Sexual Harassment Policy.

MR. HARDY: Yes, I am.

MS. SPANN: Yes. And the Department takes that very seriously. As you know.

MR. HARDY: Me too.

MS. SPANN: And Mr. Wood has assigned this complaint to me. And as you are aware, Mr. Wood has zero tolerance for sexual harassment complaints and sexual harassment issues in the department, be that staff on staff or staff on students, whatever the situation. So he just has zero tolerance for that, and he's assigned me to investigate this complaint. I have no preconceived opinion one way or the other. I don't have any judgment against anyone, and I'm just here to try and gather the facts and get them all together, and see what we can come up with.

So, you know, whatever we discuss is totally confidential. I'm not going to be sharing it with anyone who doesn't have a need to know. I'm not going to be divulging it to just anybody. So, you know, please know that, you know, whatever we discuss is confidential.

MR. HARDY: Okay.

MS. SPANN: And, you know, you can certainly trust me, and I trust that you won't be running around also divulging information about what we discuss.

MR HARDY: No, ma'am, I won't.

MS. SPANN: I understand. But, you know, we have to share this information with you so that you won't. Again, you know, that is the policy is taken very seriously, and there are consequences if the policy has been --

MR. HARDY:  Violated?

MS. SPANN: Exactly. I couldn't think of the word. Yes, if the policy has been violated. So, we're just here purely to get the facts. And just because we're here doesn't mean that anyone's guilty. We're just trying to gather facts to find out what, what, if anything, happened or didn't happen. So, that's all. And just because we're here, it's just to find out.

EXHIBIT

5

Obviously, you know, sometimes people – it's he says, she says, so a lot of times it never leads to anything, so it's just a way for us to find out. Okay.

And so I'm nonjudgmental. I don't have preconceived notions about any of it. So, I hope that, you know, you can be comfortable with me. And I'm comfortable with you. And you can tell me anything and I don't, you know, I don't hold it against you, and you certainly don't hold anything against me. You know, and when you leave here we're still, you know – this is a job and you have a job, and we all have to work together. So, you know, we're just doing what we have to do.

MR. HARDY:  Okay.

MS. SPANN:  Okay.  So, now, how long have you been with the Department, Mr. Hardy?

MR. HARDY:  Since June of 1987.

MS. SPANN:  And your position is?

MR. HARDY:  Counselor I.

MS. SPANN:  Counselor I.  And you're currently the unit manager of --

MR. HARDY:  Paige Hall.

MS. SPANN:  -- Paige Hall.  Okay.  And how long have you been in Paige Hall?

MR. HARDY:  I went to Paige Hall over in 1995.  I had a, probably about, a nine-month departure to go down to over to a new program, the ABSOP II Program in Holloway Hall.  Then I went back to Paige Hall.  So approximately 10 years, 9 or 10 years.

MS. SPANN:  So you've been in Paige Hall about 10 years.  Okay.  Has a lot of the staff been with you for that long?

MR. HARDY:  We have basically new staff now.

MS. SPANN:  Okay.  I know Mr. Dortch has been a long-time employee, hasn't he?  I think he's invested 10 years.

MR. HARDY:  Right.  He's downstairs in (inaudible).

MS. SPANN:  Oh yeah, that's right.  I forget who they gave it to.  Yeah.  Okay. Now, Ms. McMillan, Tera McMillan, are you familiar with her?

MR. HARDY:  Yes, I am.

MS. SPANN: Okay. How long has she been one of your staff?

MR. HARDY: Approximately, I'm guessing, probably two and a half years.

MS. SPANN: Okay. And you – obviously you know her?

MR. HARDY: Right.

MS. SPANN: Okay. Now, she was with you – has she always been at Paige?

MR. HARDY: Well, I think when she first came on board, even then, I was then a unit manager at Holloway. But she transferred from Holloway to Paige Hall with me.

MS. SPANN: Okay. Was that her decision or did Ms. Coles move her or how did that come about?

MR. HARD: Everybody that was down in Holloway Hall had a choice of staying there or to move into Paige Hall. And she chose to move to Paige Hall.

MS. SPANN: Okay. She went the same time as you?

MR. HARDY: Huh?

MS. SPANN: She went with you –

MR. HARDY: Right.

MS. SPANN: -- at the same time?

MR. HARDY: Right.

MS. SPANN: Okay. Since she has filed this complaint, have you talked to her?

MR. HARDY: No, I haven't.

MS. SPANN: Do you know if anybody else has talked with her on your behalf?

MR. HARDY: No, they haven't. Not to my knowledge.

MS. SPANN: Now, she came with you from Paige –

MR. HARDY: Right.

MS. SPANN: -- I mean from Holloway and wanted to come. Why now, all of a sudden, would she want to leave your dorm?

MR. HARDY: Um, let me go back some time. All this came up, to the best of my knowledge, all of this came about probably about two months ago, at which point, probably about the last part of May. Because she called – she called me one day, it was like about five o'clock, it was a Friday, and she called me and she say, "Well, Mr. Hardy, can I talk to you?" Then I said, "Yes." I said, "I'll meet you back at work." I had left work. She said to me, she said, "Well, I'm on my way back from Birmingham." She said, "Can I meet you in Montgomery somewhere?" Then I say, "Sure." I said, "Where?" And she said, "At the McDonald's over by your house." Which it's like two - - the McDonald's is, like, four buildings down from my house. I say that's just correct, you know, for here from proximity to where I am.

So I met her at the McDonald's. At that point she was talking to me, she said to me, she said, "Mr. Hardy," she says, "I need to spend some more time with my son." And she said, "Can I get my schedule changed?" Then I said, "Well, what are you asking me for specifically?" She says to me, she said, "Well, I wanted to know, since you have started coming in some mornings," she said, "could you come in and relieve me?" I said, "No, I'm not going to do that." I said, "The mornings in which I did come in early, I came in for (inaudible)." And then so she walked – "Mr. Hardy, let me just explain to you what's really happening." She said, "I have another job." And she say, "I'm the only person in the office. Another guy works outside the office." She said, "I would need to be in the office, you know, to make sure everything get done." I said, "Ms. McMillan," I said, "No, I can not do that. I'm not going to do that." So, at that point I said – she said to me, "Well, I really need this job." So I said, "Okay." I said – then I said to her, I said, "Well, I can't do it."

I finally learned from talking to other people on campus that she had also talked to ▓▓ ▓▓▓▓▓ who's a unit manager, and asked to work their (inaudible) shift. Mr. Bowlin referred her to ▓▓▓▓▓▓▓. Okay. I also learned from the note in the management meeting that the counselor – excuse me, the specialist in the campus administrative, that she had gone to talk to Mr. Harley about going on extended leave. Okay. So Mr. Harley then – based on the minutes, said, "No. We can't do that. The only thing you can do is FMLA for an extended period of time."

So based on those things happening, the assumption is that, based on what she told me, and based on the fact she had tried to talk to other people about attending (inaudible) shift, that she wants to leave Paige Hall specifically to work a secondary job. And also she did inform me at that point, when she did talk to me, that that was the reason why.

Can I say something else?

MS. SPANN: Certainly. Yeah.

MR. HARDY: Okay. Let's go back. Let's go back. Okay. Keep in mind – Well, let me explain the situation to you.

MS. SPANN: Yeah.

MR. HARDY: Here's a person, okay, that's been in Paige Hall that had it real good.
You know, I mean, loved it. Up to a certain point. Now something had to have
happened during a certain point to create that environment where by the end of it --
That's why I'm going back to the fact that your secondary job.

Okay. Now, she was transferred. We had a staff to resign some time in January, I'm
thinking. She was transferred to the 12 to 8 shift on February the 5th, okay, of this year.
February 5th. Now, according to my documentation, looking through time and
attendance, there are only two occasions, one for ten minutes, another one where I came
to work up in ▒▒▒▒▒▒, where I came to work at 7:15 one morning, and that's because
we had a fight or something (inaudible). And another time I came in at 7:50. Okay.
Now there are four month, five month period whereby I had only two contacts with her.
Two contacts. Two. One – and I can't recall even talking to her these days based on the
documentation. One for possibly a 45 minute period whereby the students were nearby,
just up and moving down to the school and whathave you. And another 10 month – 10
minute period whereby I came in at 7:50 one morning. Okay.

Now, keep in mind also that from 6/1 which is the date when my son went into the
hospital, I always took Hardee's by him about six. Six I was out. I came back in for two
days, I think. I worked for 2 days. I went back out again, okay. Stayed out. Went to a
workshop for a week, basically. And then while everybody is out of pocket, inclusive are
the campus administrator, inclusive my supervisor, she had already talked to about
transferring and also about going on leave. So then she goes out, for whatever reason,
and say, Well, hum, let me go talk to Ms. Rankins again. Okay.

Now, based on what my knowledge is of the situation, when she went and talked to Ms.
Rankins – so the sexual harassment came up then. At that point, they sought my
knowledge of what was told to me that Ms. Rankins said to – Whoa, hold up for a
minute, after hearing -- which is another violation I feel -- but after hearing it, Ms.
Rankins say, Well, this is a sexual harassment, and so I have to set you up now, let you
talk to someone else. She said to Ms. Rankins, I already know the sexual harassment
policy, Mr. Hardy covers it all the time. Every staff meeting, Mr. Hardy covers sexual
harassment. Why then, knowing policy as well as I do, would I put myself in a position
to be (inaudible).

Keep in mind, based on the documentation, everything I say can be documented, that you
have made several attempts to, not to mention the fact that you have talked to people on
12 to 8 shift which they said, and then she said, Well, I'm going to get Mr. Hardy
because he's interfering with my job, this, this, and this. Okay. And another thing that
happened, when everything did happen also during that time, there was a staff, Mr.
▒▒▒▒▒ – because she was working – she's off on Friday and Saturday – Okay. Mr.
Harvis is off on Sundays and Monday. We were one staff short. Mr. Harvis put in some
leave to be off that on two occasions that Friday, which would give him Friday, Saturday,
and Sunday. Her off days changed then to Thursday and Friday because he had three
people working on Thursday. She got mad at that too. "But Mr. Hardy you can't change
my scheldule." As a matter of fact, she said in a staff meeting, she said, "Mr. Hardy,

well I would like to know the next time that you change my schedule that you let me know in advance." I said, "I will make every effort to." I said, "Just like sometimes people call in at the last minute, schedules has to be adjusted at the last minute also." I said, "That's a two way street, but I will make every effort to."

Keep in mind also that staff meeting was the first Wednesday of this month. Which I always have staff meeting first Wednesday. So at that point, everybody left. So now you come back whereby no contact with her now. Keep in mind no contact with her. You come back and while I'm down in Eufaula, then I learn here's a possible sexual harassment charge. Doesn't meet the (inaudible) of sexual harassment by no standards, based on my explanation of it. Here's a person that wanted to get out of Paige Hall because of conflict with another job one. And here's a person also in that staff meeting where I told everybody I'm holding them accountable according to what the policy say you supposed to be doing.

So be confident then you (inaudible). And we (inaudible) too. Which the other issues I have is that my character is being attacked.

Now, keep in mind also, and she knew this, it looks like she had some help too, but that's another story, but she knew this. She said, Okay, hmm, I'm going to get him when he least expects it. I'm out of town. I'm out of pocket. I'm out of town. I'm dealing with my child. So I'm going to get him now. No way possible that's sexual harassment. No way possible.

MS. SPANN: I understand what you're saying, but I do have to —

MR. HARDY: I understand. I fully understand. And (inaudible) I do understand. And if I'm a little emotional, I think you pretty much can understand that. But.

MS. SPANN: I do. But I want you to say everything and anything that you feel like you need to say, because I need to hear it.

MR. HARDY: And also, I'm about the last several breakdowns, I feel that basically my understanding of the policy — now, I understand sexual harassment, I'm a policy person, I read policy all the time.

MS. SPANN: Right.

MR. HARDY: I try and follow policy. Anybody who knows me will say that. Here's the problem, okay, you hear the complaint, didn't you.

MS. SPANN: Uh-huh.

MR. HARDY: Okay, now. Based on he said again, just — I'm quite sure you ask people, they'd have to tell the truth about some things. You get a complaint in, now, if the court

were to (inaudible) and they must have been well trained in this, if they court whereby had any sexual connotation behind it, you'd have to stop it.

MS. SPANN: Right.

MR. HARDY: Because my confidentiality is at stake, and my reputation, and my case.

MS. SPANN: Exactly.

MR. HARDY: If you heard that complaint, you're in violation for even hearing the complaint. Based on what I heard, and I don't know this for a fact, but I can't even find out because I haven't been back to work, you know what, they didn't come up here, they went to someone else first.

MS. SPANN: Uh-huh.

MR. HARDY: Which is another violation.

MS. SPANN: Uh-huh.

MR. HARDY: As a supervisor we've got to know it. And now, people walking around here saying, Guess what. Now, I've got six years before I can retire. Six years this will hang over my head. For what? Because someone did not follow policy.

MS. SPANN: Well I—she—Ms. McMillan told me she did not intend to tell Ms. Rankins, if that's who you're referring to.

MR. HARDY: I am.

MS. SPANN: And it just kind of came out. She was so upset. And then Ms. Rankins listened. And then Ms. Rankins sent her up here. And then I don't know if Ms. Rankins told anyone or not. And it's unfortunate if she did. But I want you to know, I haven't told anyone, because it's my job, and I don't tell anyone.

MR. HARDY: You know, and I believe that.

MS. SPANN: But all I can do is apologize for Ms. Rankins or whoever else.

MR. HARDY: Keep in mind, keep in mind now, as I said, that, which is a lie, again—now, I'm not talking about you, I'm talking about (inaudible)—which is a lie again, as (inaudible) as I stated, as a (inaudible), you know I know that if staff come in my office and say, Mr. Hardy, such and such, such, touched me inappropriate. Stop. I can't you hear you. Stop it. (inaudible) I know this. Keep in mind that when Ms. Rankins pulled out the policy, Ms. McMillan said to Ms. Rankins, "I understand the policy. Mr. Hardy told policy all the time." Keep in mind, now, she had weighed it down to during the time whereby she was waiting til Ms. Rankins right to do an interview. She waited. She

wasn't upset, she waited, and laughed. As a matter of fact, she saw a staff in Paige Hall and she asked the staff in Paige Hall, "How is Mr. Hardy's son doing?" You're not upset.

MS. SPANN: Well, again, all I can do is apologize for staff.

MR. HARDY: I understand. I do understand.

MS. SPANN: And we have trained and trained. You know, yourself, we have trained and trained and trained staff on this. And continue to train staff on the sexual harassment policy. And they just don't get it.

MR. HARDY: And, Ms. Debra, I understand. I understand mistakes. I understand people make mistakes. But I also understand people gossip. And the gossip to personal attacks. I understand that. When people start to gossiping, that's another whole issue. And I'm not going to get into that right now because I know who the players are. I do. I knew who the players are. When people started gossiping, and they knew, could you — well, I'm venting right now — could you imagine that I come back, I get a call from ▓▓▓▓▓▓ on Thursday saying this, I might — ▓▓▓▓ might be (inaudible). I said (inaudible). So I'm really upset now with this. I said, Okay. I said, "Well, let me call you back."

In the process there are, (inaudible) of a sexual harassment. I said, "Sexual harassment. Whoa." Call her back, she goes, "Mike, I just can't take anymore." Friday I got to come back and say, "Linda, let me explain something to you." Why? Because now it's the buzz. Everybody's buzzing. It went from, based on what I was told, "This will be confidential." It went from Ms. Rankins to Mr. Booker to you. That's a violation.

MS. SPANN: Uh-huh.

MR. HARDY: You don't have no confidentiality of that no more.

MS. SPANN: Uh-huh.

MR. HARDY: You know. And basically the fact like I said, I can prove without any doubt that this person said on numerous occasions that she was going to do it. I can prove that (inaudible) her trying to get out by talking to those people. I can prove prior to the fact of her, which is documented and admitted, prior to the fact of her filing this that — or even stating this that she went to my supervisor and asked to go on leave. All those — that's not even questionable documents. Thoroughly documented. I can prove based on the fact that she got moved to a shift February 5th, 12 to 8 shift, I can prove the signs that she left on my car that go on two pages, whereby people around us all the time. I can prove all of that.

MS. SPANN: I understand. Don't you see how that violations of those policies can hurt people.

MR. HARDY: Real bad. Can you imagine me being officer in my church having to go to church (inaudible). And people out here work in the same district. So I got to set up in front of people and feel like smiling, because that's the way they expect me to be.

MS. SPANN: Uh-huh. It's tough.

MR. HARDY: And why?

MS. SPANN: That's why the policy is designed to protect people in your situation. Not that you are guilty by any means, and that's not what I'm implying.

MR. HARDY: I understand what you're saying.

MS. SPANN: But that's what the policy is designed to do, it's designed to protect you. And I don't know, maybe Ms. Rankins felt like she needed to advise her supervisor that someone in her, quote, supervision, had been accused of this. Maybe that's what she felt like Ms. Coles would do. Ms. Coles wasn't there, and so she felt like she had to advise someone. I don't know. Maybe she thought she was doing the right thing.

MR. HARDY: And again, I understand that Ms. Spann. And I'm not differing with you, but then I can look at it from the standpoint of here's another person who violated our policies.

MS. SPANN: Uh-huh. Right.

MR. HARDY: Here's another person.

MS. SPANN: I understand totally.

MR. HARDY: You see, I understand all of that. I understand having to advise. I understand that, fully understand that. But then here's another person.

MS. SPANN: I know. I know.

MR HARDY: Who's been at this Department 18 years.

MS. SPANN: Uh-huh. I know. It can ruin your life. And I know you have to work with these people, side by side.

MR. HARDY: Every day, ma'am.

MS. SPANN: Uh-huh. Uh-huh.

MR. HARDY: Every day. Not to mention the fact—and then something else that -- I'm concerned about one, my family, and I'm concerned about my truck (inaudible) this job.

MS. SPANN: (inaudible) because whether or not you're guilty (inaudible).

MR. HARDY: Uh-huh. Based on their standards. You know what the bad thing is, Ms. Spann? There's some people up here who (inaudible). Who advised her too. They got into all that. And when I get back to work, I'll be in the program. I don't want to deal with that part right now.

But see, they didn't know. They didn't know all the details about it. It will be translated, you don't be doing shit ?? , because Oh we got something on him that sounds bad. But they didn't know all the facts, all these other things that she was doing.

MS. SPANN: Uh-huh. Uh-huh.

MR. HARDY: That's why I want a transfer to VACCA, because I don't know who's going to hire me. And it's just (inaudible) to be difficult. Stress, a lot of stress. A lot of stress. No one can ever imagine. Because one thing I pride myself on is priority and (inaudible). (inaudible) all these shift (inaudible) might not like it. But if you don't like it, don't ask me any questions. I try to give facts to them. Saying this is what my question is, I'm going to give her the right answer, that I feel is right.

MS. SPANN: Uh-huh. That's the way I am, don't ask me unless you want me to tell you.

MR. HARDY: Uh-huh. And some people didn't like some things I said, I know that. But that's okay. That's between them and God.

MS. SPANN: Uh-huh.

MR. HARDY: I don't have to worry about that.

MS. SPANN: Uh-huh.

MR. HARDY: That's between them and God. And this will be okay. Am I worried? This is not about them. I'm worried about my character, you know. I'm worried the fact that I can say (inaudible). I'm worried about the fact that working on the job whereby being in management, supposed to understand, and they don't — I think a lot of people know I said this and this. But this is all about — I think now they are beginning to, because now people — the first week or so — that's why (inaudible) guards was liking me because the fact that I didn't make them do the work, for a while. Because everybody been (inaudible) Whoa, whoa, whoa, that Mike Hardy. Whew. On the third shift. (inaudible) She's done too much talking already. You can't stop it now. "I don't want anybody to say I said anything." but she's been talking all the time.

MS. SPANN: Let me ask you a few questions.

MR. HARDY: Sure.

MS. SPANN: Based on what she said.

MR. HARDY: Uh-huh.

MS. SPANN: And we'll see if we can't see what happened, or not. You know what I'm what I'm saying.

MR. HARDY: Okay. I understood you.

MS. SPANN: Okay, now, you already stated that you assigned Ms. McMillian to the 12 to 8 shift.

MR. HARDY: Right.

MS. SPANN: Now, she says that you assigned her to that shift when three other men wanted the shift. She stated she feels like it may be because she had talked to Mr. Bolin about a transfer. Can you make some comment to that?

MR. HARDY: She was most definitely transferred. Okay. Keep in mind as proof as stated prior to the enroll list, she talked with Mr. Bolin probably about a month or so ago, two months ago. She was originally assigned that shift February the 5th. Okay. Those two times does not mingle. Okay. She was making it seem like it was a problem. And yes, there was some other guys that requested that shift, but part of my responsibility is to put the people in the right position. Keep in mind, if I have two females and we're short, versus two males, then I need a female in a position whereby it'd going to hurt the dormitory to leave.

MS. SPANN: Uh-huh.

MR. HARDY: Okay. And the person that transferred from that shift, that left, was Ms. Howell, who left, was a female. So therefore in order to (inaudible) the dormitory, I put another female back on that shift. At which time, she never questioned that.

MS. SPANN: Uh-huh. Okay. So it didn't have anything to do with her —

MR. HARDY: No. Absolutely not.

MS. SPANN: And it wasn't in retaliation for anything?

MR. HARDY: No. No.

MS. SPANN: Okay.

MR. HARDY: As a matter of fact, I asked her, as I always do anybody, is that if it's going to create a hardship for you, you know. I mean. Now she is correct in (inaudible) that later, later on some guys said, "Well, I want to work it. I want to work it. Can I

work?" Two in particular that probably asked to work it. But I didn't feel like (inaudible.) But the main point then that she was originally assigned February 5th. She talked to Mr. Bolin, based on my knowledge, sometime in the next month later.

MS. SPANN: Uh-huh. Okay. Is it an accurate statement that you told Ms. McMillian she couldn't transfer out of your dorm for two years?

MR. HARDY: No, Debra, that's not true. I brought up – I had – What I told her was that I had learned that she had talked to Mr. Bolin about (inaudible). And I said to her – keep in mine earlier I mentioned the fact that I told her I would reasonably work with her. She asked me to work that—come in and releave her, and I said I wasn't going to do that, then after agreed that I would reasonably work with her.

MS. SPANN: Uh-huh.

MR. HARDY: Okay. What I did tell her, I said that, I said to her, I said, "Ms. McMillian, based on my knowledge of it, there's a waiting list for people to transfer."

MS. SPANN: Uh-huh.

MR. HARDY: A waiting list. So to say that I told her two years, no. Now that could have been implied, but I did not say that.

MS. SPANN: Okay. Why do you think she would have thought that it would have been two years? Where do you think she got that?

MR. HARDY: Because it's common knowledge, for example, using one dormitory in particular, he could probably transfer from Holloway Hall, Mr. Gary, staff like Mr. Gary for example, he's been trying to transfer ever since he's been down there. That's just common knowledge, that staff been trying to transfer from one dorm to another dorm and the waiting list has been exceptionally long and the time of it.

MS. SPANN: Uh-huh.

MR. HARDY: Keep in mind also that we just had a staff, Mr. Steele, who was in Paige Hall, he was a shift supervisor who was trying to transfer at one point.

MS. SPANN: Uh-huh.

MR. HARDY: Okay. So, I think from talking to people, I think some things are common knowledge.

MS. SPANN: She also states that you told her the only reason Christy ?? had got transferred was because he was White.

MR. HARDY: No.

MS. SPANN:  Well, why would she say something like that?

MR. HARDY:  I have no idea.

MS. SPANN:  Christy—How long has Christy been with the Department?

MR. HARDY:  Twenty-something years.

MS. SPANN:  That's what I'm thinking.  He was—was Christy in your dorm?

MR. HARDY:  No.

MS. SPANN:  No.

MR. HARDY:  No.  Could I say something else?

MS. SPANN:  Sure.

MR. HARDY:  It appears that based on the questions that are asked so far have been associated with being transferred to a particular dormitory, not just transferring—

MS. SPANN:  Uh-huh.

MR. HARDY:  -- to ITU.

MS. SPANN:  Uh-huh.

MR. HARDY:  That goes back to my theory, it's not about transferring.

MS. SPANN:  Uh-huh.

MR. HARDY:  It's about transferring to a particular dormitory.  More specifically a particular dormitory with a particular shift.

MS. SPANN:  Uh-huh.  Okay.  You think (inaudible) that a particular shift of what?

MR. HARDY:  She was sick.

MS. SPANN:  No.  Now you mentioned Mr. Smith.

MR. HARDY:  Uh-huh.

MS. SPANN:  Now he was the (inaudible)?

MR. HARDY:  Right.

MR. SPANN: Why did he transfer out of your dormitory?

MR. HARDY: There were two occasions when Mr. Smith got letter of reprimand.

MS. SPANN: Uh-huh.

MR. HARDY: Okay. Both of them said it was falsification. Okay. Mr. Smith felt that I should have supported him more (inaudible) in those two particular cases. As a result of him feeling that I did not support him, he chose to transfer.

MS. SPANN: Okay. The letters of falsification of what?

MR. HARDY: On one occasion he signed in somebody and worked for someone that didn't work. I can't recall his last one.

MS. SPANN: She said — Ms. McMillian alleges that he transferred out of the dorm because of some rumors. Apparently the rumors involved something that was going on. Are you aware of these rumors?

MR. HARDY: No.

MS. SPANN: Apparently you told her that these rumors were true.

MR. HARDY: (inaudible).

MS. SPANN: Apparently they involve women. No?

MR. HARDY: No.

MS. SPANN: No. You don't know anything?

MR. HARDY: No.

MS. SPANN: Okay. I don't have all of the details, but she said you and he, I'm not certain if it was a competition or exactly what it was, but perhaps he got a woman that you were interested in or whatever the situation was, or you got a woman who was interested, I don't know, and so he transferred out of the dorm.

MR HARDY: Absolutely not.

MS. SPANN: That doesn't sound familiar to you?

MR. HARDY: No. I understand what she's implying, but that's not true.

MS. SPANN: She alleges that you touched her at work. ?????

MR. HARDY: No, ma'am. No.

MS. SPANN: No. Do you have a clue what I'm talking about?

MR. HARDY: Yes and no. There were -- As far as me talking to her, no. But I think what she's talking about the fact is that Mr. Smith supposedly had been talking to another female staff on campus. I think that's what she's talking about.

MS. SPANN: Okay. What has that got to do with you?

MR. HARDY: Nothing.

MS. SPANN: So he transferred out?

MR. HARDY: No. No. I'm saying it had nothing to do with him transferring.

MS. SPANN: I'm not sure I understand.

MR. HARDY: Okay. Okay. You asked the first question why— do I have any idea what she's talking about.

MS. SPANN: Uh-huh.

MR. HARDY: Okay. Okay. I answered that question. My answer to that question was, I think she's talking about the fact that Mr. Smith (inaudible) had been talking to a staff that's on campus. Your second question was, did it have anything to do with me. My answer to that was no, it didn't have anything to do with me.

MS. SPANN: Okay. Ms. McMillian alleges, or she has heard, she has not seen it or witnessed it, that you have harassed other female staff on campus that may or may not still be with us. Would you say that this is a true statement?

MR. HARDY: Absolutely not.

MS. SPANN: In particular, Ms. Maton.

MR. HARDY: Uh-huh.

MS. SPANN: Or Ms. Howard.

MR. HARDY: Absolutely not. (inaudible) Ms. Howard called when my son went in the hospital. Which I didn't talk to her, she left a message on my phone, I'm sorry. I heard your son— we'll keep praying for you, yada, yada, yada, yada, yada.

MS. SPANN: Isn't that nice?

MR. HARDY: These are staff that -- kind of like a family.

MS. SPANN: Uh-huh.

MR. HARDY: I'm not concerned about that any. (inaudible)

MS. SPANN: Well, I would rather to ask you —

MR. HARDY: Understood. Understood.

MS. SPANN: And now you just answer and share whatever information you need to. Okay. I have been told that you have merchant days that staff can purchase from you --

MR. HARDY: Uh-huh.

MS. SPANN: Sweatsuits, purses, athletic apparel, things along those lines. Is that true?

MR. HARDY: Yes, I did sell merchandise.

MS. SPANN: Okay. And what type of stuff do you have?

MR. HARDY: I have purses, some clothing, men's suit, dress ware, casual wear, t-shirts, stuff like that.

MS. SPANN: Do you have a store or something?

MR. HARDY: I don't have a store now, but I've had one in the past.

MS. SPANN: Is it — do you just sell to people in your dorm, or do you sell to anybody, or what — how —

MR. HARDY: Mostly I have — I have an established clientele (inaudible). And normally those people will call me when they need something. For example, at — using men's suits for example. I do Miller ?? , I do singing groups, I do different, you know, we have young people that buy from me. I have the same clientele to today that calls me when they need something.

MS. SPANN: Do you have a lot on campus that purchase from you?

MR. HARDY: In the past we have. When I say in the past, I'm talking about maybe a few years ago. I have not — I have not sold to anyone in campus probably at least in the last three years.

MS. SPANN: When you do sell on campus, there're not — I mean it's not a condition of employment —

MR. HARDY: No.

MS. SPANN: -- or nothing like that? I mean, they don't --

MR. HARDY: No.

MS. SPANN: -- feel like they have to or anything like that?

MR HARDY: Absolutely not.

MS. SPANN: Okay. You just -- how do you do it? Let me ask you that.

MR. HARDY: Normally a person would come to me and ask me a question about something.

MS. SPANN: Uh-huh.

MR. HARDY: And, for example, they would say, Mr. Hardy I saw this purse at Gayfer's, style number such, such, such, can you get it for me?

MS. SPANN: Uh-huh.

MS. HARDY: And then I would say, I'll check and see. And if I could, then I would call them back and let them know, Yeah, I can get it. If I can, I'll (inaudible).

MS. SPANN: Okay. And then you can get it for a good price?

MR. HARDY: Right.

MS. SPANN: Okay.

MR. HARDY: Yes, I can.

MS. SPANN: Well, that's pretty cool. Okay. (inaudible) to save them a lot of money.

MR. HARDY: Now, forty percent mark up (inaudible).

MS. SPANN: Don't it though. Well, that's nice. Does staff -- do some of your staff feel obligated?

MR. HARDY: No.

MS. SPANN: No.

MR. HARDY: Absolutely not. I can't say the staff have never inquired before, but I can say in the last year, I haven't had staff inquire about buying anything.

MS SPANN: Do you know has Ms. McMillan ever bought from you? Do you remember?

MR. HARDY: I want to say yes, she has. I want to say, yes, she has. To the best of my knowledge, a purse. To the best of my knowledge, that was the purse that was about a year and a half ago.

MS. SPANN: So where do you get this stuff? Like, you just have a license and then you just—

MR. HARDY: You can have a peddler's license, small business license, what have you, and wholesale license. What happens is that you're a trading company. It's kind of like I'm going online versus a trading company. And you get in with a trading company and they buy stuff in bulk. And there are magazines that comes out to dealers. One is like called "Closeout News," for example. They have a listing of all the surplus stuff and that they can sell. The magazine probably got about over a thousand businesses in there. So if there's something that you wanted, then you have the—you can call that business and say, You know, how much are you selling this right here.

MS. SPANN: Uh-huh. Neat. Have you ever asked any of your staff to falsify any of the books or log books or anything with a log?

MR. HARDY: No. What I have done is I quieted down some. You might get a phone call, for example, and let's say you do it on a sheet of paper, and they might not transfer the information to the appropriate form at the time whereby they—just phone calls for example. But they actually want to talk to (inaudible).

MS. SPANN: What about the chemical book.

MR HARDY: What happened with the chemical book is that when we were told that we had to do the chemical, you know, complete—keep documentation on the chemical book, Ms. McMillian wanted to sign that time of doing that. And there was an occasion whereby she did take the book home in order to catch up on the chemical book.

MS. SPANN: Uh-huh.

MR. HARDY: Okay. Now, if she's construing that as falsifying, I'm going to say it's not. Okay. It wasn't asked—I didn't request that. I came in one day to check the chemical book, and I said, "Who has the (inaudible) of the chemical book?" "McMillian has the (inaudible) and chemical book." Now keep in mind, as I said before, is that most of the time, not (inaudible) information is transferred from one sheet of paper to the (inaudible). So, and I think that that's what she was speaking of at that time.

MS. SPANN: She said she left in January, and she kept the chemical book until like March or April.

MR. HARDY: No.

MS. SPANN: How do you feel about that?

MR. HARDY: I would say that's not true. I would say that she did get them — I am eluding to the fact — I am acknowledging the fact that she did have the chemical book. To the best of my knowledge, I'm going to say for a couple of days.

MS SPANN: Uh-huh.

MR. HARDY: I'm going to say for a couple of days.

MS. SPANN: A couple of days, but perhaps not a couple of months?

MR. HARDY: No.

MS. SPANN: What would be your response if she said that you told her just to make the stuff up?

MR. HARDY: I would say she's lying.

MS. SPANN: Have you ever heard the statement or perhaps made the statement "The Mount Meigs Clique"?

MR. HARDY: No.

MS. SPANN: Have you ever heard it?

MR. HARDY: Yes.

MS. SPANN: Do you know what it means?

MR. HARDY: No.

MS. SPANN: Okay. But you have heard it?

MR. HARDY: Right. Matter of fact I heard management saying it.

MS. SPANN: Okay. But you don't know what it means?

MR. HARDY: No. I have an understanding, but I know — I mean my opinion of it if you would like me to share that.

MS. SPANN: Yes, please.

MR. HARDY: I think what they're saying is that there Mount Meigs pretty much stay together especially (inaudible) clique, we stay together. We try and help each other in training staffs.

MS. SPANN: Okay. Would you say that you're a member of that?

MR. HARDY: No.

MS. SPANN: No?

MR. HARDY: No, I'm not.

MS. SPANN: Okay.

MR. HARDY: That's (inaudible). I would go as far as to say now that I'm by myself. No respect. And that goes towards to saying that friends or hanging with somebody or whatever, I see them in Paige Hall, I go home. That's pretty much it. I don't go down to their office and talk with anybody. I don't hang around anybody. Now, have I talked to people more in the past than I do now? Yes, I have. Now, I don't do any of that.

MS. SPANN: This is since when?

MR. HARDY: About a year and a half, two years.

MS. SPANN: And what brought that about?

MR. HARDY: Broke. Focus. The death of my mother and grandmothers, just everything.

MS. SPANN: Now, we've kind of (inaudible). Some things don't matter as much.

MR. HARDY: (inaudible) just dealing with priorities is that at one point, I dilly dallied wanted to be (inaudible) about everything as far as management, upper management, middle management, lower management, peers and everybody, to try to find out if I really wanted to be promoted. That's not an issue with anybody.

MS. SPANN: Okay.

MR. HARDY: I'm not concerned about that.

MS. SPANN: Okay.

MR. HARDY: (inaudible).

MS. SPANN: Okay. Ms. McMillian said that you told her that you've gotten out of a lot of stuff because you can write well. What do you mean by that?

MR. HARDY:  I never said that.  I think I can write well.

MS. SPANN:  All right.  You've said that.  Why would she have said something like that?

MR. HARDY:  I don't know.  But I would have to say that all these things that Ms. McMillian is talking about now, that she's (inaudible) all this time, why talk about it now?

MS. SPANN:  Uh-huh.

MR. HARDY:  So she knows her motive.  I don't know that.

MS. SPANN:  Uh-huh.  Did you go to Ms. McMillian's past (inaudible) Christmas parties.

MR. HARDY:  Yes, I have.

MS. SPANN:  Why would you go?

MR. HARDY:  (inaudible) dropped her check off.

MS. SPANN:  Okay.  Did you stay?

MR. HARDY:  Probably five minutes.

MS. SPANN:  Did you have a drink?

MR. HARDY:  (inaudible).

MS. SPANN:  Was anybody else there?

MR. HARDY:  (inaudible).

MS. SPANN:  Did you have a conversation with her?

MR. HARDY:  (inaudible).

MS. SPANN:  Did you have a drink?

MR. HARDY:  No.

MS. SPANN:  Did you take your shirt off?

MR. HARDY:  No.

MS. SPANN: Did you know where she lived before you got there?

MR. HARDY: No.

MS. SPANN: You only stayed just a few minutes?

MR. HARDY: (inaudible).

MS. SPANN: Yeah.

MR. HARDY: Based on my understanding from your line of questions, obviously what I would say has to be truly blunt is the fact that I didn't know where she stayed. Okay?

MS. SPANN: Uh-huh.

MR. HARDY: Now, I acknowledge the fact that (inaudible) and I'm quite sure, based on the fact the question was asked to me that she did say that too. If I — If it's reasonable to assume if I had been there before, I'm quite sure she would have said that. If I had gone there afterward, I'm quite sure she would have said that too.

MS. SPANN: Uh-huh.

MR. HARDY: Okay.

MS. SPANN: Uh-huh.

MR. HARDY: So it's obvious that here's a time whereby I went there.

MS. SPANN: Right.

MR. HARDY: Which I'm acknowledging that.

MS. SPANN: Yes.

MR. HARDY: The other things that she's saying, totally out. If there was any intent there to drink or to do anything else, it's reasonable to assume then that I would have made some effort to go back. That didn't happen.

MS. SPANN: You do acknowledge that you went there and you stayed a few minutes?

MR. HARDY: Right.

MS. SPANN: And then you left?

MR. HARDY: Right.

MS. SPANN: That's what you're saying. Okay. They are alleging that you came, you talked, you had a couple of drinks, and you pulled up and you removed your t-shirt and you were, you know, fanning yourself, and you may have been rubbing yourself. Why do you think that they would have said those things?

MR. HARDY: The only reason that I could think of would be the fact that Ms. Harris and (inaudible) Ms. Harrison, Ms. McMillian, Ms. Harrison, Ms. McMillian (inaudible) they grew up together, went to the same school, you know, and she had to have — she had to find somebody to substantiate something and that's what she(inaudible).

MS. SPANN: But you're saying that — and don't let me put words in your mouth, correct me if I'm wrong — you went (inaudible) you didn't know where she lived.

MR. HARDY: Correct.

MS. SPANN: They are alleging that you knew where she lived.

MR. HARDY: No.

MS. SPANN: And you're saying that you didn't know where she lived and you went caroling simply to take her her check and you didn't stay but just a few minutes and you left.

MR. HARDY: Right.

MS. SPANN: They are alleging that you knew where she lived, you came and you stayed a while, had a couple of drinks, you may have removed your article of clothing or at least put it over your head, and you stayed a while.

MR. HARDY: (inaudible) No.

MS. SPANN: Okay. Have you ever talked about the red (inaudible)?

MR. HARDY: No.

MS. SPANN: Do you know what that is?

MR. HARDY: No.

MS. SPANN: I don't either. Do you have a clue why they would have said that you would have talked with them about that?

MR. HARDY: No. Because (inaudible) staff problems in Paige Hall we had a new staff that was Ms. — excuse me, that was Mr. McCord. And he was (inaudible) I heard staff talking. Mr. McCord had asked Ms. McMillian (inaudible).

MS. SPANN: Did you get in on that conversation, or you just were out there on the same (inaudible)?

MR. HARDY: I was out there walking out to my (inaudible) and overheard the conversation.

MS. SPANN: You didn't participate in the conversation?

MR. HARDY: No.

MS. SPANN: Okay. Did you ask Ms. McMillian's friend how much it would take to get her?

MR. HARDY: (inaudible).

MS. SPANN: Do you know why she would have said that you asked her that question?

MR. HARDY: I have no idea.

MS. SPANN: By "friend," do you know who I'm referring to?

MR. HARDY: (inaudible).

MS. SPANN: Uh-huh. Do you understand or know why she would have said that you asked her that?

MR. HARDY: No, I do not. My only thing could be — My only, my only, only thing I could think of is the fact that once you finally allege something, you see, you got to find some reason or some way to try and substantiate something.

MS. SPANN: Uh-huh.

MR. HARDY: So you go fishing.

MS. SPANN: Uh-huh.

MR. HARDY: Because she believed, based on, I feel her knowing me, that there's a possibility I'm going to file against her too.

MS. SPANN: Uh-huh.

MR. HARDY: So therefore you got to find somebody or something to substantiate something --

MS. SPANN: Uh-huh.

MR. HARDY: -- when you're fishing.

MS. SPANN: Uh-huh. Have you ever gotten behind Ms. McMillian when she's sitting at her desk in Paige Hall and cupped her breasts or fondled or her breasts?

MR. HARDY: Absolutely not.

MS. SPANN: There again, why would she say you had done that if you haven't done that?

MR. HARDY: I have no idea. My only reservation would be the fact is because like when I first started talking, here's a person who wanted to move out of the dormitory and basically in order (inaudible) they feel that for them to leave, they have to file some type of harassment charge. (inaudible).

MS. SPANN: Have you ever asked Ms. McMillian to meet you (inaudible)?

MR. HARDY: Absolutely not.

MS. SPANN: Have you asked her (inaudible) in person or on the telephone?

MR. HARDY: Absolutely not.

MS. SPANN: We have — Ms. McMillian says that you asked her on the telephone one time to do that when you guys were talking. I don't know at which point this (inaudible) that conversation, but she claims that you asked her (inaudible).

MR. HARDY: People (inaudible) that prior to I think around about May 27th or so when she contacted me, I had no way of contacting Ms. McMillian because the number that she gave her, was inoperable and that was for months.

MS. SPANN: Well she said this had been going on for two years. This wasn't just, you know. May 27th, did you say?

MR. HARDY: I think around May 27th.

MS. SPANN: Have you ever offered to give Ms. McMillian a monthly salary if she would be (inaudible).

MR. HARDY: Absolutely not.

MS. SPANN: How come she is continuing all these types of statements? Where is she coming up with all these statements?

MR. HARDY: I have no idea.

MS. SPANN: She says she has witnesses she claims to one or two of these.

MR. HARDY: Okay.

MS. SPANN: But why would — why? I don't understand why she was saying all these things.

MR. HARDY: I have no earthly idea.

MS. SPANN: Me neither. You gave her the 12 to 8. Other than that, were you (inaudible) supervisor to (inaudible)?

MR. HARDY: No.

MS. SPANN: You didn't retaliate for some other perceived wrong?

MR. HARDY: A what?

MS. SPANN: Perceived wrong toward her for something? I don't know. No? Okay. Ms. McMillian did ACA the first time?

MR. HARDY: She (inaudible).

MS. SPANN: Okay. She said that you asked her to stay behind one time when the boys were going to the dining hall. And after they all left that you asked her to suck your dick.

MR. HARDY: (Inaudible).

MS. SPANN: And she just looked at you and you said it's okay we've got enough time, we'll be through by the time the boys get back.

MR. HARDY: Absolutely not.

MS. SPANN: Then she is just wrong about that?

MR. HARDY: Absolutely not. You know what concerns me also is that especially the victim up in this area is that when you're perservering (inaudible) and showing all these emotions at the time, but based on what you just told me you're talking about a two year period, but all these (inaudible) happened. But up into the point whereby we can show a pattern whereby your schedule got changed and you (inaudible) you're working a second job, and everything is okay or appears to be okay.

MS. SPANN: Uh-huh.

MR. HARDY: But you're saying, you're alleging now that you were showing all these emotions.

MS. SPANN: Uh-huh. You're saying none of this is true?

MR. HARDY: As far as the last thing that you talked about. Ms. Anthony which I acknowledge, I mean (inaudible) like the (inaudible) for example the house, those things I did acknowledge that, but the other things, no.

MS. SPANN: You understand, I have to check it all out.

MR. HARDY: I do understand that. I do understand that. (inaudible)

MS. SPANN: No, I want you to say everything and anything that you want to say.

MR. HARDY: I understand.

MS. SPANN: Because I want to hear whatever you have to say. I don't want you to (inaudible) whatever you have to say (inaudible).

MR. HARDY: I got to tell you, another staff, any question (inaudible) my professional courtesy for people, this and that. But here's one person that, regardless as to what reason, and I can't even begin to try and conceptualize that, I can accept it to a point whereby you're trying too. It just don't add up. If you're going to go on administrative leave, you're asked to go on administrative leave. Okay. But you're saying all this took place. It just don't add up.

MS. SPANN: Uh-huh.

MR. HARDY: And it's been going on for two years.

MS. SPANN: That's what she said.

MR. HARDY: And I can — And I'm probably really just maintain, maintain — just maintain right now. I could have been (inaudible). Came in and saying, Okay, even a two-year period. I could have came in and said, Well, I mean, even at the house, I could say, Well that's not sexual harassment still. But I'm cutting in, I'm being honest about that which I know to be honest about. You know, if someone came to your house and did all this and (inaudible) the fact that they did it, if someone asked you to unbutton their pants or what have you, you better (inaudible) about whatever or whatever. Anybody in their right mind, any court anywhere is going to say, Okay, now this has been happening for two years and you're complaining, and you're telling me you want me to believe that you were so offended, and all of a sudden at the time whereby (inaudible) working another job or whatever, now you're saying that I need to bring a sexual harassment case? (inaudible). If you're that offended at that point, you're going to say something. Face it, everything that you got on that paper, if you're that offended at that point, you're going to say something. If I'm that offended, I'm going to say something.

MS. SPANN: I don't know what was going on in her mind. And she claims to me when she went to see Ms. Rankins is to get her dorm moved. She did not mean to bring all that other up. And Ms. Rankins asked her why she wanted her dorm changed. And she just told her, I want my dorm changed. And Ms. Rankins pushed her and that's when she said, Well, it was harassment.

MR. HARDY: That goes back to what I'm saying, this whole thing is about one thing, that's getting her dorm changed. Why? Because no less than a taylor-made – make a taylor-made schedule. I'm just not going to do that. Okay? Now, you couldn't work 8 to 4 shift. That was a conflict. What we got is Paige Hall. We got 8 to 4, 4 to 12, and 12 to 8. You can't work any of those shifts because you need to be somewhere else. You work 12 to 8 it's going to conflict. If you work 4 to 12 it's going to conflict. You have to work 10 to 6. Keep in mind you went and talked to two people – three people you've been talking to, Bolin, who's the manager at ITU. You went and talked to Phyllis Rankins, who is his supervisor, over ITU. And you went and talked to my supervisor to go on leave, extended leave. You didn't talk to another unit manager to my knowledge. For another specialist to my knowledge. If you're being harassed, if you're being harassed, you're going to do everything in your power to move anywhere possible to get from under this form of harassment that you allege.

MS. SPANN: Why did she want to go on FMLA?

MR. HARDY: Remember I didn't say that. What I said was that that's the only reason I know that a person can be offered extened, is FMLA

MS. SPANN: Right.

MR. HARDY: Okay. I didn't say that. She just wanted to be off, not FMLA, she just wanted to be off. And the reason why she wanted to be off is to make sure that this other job works off for her prior to leaving this one. That's my opinion.

MS. SPANN: Uh-huh.

MR. HARDY: Two years. (inaudible) you had the opportunity to stay down at Holloway Hall, you chose me.

MS. SPANN: Uh-huh.

MR. HARDY: And that's about a year.

MS. SPANN: Uh-huh.

MR. HARDY: Okay. Out of the other year we've got five months of which that no contact or very limited contact. Now you got another period of probably about 10 months there. Okay. But all this (inaudible) really wasn't what we're talking about, because you chose to move. We're talking about a window of 10 months, basically. If

they're just going to (inaudible) transfer, but even after that you still didn't say anything. Now, based on my understand of sexual harassment, that's my understand, is that — and I'm not saying any of this is true, but let's say for example you anyone that you talked about me is true. Let's say, let's use something like I walked up to you and I touched you on your leg, for example, and let's say you say okay, well, hmm, I'm not getting what I want now, so I'm going to file sexual harassment charge. Is that sexual harassment? I don't think so.

MS. SPANN: Uh-huh.

MR. HARDY: But the point, my point making that is that I can show, based on the documentation, I can't deal with he said, she said, because I have no idea as to why people are saying I think that you got what you want now. You probably got the shift you want, you know what I'm saying. I understand that. But I also understand the fact that there was some conflicts. What was going on in your mind, I don't know. Now, there are some rumors that are floating out there. Since you talked about rumors, the rumor is that you're on drugs. Now, based on what I seen, I'm willing to take any type of test, I'm wondering are you willing to do likewise. Drugs could be an issue there. Keep in mind you chose to go to Paige Hall. Ms. Coles told everybody they was not going to change the schedule, you could stay where you are. You could stay put. Question for you, does she have a date that anything happened?

MS. SPANN: Does she have what?

MR. HARDY: A date.

MS. SPANN: No.

MR. HARDY: No date?

MS. SPANN: Uh-uh.

MR. HARDY: Now, someone walks up to you (inaudible) - anybody in this office, I'm not going to use you - came to my wife's office, groped her, she not going to document that? No dates? But then this is sexual harassment. And I think what she don't realize is (inaudible) but I do. But all this is he said. Let me get my friend in here. Ms. Spann, and you know that's true right now. I can go down to get five friends and say that we saw you in such and such such place doing such and such and such if I choose to. That don't mean that it happened. That don't make it right. I can't answer that. (inaudible) No date. I can pull, also, based on my understanding Title 7, Civil Right Act of 1964, that deals with sexual harassment, you got how many day, 180, to file, but you don't have a date? But you tore my character up. You can't even give a date. But I can show you in five months, whereby I had two contacts with you. Don't make a sexual harassment (inaudible). Well, that's the third violation. But you can't even say — but you're saying this is so serious you would come in here or come down to down there and you going to be talking all whatever like everything is okay just greeting people being all friendly but

you're going down and start all this crying and stuff, but you can't even give me a date, can't give you a time. That ain't right, Ms. Spann.

Anything that she said (inaudible).

MS. SPANN: Well to file and EEO complaint. Our sexual harassment policy doesn't have any time limit on it.

MR. HARDY: Okay. An EEOC?

MS. SPANN: Uh-huh.

MR. HARDY: I'm trying to think what shift (inaudible) Michael, we got your best friend, who you went to school with y'all grew up together.

MS. SPANN: I understand.

MR. HARDY: God showed me the Monday night before it happened. Why in the world is he showing me everything is okay? Why in the world? (inaudible) And a person going to come in here with all these allegations. I ain't got nothing but (inaudible). I'm angry. I'm just torn apart. I can show you right here that if these happened, Mr.Harvick prayed together Saturday (inaudible) at a job, go back (inaudible) that Saturday you call me. You said, Mr. Hardy, has my schedule changed and I said no. I said your schedule have not changed and you say well, I'll have three days off, seems like she had four. I said you're off Saturday – Friday, Saturday and Saturday, and Friday – excuse me. Saturday, Friday, Saturday, and Friday, that's your four days off. Then she Well, I thought I needed to be off Saturday. I said, No, you're having your four days off. That's what she did. Did I get mad? She didn't even show up. I went down to my supervisor. I said, I have a little problem. No show. Mr. Hardy talk to me about it. I called, I said, Matt, I said, No call, no show. She said, Well I was just under the assumption that well, that I was still going to be off on Saturdays (inaudible) I talked to you about. (inaudible) only choice you could have came. You got what you needed. You can't have them again. She did that. I didn't do it. (inaudible) and everything I say can be substantiated.

You know something else, Ms. Spann, this girl is thinking, people (inaudible) is that you go (inaudible) and everything that he's saying is his (inaudible). I forgot to say that. You can question (inaudible) that would be right. You can't question anything. (inaudible) If you want to know policy, ask (inaudible). So the reason why you can't have anything, (inaudible) out that hand. You're going to go pick somebody – Mr. Smith. For the record, I didn't talk to Mr. Smith, but he talked to somebody. You talk to somebody, it's enough that I'd tell you the whole story. Mr. Smith talked to Ms. Howard, Ms. Howard talked to Mr. Hollis, Mr. Hollis talked to me. He said, Mr. Hardy, Mr. Smith want you to do that he don't have anything to do with this. I said, Look, I ain't touching this right now. Because (inaudible) with the investigation. We'll call Howard. Now, Howard (inaudible) person too, who called Hollis, who called me.

MS. SPANN: Uh-huh.

MR. HARDY: And these are the people you're talking about too, ain't they?

MS. SPANN: Uh-huh.

MR. HARDY: Everything I say is factual.

MS. SPANN: Uh-huh.

MR. HARDY: You can't believe (inaudible). You can't believe (inaudible).

MS. SPANN: No, I can't.

MR. HARDY: (inaudible). The only thing that's questionable that I stopped by her house (inaudible). Did I stop a second time? No. A third time? No. What's that look like to you? She's off on Thursday and Friday, Ms. Spann. (inaudible) She didn't bring that up? Keep in mind, you off Thursday and Friday. Of course she didn't. But that's okay. Because I know she can't do anything. You talked to one girl. That's just so wrong. (inaudible) You talked to one (inaudible). Because you hear what you want. I don't think I can change it. (inaudible) You chose being here. That's just not right. You walk around (inaudible) and then you come in — actually (inaudible). You said that Mr. Hardy teach policy. You said, that's what you just said, what I heard too. I haven't (inaudible). I just wanted to move. That's just (inaudible). It will be okay. (inaudible)

I said let me ask you, "What do people actually think about me?" I'm not just talking about Mt. Meigs, just period (inaudible). (inaudible) What do people actually think about me. She said, "I'm supposed to know." She said but I wish I would, I could do that. This is your child's fault. She said, "I wish I could do that." All this is about the fact tht she messed up, she knew I wasn't going to tolerate her messing up anymore. Basically, she wants to go. I said in a meeting I would be out there on the 12 to 8 shift. I would monitor you guys. That's all it is.

But then I think (inaudible). (inaudible). And I feel if I had not talked to her and told her, (inaudible)because I feel people talk about stuff. (inaudible) two or three saying the same thing it's clear to me too. (inaudible) I ain't got nothing to worry about. I'm in at night all the time, doing rewrite and (inaudible) tired yet. Am I righteous? Yes. I shouldn't rewrite it all. (inaudible) I don't nobody. She can't never say that, I tried to hurt her, because I haven't. (inaudible) she might not like the fact that I moved my clock, but because I'm around (inaudible). That's part of my job I don't like. But I had to do it.

MS. SPANN: Uh-huh.

MR. HARDY: (inaudible) hurt me? Yes, (inaudible). (inaudible) I mentioned that earlier. Based on what I'm hearing, there's some people down here in this area who

know her. How do you prove (inaudible). (inaudible) They can start (inaudible) me. (inaudible) I know that. (inaudible) talking. I dare them to say that to me. (inaudible) disrespect a man, no you didn't. You're told to respect (inaudible). But I dare you to do it. She had no desire to violate that policy. That's why I ain't mad anyway. You got in too deep, you got to file it. You can't (inaudible). Who you came over with? (inaudible) when it come out. I'm going to say you're going to tell the truth. And if you tell the truth it will come out in my favor still. That's what I mean by that. Call Mr. Smith, (inaudible) a stamp that I wrote her twice. You call his mother, the staff had left. Who just abandoned, did not give a note, everybody is trying to call to come on back, you know, let them know what's happening. (inaudible) that ain't going to change. God (inaudible). And you call her your best friend. You got a dormitory full of staff and students. Staff and students, Ms. Spann. Dormitory full of them. (inaudible) I'm okay.

MS. SPANN: You seem to be.

MR. HARDY: I'm okay. I'm more pissed now. God will (inaudible)

MS. SPANN: All right.

MR. HARDY: (inaudible) because people will start talking. And the best guess you're talking about (inaudible) the people in here bothering me about their jobs. What am I supposed to say? (inaudible) if anybody wants to leave, you can just turn your pass in (inaudible). But after that, people are talking.

MS. SPANN: We don't want to do anything to harm anybody. You know the Department policy. And it's not being (inaudible).

MR. HARDY: I understand. I understand (inaudible) I don't have no problem, Ms. Spann, if you said I believe her too. I really do. How you do (inaudible). God bless (inaudible) gone to church. They don't do him right all the time, because he watches them.

MS. SPANN: Uh-huh.

MR. HARDY: Why he ain't walking around talking about his bills and (inaudible) I heard from Ms. Collins I heard this, I heard that. From our janitor too. (inaudible) but that came with it. (inaudible). And it grew. It grew during the first year. Because when you kept pushing trying to find something, you were searching for something from the first day. And they got it (inaudible) You can't go back now. You've already stated that you don't want to go there. But you're pushing it. And now you go ahead and go to the faculty members, and you go talk to these people. And it keeps growing (inaudible) Ms. Spann, if I can (inaudible) anything she has (inaubible)

Do I get respect on campus? I get multirespect. I think (inaudible). I'll talk about that. You know why I did, because I (inaudible) and straight. (inaudible) I'm going to do it. I study the policy book. I study it. Because you know if you're clean, according to the

policy manual. She knew that. Because this too shall pass. And why she support me and then from the second (inaudible). I'm not going to be planning to get back until an attorney, as soon as I put some closure (inaudible). And what she's doing (inaudible). I (inaudible) had something.

(inaudible) Make you fight back when you don't want to fight back. They make you do things that (inaudible). They make you take things (inaudible)

MS. SPANN: Well you just have to be the bigger horse than that. Do in your heart what you think is right.

MR. HARDY: (inaudible) Only thing right now is my (inaudible). That's the only thing. I gave too hard for that. Very hard. (inaudible) a little country boy who came to Alabama State (inaudible).

MS. SPANN: You've done very well.

MR. HARDY: (inaudible) I knew if I said I was going to do it, I did it. I don't understand this myself. (inaudible) I really don't understand.

MS. SPANN: Well, you know, I have (inaudible). And what she told Ms. Rankins, I don't know whether she told Ms. Rankins (inaudible).

MR. HARDY: (inaudible) But that's okay. See, I ain't worried about people down there (inaudible) in my job. Because I got (inaudible). And everybody knows (inaudible). I ain't perfect, Ms. Spann.

MS. SPANN: Nobody is.

MR. HARDY: And you acknowledge the fact that even suggests that I am. I'm upset.

MS. SPANN: Uh-huh. (inaudible).

MR. HARDY: (inaudible). I know I shouldn't say this, but I'm going to say it, Ms. Spann. Maybe (inaudible). And it might even hurt me, but I'm going to say it anyway. (inaudible) I would have to harass somebody? (inaudible) around a lot of folks, and (inaudible) for saying that. But it's the truth. And to have to pay somebody? I can think of five ladies every day (inaudible). (inaudible). (inaudible). I think you understand that.

MS. SPANN: I sure do.

MR. HARDY: I think you wanted me to come in (inaudible).

MS. SPANN: I understand exactly what you're saying.

MR. HARDY: I believe that, Ms. Spann.

MS. SPANN: (inaudible).

MR. HARDY: You don't understand, Ms. Spann. You really don't understand.

MS. SPANN: I do.

MR. HARDY: I (inaudible). And then to come with allegations that ain't got nothing to do with me. He ain't mad (inaudible) with some ladies. What that got to with here? Nothing.

MS. SPANN: (inaudible).

MR. HARDY: That's a discredit. That ain't got nothing to do with it. That's telling you fishing. If I come in here and talk to you about someone done something to me, that's what I'm going to talk to you about.

MS. SPANN: But still could show pattern.

MR. HARDY: All right. It's bad when people have that much time (inaudible). (inaudible), Ms. Spann. You know that wasn't that girl talking.

MS. SPANN: (inaudible).

MR. HARDY: I understand. I fully understand (inaudible). I understand that.

MS. SPANN: Right.

MR. HARDY: (inaudible). I mean if God chose that, that wouldn't be (inaudible).

MS. SPANN: Is there anyone you think I need to talk to?

MR. HARDY: (inaudible). The 12 to 8 shift. The people she work with Mr. Harvest and Mr. Ellis and (inaudible). She told them (inaudible) she was going to (inaudible) that she was going to get me, nah, nah, nah, nah.

MS. SPANN: (inaudible).

MR. HARDY: Feel free to talk to whomever you can. I mean, (inaudible).

MS. SPANN: Okay.

MR. HARDY: But they didn't like the truth. (inaudible).

MS. SPANN: All right.

MR. HARDY: (inaudible).

MS. SPANN: Uh-huh.

MR. HARDY: (inaudible).

MS. SPANN: Uh-huh.

MR. HARDY: (inaudible). Mr. Hardy works (inaudible). I want to say this to, that (inaudible) or anything like that, but to tell you that (inaudible). (inaudible).

MS. SPANN: Uh-huh.

MR. HARDY: Because right now (inaudible) litigation.

MS. SPANN: Uh-huh.

MR. HARDY: If I had – if nothing they know that I'm a person that trying to (inaudible).

MS. SPANN: Uh-huh.

MR. HARDY: And see the question there can (inaudible).

MS. SPANN: (inaudible)?

MR. HARDY: The kids. They would (inaudible). (inaudible). And then to come in and file a claim without asking for the documentation for it, the dates. You even told me something about dates. I mean, what can I do? My hands are tied.

MS. SPANN: Uh-huh. All right.

MR. HARDY: When you look at that one. That's not a date. You can't even give me whereby – There might be a date whereby I didn't even work one time. I can go back to time changes and say, "Hey, look, I didn't work this day."

MS. SPANN: Uh-huh.

MR. HARDY: I can't even do that.

MS. SPANN: Uh-huh.

MR. HARDY: I can't do anything.

MS. SPANN: Well, that's a good issue. (inaudible)

MR. HARDY: (inaudible). And when that has to happen (inaudible), it will continue. Because you don't have nothing for this (inaudible).

MS. SPANN: Okay.

MR. HARDY: (inaudible). But I need (inaudible) but stay and harass me in 2002. When, Hardy? Some time in 2002, I'm not sure when. Yeah, right. Yeah, right. Somebody you (inaudible). And I understand your job. Don't get me wrong.

MS. SPANN: (inaudible).

MR. HARDY: I don't question that.

MS. SPANN: Right.

MR. HARDY: But that ain't right for them to be able to do that.

MS. SPANN: Uh-huh. Well, I think it makes everybody's job harder.

MR. HARDY: Uh-huh. (inaudible) standpoint. Now, I got to be careful now. As a matter of fact, talking to people I need (inaudible).

MS. SPANN: Right.

MR. HARDY: How can I expect to be a supervisor?

MS. SPANN: Now you're thinking.

MR. HARDY: That's what I'm saying. I can even think as a supervisor no more, Ms. Spann. Because I'm going to be so cautious. I'm going to have to lick a midappraisal, and you won't like it. (inaudible) Believe me, I don't know when, but he did it. What did he do? He wrote me. He asked me this. He said (inaudible). Well, when? I don't know.
        (inaudible). But I go to (inaudible). (inaudible).

MS. SPANN: Well, that's all you can do.

MR. HARDY: (inaudible). Because I am (inaudible), they will (inaudible). But that's okay. (inaudible).

MS. SPANN: (inaudible).

MR. HARDY: But I don't wish that on nobody.

MS. SPANN: Huh. (inaudible).

MR. HARDY: Everything you have asked me, but I've been (inaudible), Ms. Spann. I hate to say that, but (inaudible). (inaudible) start it. I asked Linda Hardy if she wanted to come today. She said no.

MS. SPANN: (inaudible) I know she's the one (inaudible).

MR. HARDY: Like I (inaudible). (inaudible).

MS. SPANN: (inaudible).

MR. HARDY: (inaudible).

MS. SPANN: (inaudible).

MR. HARDY: I don't believe that.

MS. SPANN: It won't?

MR. HARDY: It won't.

MS. SPANN: And you know you (inaudible) against retaliation. If you suffer any kind of retaliation or anything like that you are to let me know immediately. Because I can fix that.

MR HARDY: (inaudible)

MS. SPANN: Well, you just let me know. Let me know. And I'll see what I can do. Because it's not going to happen. Should not happen. Not supposed to happen. We have a policy against that. So you let me know (inaudible). (inaudible). (inaudible). If I can't fix it, I know somebody who can. Because it should not happen.

MR. HARDY: There is one more thing, Ms. Spann. I'm (inaudible). (inaudible).

MS. SPANN: And you know a lot of our supervisors (inaudible) and just go on about their life and (inaudible) and they really don't realize (inaudible). They really don't. And then it's too late.

MR. HARDY: (inaudible).

MS. SPANN: Yeah. I know. And they think I'm playing when I have to tell them, you know, No, don't do that, you know, or tell them to come to me or whatever, keep your mouth shut and they don't pay a bit of attention to that.

MR. HARDY: (inaudible).

MS. SPANN: Uh-huh.

MR. HARDY:  And I thought about it.

MS. SPANN:  Uh-huh.

MR. HARDY:  (inaudible).

MS. SPANN:  Uh-huh. You could (inaudible) with disciplinary steps. Tell them to keep their mouth shut and (inaudible), and they need to keep their mouth shut. They don't know what (inaudible) is. And (inaudible). They just do not realize (inaudible) until (inaudible). (inaudible) and that's not what it is. But you understand what I'm saying. They think that they're doing the right thing, but they're not.

MR. HARDY:  No. No. The point is to go to someone else first. You know. That's the whole point to it. And they want to (inaudible). It's always about, I got some (inaudible). (inaudible).

MS. SPANN:  (inaudible). I can't tell. I don't tell my people. I say, I work for Allen Peaton. He doesn't know about this, unless he heard it from somebody else. I don't tell him.

MR. HARDY:  That's how it has to be, Ms. Spann. It has to be that way.

MS. SPANN:  Yeah. I don't tell him. I don't tell him anything. (inaudible) You know, it's my job (inaudible). And so far, I've been here almost seven years, it's been fine. But (inaudible) you're supposed to. I want you to call me if you need to talk or if you want to talk about something else, or if somebody does something to you or whatever, you give me a call and let me know, and I'll try and get that straightened out for you.

MR. HARDY:  Thanks (inaudible) try to refocus and (inaudible).

MS. SPANN:  Uh-huh.

MR. HARDY:  (inaudible) keep focus on them (inaudible).

MS. SPANN:  Right. Right. And just don't worry about the other stuff. (inaudible). And whatever happens, it will be for the best.

MR. HARDY:  Ms. Spann, (inaudible). It will be okay.

MS. SPANN:  (inaudible).

MR. HARDY:  (inaudible).

MS. SPANN:  (inaudible).

MR. HARDY: (inaudible) a big fuss or anything like that. Like I say, I know what they want from me, I (inaudible) who I am. And I just think (inaudible).

MS. SPANN: Uh-huh.

MR. HARDY: (inaudible).

MS. SPANN: It's rough.

MR. HARDY: And then, our people, like I say, when I first started talking, they started talking first and then (inaudible) we might better be quiet because (inaudible) so we better kinda like watch what we're saying. I think based on that, and then some other people want to get in the conversation.

MS. SPANN: Uh-huh. And it certainly happens.

MR. HARDY: And (inaudible) and you know, people would basically jump up and down around here saying, Yeah, I know this, but you don't know nothing. That's (inaudible). I think about that too. You know, that maybe that God is using me as (inaudible) to get some things (inaudible). Because, like I said, for me (inaudible) could be tomorrow.

MS. SPANN: Uh-huh.

MR. HARDY: (inaudible) anything (inaudible) he said-she said type (inaudible). (inaudible).

MS. SPANN: (inaudible).

MR. HARDY: You got to laugh sometimes to keep from crying.

MS. SPANN: You do. You sure do.

MR. HARDY: Oh, boy. (inaudible).

MS. SPANN: Huh?

MR. HARDY: (inaudible).

MS. SPANN: He is. I don't know how he has time for everything that he gets into.

MR. HARDY: When it's over, if I come down here and talk to you, Ms. Spann (inaudible).

MS. SPANN: Okay.

MR. HARDY: (inaudible). You know people like to talk. You know (inaudible). (inaudible).

MS. SPANN: Some of this mess on me ?

MR. HARDY: No. No. No. Oh, no. Oh, no. I'm not saying. What I'm saying was that as this -- like I said before, it appears that you know how sometimes if you're in possession of (inaudible) that person calls you (inaudible). And you say, can you talk to that person, and you thought you were right to talk to that person. You hurt someone else by doing that. (inaudible).

MS. SPANN: Uh-huh.

MR HARDY: A lot of (inaudible).

MS. SPANN: Uh-huh.

MR. HARDY: (inaudible). Huh?

MS. SPANN: (inaudible).

MR. HARDY: (inaudible).

MS. SPANN: Uh-huh.

MR. HARDY: (inaudible). (inaudible) you're hurting somebody. (inaudible)

MS. SPANN: (inaudible).

MR. HARDY: (inaudible).

MS. SPANN: Uh-huh.

MR. HARDY: (inaudible).

MS. SPANN: Okay.

MR. HARDY: Thank you.

MS. SPANN: Thank you. (inaudible)

MR. HARDY: (inaudible).

MS. SPANN: Is he your only staff?

MR. HARDY: I have a medical (inaudible). (inaudible). Ask him what's (inaudible).

MS. SPANN: (inaudible). You got to step in.

MR. HARDY: (inaudible). (inaudible) front line. I understand I got to stop. (inaudible) I don't care what else she comes in talking about, I got to stop (inaudible).

MS. SPANN: And you need to shut up.

MR. HARDY: (inaudible).

MS. SPANN: I know. I know.

MR. HARDY: (inaudible). And that's what I got to do, this and this, and this. And she's saying yada, yada, yada, yada, yada, yada. That's what I'm going to do, I'm going to (inaudible).

MS. SPANN: Uh-huh.

MR. HARDY: (inaudible). You can understand that.

MS. SPANN: Uh-huh.

MR. HARDY: You can't do nothing (inaudible).

MS. SPANN: Uh-huh.

MR. HARDY: I understand that. (inaudible)

MS. SPANN: No, I am (inaudible). But if you think of anything else (inaudible) and you want to stop by, give me a call. I'm here (inaudible). Leave a message and I'll get right back with you. And you know my door is always open for you. And just, whatever, whenever. I was glad to see you and talk with you.

MR. HARDY: I wish it was under (inaudible) circumstances this time.

MS. SPANN: Well, we're not worried about that. You know.

MR .HARDY: (inaudible).

MS. SPANN: Me too, but that's okay. (inaudible).

MR. HARDY: They're my credibility and my reputation, I carry them. My everything.

MS. SPANN: Yeah. So, we're just not telling anyone. (inaudible) and then I'll try and digest all of this and try to get something worked up, talk with Mr. Harvest and Mr. Ellis and (inaudible). Okay.

MR. HARDY: But like I say, he will (inaudible). (inaudible). My wife, she's got four discs messed up in her back. (inaudible) Everything kind of like falls back. See, that's the thing that hurts me the most is that because, they need me. And that's okay. (inaudible). That's why I want to go on and move on things or whatever I'm supposed to be doing or whatever. If I can do it, I need to do it.

MS. SPANN: (inaudible).

MR. HARDY: Yeah. (inaudible) and I swayed (inaudible) down in the ditch. And I stayed there and (inaudible) and I woke back up and (inaudible) and (inaudible) some land and cattle and stuff. (inaudible) And then he showed me (inaudible). And just that faith is what keeping me (inaudible). Because if I didn't have it, I mean, this is the kind of thing to make (inaudible). (inaudible). (inaudible).

MS. SPANN: (inaudible) that's for sure.

MR. HARDY: (inaudible) don't do everything right. But I (inaudible).

MS. SPANN: Yes, you're right.

MR. HARDY: (inaudible).

MS. SPANN: Uh-huh. Well you take care of everybody.

MR. HARDY: Do you have any timeline?

MS. SPANN: I want to talk with Mr. Harvest and Mr. Ellis and then I'll probably get everything written up within a week depending on (inaudible).

MR. HARDY: Okay. (inaudible) probably going to be back until after September, which will be good, because I wouldn't want to be a part of anything if I'm still (inaudible). And I really don't want to come back on campus until there's some closure one way or the other way. Whatever. It' (inaudible).

MS. SPANN: Okay.

MR. HARDY: And honestly, any (inaudible) toward her, I'm disappointed, but not angry. Because I feel that there's a lot of things, other things going on there that I'm not going to get into right now, but (inaudible). (inaudible).

MS. SPANN:

# HARDY V. WOOD

## BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

# EXHIBIT

# 6

# CHARGE OF DISCRIMINATION

This form is affected by the Privacy Act of 1974; See Privacy Act Statement before completing this form.

| AGENCY | CHARGE NUMBER |
|---|---|
| ☐ FEPA | 130.2005.05479 |
| ☒ EEOC | |

and EEOC

State or local Agency, if any

NAME (Indicate Mr., Ms., Mrs.)
Tera A. McMillan

HOME TELEPHONE (Include Area Code)

STREET ADDRESS                CITY, STATE AND ZIP CODE

DATE OF BIRTH

NAMED IS THE EMPLOYER, LABOR ORGANIZATION, EMPLOYMENT AGENCY, APPRENTICESHIP COMMITTEE, STATE OR LOCAL GOVERNMENT AGENCY WHO DISCRIMINATED AGAINST ME (If more than one list below.)

| NAME | NUMBER OF EMPLOYEES, MEMBERS | TELEPHONE (Include Area Code) |
|---|---|---|
| Alabama Department of Youth Services | Over 100 | |

| STREET ADDRESS | CITY, STATE AND ZIP CODE | COUNTY |
|---|---|---|
| | Mount Meigs, AL | Montgomery |

RECEIVED

| NAME | TELEPHONE NUMBER (Include Area Code) |
|---|---|

| STREET ADDRESS | CITY, STATE AND ZIP CODE | COUNTY |
|---|---|---|

CAUSE OF DISCRIMINATION BASED ON (Check appropriate box(es))

☐ RACE   ☐ COLOR   ☒ SEX   ☐ RELIGION   ☐ AGE
☒ RETALIATION   ☐ NATIONAL ORIGIN   ☐ DISABILITY   ☐ OTHER (Specify)

DATE DISCRIMINATION TOOK PLACE EARLIEST
May 2003

☒ CONTINUING ACTION

THE PARTICULARS ARE (If additional paper is needed, attach extra sheet(s)):

1. My name is Tera McMillan and I am employed by the Respondent at its Mount Meigs campus. I was first hired by the Respondent in October 2002 and since that time I have always performed my duties and responsibilities in a satisfactory manner. Since May of 2003, I have been subjected to a sexually hostile work environment by my supervisor and my co-workers.

2. Beginning in May of 2003, I have persistently been propositioned for sex and sexual favors by my immediate supervisor Michael J. Hardy. On an almost daily basis, Hardy has requested that I "suck his dick." He has offered me money and other material objects if I would perform this act of oral sex on him. Furthermore, Hardy has almost on a daily basis talked about his sexual prowess with other female workers at the Respondent's Mount Meigs campus. For example, Hardy has stated to me that he cannot "fuck all night like he used to" and that he can "only fuck real hard for 5 of 6 minutes" at this time in his life. Also, Hardy grabbed both my breasts while I sat a desk in the facility. All of this behavior was uninvited and unwelcome and I asked Hardy to stop harassing me, but he did not. Hardy also stated that he loved big "titties" and requested that be allowed to suckle my breast in the office. Again I declined his invitation. Hardy also spoke regularly of his abilities with regard to oral sex and asked me to allow him to try such with me. As before I declined his invitation and requested that he leave me alone.

3. During this time of almost constant harassment, I began seeing a doctor for anxiety and depression regarding these issues. My treating position placed me on medication and referred me to a therapist to help deal with these issues.

I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or telephone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures.

NOTARY - (When necessary for State and Local Requirements)

I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief.

I declare under penalty of perjury that the foregoing is true and correct.

SIGNATURE OF COMPLAINANT

July 12, 2005        Tera A. McMillan
Date        Charging Party (Signature)

SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE (Day, month, and year)
7/12/200

NOTARY PUBLIC STATE
MY COMMISSION
BONDED THRU NOTARY

EXHIBIT
6

EEOC FORM 5 (10/94)

CONFIDENTIAL     L  2005, 05479

4. In March of 2005, Hardy beg  asking me to go to hotels with him for sex a  offered to buy me a car, tires, and other goods in exchange for my compliance. I did not go along with his request. Hardy's harassment of me continued until I reported him on June 16, 2005. After I reported Hardy I was made to transfer to another department within the Mount Meigs facility. Since arriving in the new department, I have been subject to retaliation in the form of personnel not being willing to help me learn the new position and I have been threatened with being disciplined for no reason.

July 12, 3005
Date

Tera A. McMillan

JUL 12 2005

RECEIVED
EEOC

000182

# HARDY V. WOOD

## BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

# EXHIBIT

# 7

# STATE OF ALABAMA DEPARTMENT OF PERSONNEL

## HEARING OF MICHAEL HARDY

May 8, 2006 and June 10, 2006

Pages 1 through 691

## CONDENSED TRANSCRIPT AND CONCORDANCE PREPARED BY:

Laura A. Head
Court Reporter
Phone: (334) 286-4938
Cell: (334) 202-4851
lauraheadreporter@charter.net



EXHIBIT

7

1    BEFORE THE

2    STATE OF ALABAMA

3    DEPARTMENT OF PERSONNEL

4    MONTGOMERY, ALABAMA

5

6  IN THE MATTER OF:  MICHAEL HARDY

7    TERMINATION APPEAL

8

9

10

11

12

13

14    * * * * * * * * *

15    TESTIMONY AND PROCEEDINGS, taken before

16  the Honorable Julia J. Weller, Administrative Law

17  Judge, at The Folsom Administration Building, 64

18  North Union Street, Montgomery, Alabama, on

19  Monday, May 8, 2006, and Monday, July 10, 2006,

20  and reported by Laura A. Head, Court Reporter and

21  Commissioner for the State of Alabama at Large.

22    * * * * * * * * * *

23

---

**Page 2**

1    APPEARANCES

2  ADMINISTRATIVE LAW JUDGE:

3  Honorable Julia J. Weller
   Administrative Law Judge
4  Folsom Administrative Building
   64 North Union Street
5  Montgomery, Alabama  36130

6  FOR THE ALABAMA DEPARTMENT OF YOUTH SERVICES:

7  Mr. T. Dudley Perry, Jr.
   Deputy Attorney General
8  Alabama Department of Youth Services
   P. O. Box 66
9  Mt. Meigs, Alabama 36057

10  FOR EMPLOYEE MICHAEL HARDY:

11  Mr. Theron Stokes
   Attorney at Law
12  P. O. Box 4177
   Montgomery, Alabama 36103

13

14  Ms. Monica Arrington
   Attorney at Law
15  317 Rosa Parks
   Montgomery, Alabama  36108

16    * * * * * * * * *

17    EXAMINATION INDEX

18

19  TERA MCMILLIAN
     DIRECT BY MR. PERRY . . . . .  65
20     CROSS BY MR. STOKES . . . . .  100
       REDIRECT BY MR. PERRY . . . .  167
21     RECROSS BY MR. STOKES . . . .  192
       FURTHER REDIRECT BY MR. PERRY.  205
22     FURTHER RECROSS BY MR. STOKES.  208

23  VERONICA HARRIS
     DIRECT BY MR. PERRY . . . . .  214
       CROSS BY MS. ARRINGTON . . . .  228

---

**Page 3**

1    REDIRECT BY MR. PERRY . . . .  262
     RECROSS BY MS. ARRINGTON . . .  264

2

3  MICHAEL HARDY
     DIRECT BY MR. PERRY . . . . .  267

4  EUGENE SMITH
     DIRECT BY MR. STOKES . . . .  330
5     CROSS BY MR. PERRY . . . . .  361
       REDIRECT BY MR. STOKES . . . .  373

6

7  WALTER WOOD
     DIRECT BY MR. PERRY . . . . .  386
       CROSS BY MR. STOKES . . . . .  408
8     REDIRECT BY MR. PERRY . . . .  476
       RECROSS BY MR. STOKES . . . .  482

9

10  RASHIN FARLEY
     DIRECT BY MR. STOKES . . . .  492
       CROSS BY MR. PERRY . . . . .  496
11     REDIRECT BY MR. STOKES . . . .  499

12  ROGERS LEON DORTCH
     DIRECT BY MS. ARRINGTON . . .  501
13     CROSS BY MR. PERRY . . . . .  528
       REDIRECT BY MS. ARRINGTON . .  541
14     REDIRECT BY MS. ARRINGTON . .  548
       RECROSS BY MR. PERRY . . . .  551
15     FURTHER REDIRECT BY MS. ARRINGT  554

16  MICHAEL HARDY (recalled)
     DIRECT BY MR. STOKES . . . .  556
17     CROSS BY MR. PERRY . . . . .  626
       REDIRECT BY MR. STOKES . . . .  653

18

19    * * * * * * * * * *

20

21

22

23

---

**Page 4**

1    (Whereupon, the following

2    TESTIMONY AND PROCEEDINGS

3    were had and done on Monday,

4    July 10, 2006, commencing at

5    9:43 a.m. as follows:)

6    THE COURT:  Let's start with the

7  motions that y'all have got this morning.

8    MR. PERRY:  Okay.  Why don't we --

9    THE COURT:  I know you've got a motion

10  in limine.

11    MR. PERRY:  I do, and I have another

12  oral motion.  Procedurally, first of all, we

13  have had a couple of conference calls where

14  we have talked about the procedure and the

15  issues to be tried.  You remember I made a

16  couple of arguments.

17    First, I argued that under the statute,

18  that I don't think the employer has the

19  burden of proof but the employee does.  As I

20  understand your ruling, the employer does

21  have the burden, and I'm prepared to go

22  forward on that basis.

23    Second, I argued that if the employer

281

1 Q. Now, you actually went so far as to actually
2    file against Ms. McMillian a grievance for
3    her having filed this sexual harassment
4    complaint against you, didn't you?
5 A. Yes.
6 Q. That's Agency's Exhibit Number 2. Your
7    grievance specifically references her sexual
8    harassment complaint, doesn't it? That's
9    exactly what this grievance is about, isn't
10   it, her sexual harassment complaint against
11   you?
12 A. No, no.
13 Q. Continued to make unsubstantiated derogatory
14   statements referencing the writer. That's
15   you, right?
16 A. Right.
17 Q. What unsubstantiated derogatory statements
18   was she making that you claim were
19   unsubstantiated and derogatory other than the
20   sexual harassment complaint?
21 A. She was encouraging other staff, telephoning
22   other staff and asking them to come in and
23   say negative things about me.

282

1 Q. She was?
2 A. Right.
3 Q. Okay. Kind of like whoever was running --
4    whoever the other staff were that were
5    running around getting people to sign memos
6    saying that they are on your side and not
7    hers? She was doing the same thing? Is that
8    what you're saying?
9 A. I don't know what you're talking about.
10 Q. You are -- you have been a supervisor at DYS
11   for how long?
12 A. Ten years.
13 Q. And you know policy and procedure well, don't
14   you?
15 A. Somewhat.
16 Q. Somewhat?
17 A. Right.
18 Q. You consider yourself a policy person, don't
19   you?
20 A. I know policy somewhat.
21 Q. Right. As a matter of fact, you read policy
22   all the time, don't you?
23 A. Sometimes in my spare time, I do.

283

1 Q. Sometimes. Let's look at what you said to
2    Ms. Spann about that. On Exhibit 4 on page
3    6. Do you remember saying, I'm a policy
4    person. I read policy all the time.
5 A. I recall saying that.
6 Q. You've trained subordinate employees on
7    policy and procedure?
8 A. Yes, I have.
9 Q. Including sexual harassment policy and
10   procedure?
11 A. Yes, I have.
12 Q. Including the anti-retaliation policy and
13   procedure?
14 A. I don't think we have an anti-retaliation
15   policy.
16 Q. You don't think -- your understanding is that
17   if an employee files a sexual harassment
18   allegation or complaint, that it's okay to,
19   for example, file a grievance against her for
20   doing it?
21 A. If it's not -- if it's something that's
22   false, yes.
23 Q. So only if you don't agree with your

284

1    subordinate employee's charge of sexual
2    harassment against you, that you wouldn't
3    file that grievance against your subordinate
4    employee for filing a sexual harassment.
5    That's your understanding of policy. What
6    about federal law?
7 A. I'm not familiar.
8 Q. You came in to see Ms. Spann and said you had
9    been researching federal law and you were
10   citing regulations to her and talking about
11   the time period within which she was required
12   to file this sexual harassment charge against
13   you, didn't you?
14 A. Right.
15 Q. Yeah. And you went and familiarized yourself
16   with the federal law on this matter, didn't
17   you?
18 A. Right.
19 Q. Yeah. You know and you have known that you
20   can't retaliate against a subordinate
21   employee who files a sexual harassment charge
22   against you. You've known that, haven't you?
23 A. I'm familiar with policy --

389

1    committee, the function of which is to
2    improve the professional qualifications or
3    the level of qualifications of staff in
4    juvenile correction facilities.
5  A. Right.  It is actually the national effort to
6    provide a certification process to establish
7    the professional level of education and
8    training and qualifications of professional
9    staff, and we actually test and certify
10   corrections staff all over the country who
11   desire to be certified just like a CPA would
12   want to be certified in his field.
13 Q. Okay.  Now --
14 A. And I'm also a certified corrections
15   professional.
16 Q. All right.  Let's talk about the facts of
17   this case.  I want you to think back to the
18   middle of June of '05.  Did you learn
19   anything about specifically Michael Hardy
20   around that time?
21 A. June '05 was when the initial complaint was
22   made about the sexual harassment against
23   him.  That was I think in early June of '05.

390

1  Q. Okay.  Now, Tim Davis is -- who is Tim Davis?
2  A. Tim Davis is the deputy director for the
3    department in charge of basically
4    institutional operations treatment
5    programming.
6  Q. Under which authority Mr. Hardy would fall in
7    line?
8  A. Right.  All the campuses, our facility
9    operations fall under Mr. Davis' purview, and
10   so all the staff that work in the facilities
11   are in that chain of command.
12 Q. Okay.  In connection with this matter
13   regarding Mr. Hardy, did you have any
14   conversations with Mr. Davis?
15 A. Well, over the course of the period of time
16   all of this was going on, I'm sure we talked
17   at times about the incident.  There was some
18   of my closest, if you can say, involvement in
19   what was going on was a discussion with
20   Mr. Davis after we had received a bunch of
21   memos.  After the incident had been reported
22   and I believe after Ms. Spann had initiated
23   an investigation, there were some memos

391

1    written to instruct the lady who had filed
2    the complaint to -- it was either to attempt
3    to have her reassigned back to Mr. Hardy's
4    unit.  There was an effort to call her in for
5    a face-to-face meeting with Mr. Hardy in
6    charge of the meeting, all of this right on
7    the heels of the complaint.  Mr. Davis and I
8    talked about that as being inappropriate, and
9    I believe Mr. Davis was instructed to make
10   sure that anything that smacks of
11   intimidation or retaliation or anything like
12   this was stopped.  And I believe that he did
13   make sure those meetings did not take place.
14 Q. Okay.  Why did you feel that it was important
15   to make sure that Mr. Davis stopped those
16   meetings from taking place?
17 A. Ms. Spann had already initiated the
18   investigation.  She had taken what I think
19   was an appropriate step with the cooperation
20   of the complainant to have her reassigned to
21   another dormitory which would be usual
22   practice I would think to --
23     MR. STOKES:  Object to what he thinks

392

1    if he doesn't know.
2      THE COURT:  Just what was said rather
3    than uncommunicated mental operations.
4      THE WITNESS:  Yes, ma'am.
5  A. In this circumstance, which has also been my
6    experience in similar cases, that the
7    complainant was separated by being reassigned
8    to another dormitory.  It was my
9    understanding that the nature of one of the
10   memos was to complain about the lady being
11   reassigned and demanding she be put back
12   under his supervision and that, secondary to
13   that, a meeting be held where she be forced
14   to come into a meeting with the person to
15   whom she had made the complaint.  All of this
16   to me was clearly an attempt to bring this
17   situation under his control to intimidate
18   this lady.  In my view, this action was
19   totally inappropriate.  I think it easily in
20   my mind was -- crossed the line into what
21   I -- clearly to me was intimidation and could
22   easily be classified as retaliatory.  It was
23   a situation where this lady should not have

401

1  Exhibit 10.
2  A. Okay.
3  Q. Can you identify that?
4  A. This is a memo to me from Deborah Spann.
5     It's dated July 19th, 2005, regarding her ---
6     I believe this is the one regarding her
7     findings in the investigation of
8     Ms. McMillian's complaint.
9  Q. Okay. Do you remember independently when you
10    first saw that? Well, me ask you this: It
11    has a stamp on it from the legal division.
12    Do you see the date on that stamp?
13 A. Well, it's dated November 3rd, and I was
14    looking at the July 19th date. This was ---
15    there was a time lag where this was either
16    not turned in or was in process somewhere. I
17    think we finally had to ask for this to be
18    produced, and it was much later than July. I
19    remember that. This one was dated received
20    November 3rd, so that would be about right.
21 Q. Do does that sound about right?
22 A. Yes.
23 Q. All right. Let me show you --- this one is

402

1     not marked. So this looks like it's the
2     third page of Employee's Exhibit Number 1,
3     which is the whole personnel file. Can you
4     identify that?
5  A. This is the recommendation by the deputy
6     director of programs, Mr. Davis, dated
7     November 3rd addressed to me that confirms
8     Mr. Davis' recommendation that -- well,
9     confirms that Ms. Spann concluded that the
10    investigation substantiated the complaint and
11    the recommendation that we terminate
12    Mr. Hardy's employment.
13 Q. All right. Now, let me show you another
14    document from the personnel file, which was
15    Exhibit 1. Can you identify that?
16 A. This is the follow-up letter to Mr. Davis'
17    recommendation that was sent to Mr. Hardy
18    that schedules what we call a pretermination
19    hearing which gives him --- outlines the
20    complaint. It gives him the opportunity to
21    present his side of the story, and apparently
22    that was scheduled to be conducted November
23    the 10th, 2005, at Mount Meigs.

403

1  Q. Okay. Do you conduct those hearings?
2  A. No, sir. We rotate those duties between my
3     executive assistant, Marcia Calendar, and
4     Mr. Davis, who is the deputy director of
5     programs.
6  Q. Whom did you appoint for this hearing?
7  A. It must be Monday. I'm drawing a blank. I'm
8     not sure which one we had do this. I did not
9     do it.
10 Q. Let me show you Agency Exhibit 6.
11 A. Findings from Ms. Calendar.
12 Q. Okay.
13 A. Thank you.
14 Q. Does that refresh your recollection?
15 A. It does. Had to be one of the two.
16 Q. And it was she, right?
17 A. Marcia Calendar, who is the executive
18    assistant in my office.
19 Q. You weren't present at the fact-finding
20    hearing either, were you?
21 A. No, sir.
22 Q. Did you have any communications with
23    Ms. Calendar about that? Obviously other

404

1     than that memo is what I'm asking.
2  A. I don't recall any conversations we had about
3     this until actually receiving this.
4  Q. Okay.
5  A. I do recall --- I think the only thing that
6     was mentioned to me was that there was
7     apparently some sort of delay between the
8     hearing and actually getting this because of
9     some background information that was being
10    developed by an investigator about some
11    outside employment questions. That was the
12    only issue that I remember having any
13    conversation about which was really just a
14    report as to why I hadn't gotten anything
15    yet, and that was really it.
16 Q. What's the date on that memo?
17 A. Ms. Calendar's memo is dated December the
18    8th.
19 Q. All right. Who is the investigator that
20    you're talking about?
21 A. We have a gentleman by the name of Mr. Allen
22    Staton who is the department's, for lack of a
23    better term, an internal affairs investigator

405

1  who is not attached to any of the units
2  within the agency.
3  Q. And Ms. Calendar actually references in that
4  memo her concerns about the employment, the
5  issue of whether Ms. McMillian had a second
6  job. What do you recall Ms. Calendar had
7  Mr. Staton do in connection with that?
8     MR. STOKES: We would object to that,
9  Your Honor, because we don't have any basis
10  to cross examine the information presented to
11  us in those documents. So we don't have any
12  idea, and we cannot cross examine what an
13  investigator did if they were not made a part
14  of those findings.
15     THE COURT: Well, I'll allow him to
16  express what the basis of his decision was.
17  Q. If you recall. If you have an independent
18  recollection of what --
19  A. About this particular issue?
20  Q. Yes.
21  A. There was -- I believe there was a component
22  of Mr. Hardy's defense that Ms. McMillian was
23  trying to retaliate -- or was trying to get

406

1  another shift, and Mr. Staton was assigned to
2  try to find out if she was, in fact,
3  employed. And to my recollection, nobody
4  could confirm an additional employment or
5  anything associated with this as a defense.
6  Q. All right. Now, let me show you Employee's
7  Exhibit Number 1 --
8  A. Okay.
9  Q. -- which is I believe the termination letter,
10  correct?
11  A. Yes, sir. This is a letter signed by me sent
12  to Michael Hardy dated January the 6th, which
13  is basically the letter confirming that our
14  decision was that his employment be
15  terminated.
16  Q. All right. And there were two issues
17  essentially in this case. There was the
18  allegation of sexual harassment, and there
19  was the conduct of Mr. Hardy after that
20  allegation was made.
21  A. Right.
22  Q. What was your -- what was the basis of your
23  decision to sign that letter?

407

1  A. My decision was based on the recommendations
2  from the staff who gathered the information
3  in the course of an investigation and in the
4  course of a hearing and recommended to me
5  that he be terminated. I concurred with that
6  decision and primarily for the two reasons
7  that you just enumerated. One was that we
8  had, in the view of our personnel director, a
9  substantiated sexual abuse issue. But even
10  more important was this emerging problem with
11  what I believe was an attempt to intimidate
12  this lady and in some way retaliate for this
13  complaint being filed. That emerged as, even
14  to me, an almost even more serious issue than
15  the initial complaint. So based on those two
16  issues, I concurred that the employment
17  should be terminated, and this is the letter
18  that does that.
19  Q. Okay. You mentioned this recommendation from
20  the staff. Let's just be clear about what
21  we're talking about. You've got a
22  recommendation from Deborah Spann, right?
23  A. I have a confirmation from Deborah Spann that

408

1  she believed based on her investigation that
2  the complaint was substantiated.
3  Q. You've got a recommendation from Mr. Davis.
4  A. Correct.
5  Q. A recommendation from Ms. Calendar.
6  A. The hearing officer, yes, sir.
7  Q. And this is awkward but, frankly, from me,
8  right?
9  A. Yes, sir.
10  Q. Okay. Anything else that you can recall?
11  A. No, sir. This was a very difficult situation
12  to deal with and was compounded by the issues
13  that came up after the complaint was filed.
14     MR. PERRY: Okay. That's all the
15  questions I've got for you. Mr. Stokes will
16  ask you questions now so if you will answer
17  his questions.
18        CROSS EXAMINATION
19  BY MR. STOKES:
20  Q. Mr. Woods --
21     MR. PERRY: Wood.
22  Q. Mr. Wood, let me ask you: You stated that
23  there were some letters and memos that were

429

1  allegedly called and asking about?
2  A. No, sir, I'm sorry. I don't recall any other
3  names at this time.
4  Q. All right. Now, when Ms. Deborah Spann sent
5  you a -- Ms. Deborah Spann made a
6  recommendation to you -- first, you assigned
7  Ms. Deborah Spann to the investigation
8  matter, did you not?
9  A. She at that time was the person who had the
10  responsibility of investigating these type of
11  complaints.
12  Q. And you had assigned her to do the
13  investigation.
14  A. I don't recall if I assigned her or not. If
15  a complaint came directly to her, she already
16  being the investigator would have proceeded
17  anyway.
18  Q. So looking at your policy, Employee's Exhibit
19  Number 2, in the last paragraph, have you
20  seen that policy before?
21  A. Yes, sir.
22  Q. And this is the prohibition against sexual
23  harassment?

430

1  A. Yes, sir.
2  Q. And under the procedure, it says the
3  complaint should be made to the department's
4  personnel manager?
5  A. Right.
6  Q. And who was the department personnel manager
7  at that time?
8  A. Deborah Spann.
9  Q. And it says she or he will request the
10  executive director to designate a nonbiased
11  investigator?
12  A. Right.
13  Q. And who was the executive director?
14  A. I was.
15  Q. And did you according to this appoint a
16  nonbiased --
17  A. I had already appointed one.
18  Q. And that was Ms. Spann?
19  A. Deborah Spann.
20  Q. Okay. And when Ms. Spann did her
21  investigation, I think you said that she made
22  a report back to you, which is marked as
23  Employee's Exhibit --

431

1  A. Now, that's one of Michael's memos right
2  there.
3  Q. Let me show you what was previously marked as
4  Employee's Exhibit Number --
5  A. Is that Employee's Exhibit 10?
6  Q. Employee's Exhibit Number 10. You received a
7  copy of that memo?
8  A. Yes, sir.
9  Q. And I think you testified that you received
10  it somewhere within -- it was somewhere later
11  than the date of July the 19th.
12  A. That's correct, yes, sir.
13  Q. Would it have been somewhere in November?
14  A. First of November, November the 3rd probably,
15  the day this was stamped in.
16  Q. Okay. And that's to the best of your
17  recollection.
18  A. Yes, sir, I believe that's correct.
19  Q. Now, when Ms. Spann made this recommendation
20  to you, you didn't have any reason to
21  question her recommendation, did you?
22  A. No, sir.
23  Q. Let me ask you: In this -- as you noticed in

432

1  there, it said that -- did you ever ask her
2  anything specifically regarding this memo?
3  A. I don't recall asking her anything subsequent
4  to getting the memo, no, sir.
5  Q. Okay. So when you received this memo, you
6  then made a recommendation that an
7  investigation be held regarding the
8  allegations against Mr. Hardy.
9  A. No, sir. Having received the report from
10  Ms. Spann, which was the initial
11  investigation, saying basically to me that
12  she believes the complaint was substantiated,
13  at that point we proceeded to provide
14  Mr. Hardy with a mechanism to make sure he
15  had an opportunity to present his side of the
16  story. So we went from this to scheduling I
17  believe it was the November 10th hearing so
18  that he could come and make sure he had an
19  opportunity to state his side.
20  Q. Okay. Now, let's go back to this just for
21  the Record. You're saying Ms. Spann is doing
22  the investigation. She did the factual
23  investigation of the case; is that correct?

441

1  that.  You know you received the complaint.
2  And the recommendation you received, that was
3  the one you were talking about from
4  Ms. Deborah Spann?
5  A.  The recommendation -- the most immediate
6  recommendation was from the hearing officer
7  which was a hearing based on the
8  recommendations from Mr. Davis and
9  Ms. Spann.  So this is sort of a culmination
10  of all those recommendations.
11  Q.  Since there was no hearing here prior to
12  this, the hearing officer --
13  A.  I'm sorry.  I'm one letter ahead of myself.
14  I'm sorry.  This is the letter that
15  establishes that there will be a hearing
16  November 10th that Ms. Calendar heard, and so
17  the recommendation based -- this letter's
18  recommendation is going back from that point,
19  Mr. Davis and Ms. Spann, that's correct.
20  Q.  Okay.  And also Dudley Perry.
21  A.  Yes, sir.
22  Q.  Legal counsel.  And you say a review of your
23  personnel file.  Did you review the personnel

442

1  file of Mr. Hardy?
2  A.  I did not, no, sir.
3  Q.  Okay.  And a review of your past work
4  history.  Did you look over his work history?
5  A.  I did not personally look at his personnel
6  file or his individual work history, no, sir.
7  Q.  All right.  So and then you said in your
8  opinion then, it was the determination that
9  disciplinary action was warranted; is that
10  correct?
11  A.  Yes, sir.
12  Q.  Then a hearing was scheduled.  And would you
13  turn to the next exhibit, Exhibit Number 12?
14  A.  Okay.
15  Q.  A hearing was scheduled in front of
16  Ms. Marcia Calendar.  What was the purpose of
17  this hearing?
18  A.  It was -- it is our routine due process for
19  persons who it has been recommended to the
20  director that some action be taken, and this
21  is what we call a pretermination hearing to
22  give that employee an opportunity to present
23  his side of an issue.

443

1  Q.  Okay.  Now, would it be correct to say under
2  the DYS policy, because I requested documents
3  on behalf of Mr. Hardy for this hearing,
4  under y'all's policy, you cannot get
5  discovery requests for this hearing?
6  A.  I'm sorry.  I didn't understand what you're
7  asking me.
8  Q.  I'm asking you:  Prior to the hearing -- we
9  were going to go in and have a hearing with
10  Ms. Calendar.  I requested --
11  A.  Prior to the November 10th hearing.
12  Q.  Yes.  Prior to this -- it was actually·
13  changed to November 15th.  Prior to this
14  time, I requested documents regarding this,
15  discovery documents, and I was told that you
16  could not get any documents for this
17  hearing.  Is that true?  The correct
18  procedure at DYS?
19  A.  You'd need to talk with Mr. Perry about the
20  legal procedures for obtaining documents and
21  those kind of things.
22      MR. PERRY:  I believe you had access to
23  the entire personnel file.  I believe you sat

444

1  down in my office and looked through them; is
2  that correct?
3      MR. STOKES:  I reviewed the personnel
4  file, but I wasn't given any documents other
5  than a review of the personnel file.  That's
6  what I'm saying exactly.  Would that be
7  correct that y'all told me that y'all don't
8  produce documents for that hearing?
9      MR. PERRY:  I'm pretty sure that we
10  gave you everything that was used.
11      MR. STOKES:  Couldn't have done it,
12  Dudley, because I didn't get any allegation
13  statements, anything from anybody, because I
14  had to ask the hearing officer to give me
15  something after it was over.  I mean, I think
16  that's incorrect.
17      MR. PERRY:  You asked the hearing
18  officer to give them to you after it was
19  over?
20      MR. STOKES:  I filed a written request
21  for discovery documents.  Y'all told me when
22  I went out there I couldn't get any discovery
23  documents, I could review the personnel file

445

1  only.

2      MR. PERRY:  I don't remember the facts,

3  but I'm certain you got all of the documents

4  that would have been relied on.

5      MR. STOKES:  I object to that.  I

6  disagree with that.

7  Q. But let me ask you this:  At the hearing --

8  and we'll go to the recommendations of

9  Ms. Calendar.  What, if anything, were you

10  told regarding what took place at the

11  hearing?

12  A. I don't know that I had a conversation about

13  what took place at the hearing.  It was laid

14  out like they all are:  for the employee to

15  tell his side of the story, the hearing

16  officer reviewed the information that was

17  presented and made a recommendation.

18  Q. And at this hearing, I think -- we have a

19  copy of the transcript of the hearing, and

20  Mr. Hardy presented witnesses.  I think he

21  presented somewhere like seven witnesses, and

22  there was other stipulations what some other

23  witnesses would have testified to and that

446

1  DYS did not present a single witness at the

2  hearing.  Were you aware of that?

3  A. I was not present at the hearing and would

4  have to go back and look through that.  I

5  don't remember any conversations about who

6  called who.

7  Q. Were you aware that at the hearing, there was

8  only two documents presented by DYS?  There

9  was one that was a copy of the grievance

10  filed by Mr. Hardy and a copy of the

11  recommendation by Ms. Deborah Spann.

12  A. I have not looked at the hearing record

13  recently.  I don't recall the details of what

14  went on in the hearing.

15  Q. Okay.  So then when you received the

16  recommendation from Ms. Marcia Calendar,

17  which marked as Agency Exhibit Number 6,

18  specifically in there it made -- she made a

19  finding that all of the allegations against

20  Mr. Hardy had been substantiated; is that

21  correct?

22  A. If that's what she said in the memo, then

23  that is correct.  That's what she wrote in

447

1  her memo.  Let's see.  Which letter is that?

2      MR. PERRY:  It's right there.

3  A. The termination letter?  Are you talking

4  about Ms. Calendar's memo --

5  Q. Yes.

6  A. -- or the letter we wrote Mr. Hardy?

7  Q. Ms. Calendar's memo.

8  A. Oh, okay.  The December 8th?

9  Q. Yes.

10  A. Okay.  I'm sorry.  What was your question,

11  sir?

12  Q. Do you see where Ms. Marcia Calendar made a

13  recommendation that -- made a finding that

14  all the allegations against Mr. Hardy are

15  found to be substantiated?

16  A. That is what's in her letter, yes, sir.

17  Q. Do you know or were you aware prior to their

18  making -- or her making this finding that the

19  allegation by one of the two witnesses in the

20  case, Ms. McMillian's mother, was that she

21  overheard Mr. Hardy ask her daughter to go to

22  a hotel?  Did anybody tell you that?

23  A. I don't recall discussions about the details

448

1  of those conversations, no, sir.

2  Q. And you cannot remember any details about --

3  and no one -- you didn't do at this time any

4  independent investigation, did you?

5  A. No, sir, I -- no, sir.

6  Q. And you assume that what was in this memo was

7  correct to you from Ms. Calendar?

8  A. I concurred with the work that she had done.

9  I believe in the work that she had done, and

10  I concurred with her recommendation, yes,

11  sir.

12  Q. Okay.  But you did no independent

13  investigation.

14  A. Oh, no, sir, that's why this whole process

15  exists.

16  Q. That's why the process exists.

17  A. Yes, sir.

18  Q. Now, let me ask you:  Nobody ever told you or

19  nobody doing the investigation of this matter

20  ever told you that, for example, some facts

21  that Ms. McMillian had called Mr. Hardy and

22  made -- in 2005 and requested a meeting with

23  him and had a meeting with him at McDonald's

449

1  where she specifically told him that she had
2  another job and she wanted to come -- wanted
3  to be able to come in early and leave early.
4  Nobody mentioned anything to you about that,
5  did they?
6  A. I don't believe so, but I do think the
7  information or the allegation about her
8  having another job was one of the issues
9  Mr. Hardy wrote about in one of his memos.
10 Q. Okay. But nobody specifically told you that,
11 that fact?
12 A. Told me that there was a meeting at -- no,
13 sir, I didn't get involved in the discussions
14 and the details about all the conversations
15 that went on.
16 Q. And nobody told you anything about a party
17 they were having at a house when Mr. Hardy
18 went over there to take a check and
19 Ms. McMillian and Ms. Harris over there
20 drinking vodka and offered him something to
21 drink. Nobody told you about that, did they?
22 A. No, sir.
23 Q. Nobody told you that Ms. McMillian's mother

450

1  later on just flat out denied that she had
2  ever heard Mr. Hardy say anything to her
3  daughter -- speak to her daughter about going
4  to a hotel. Nobody ever told you that, did
5  they?
6  A. No, sir, that's correct.
7  Q. Nobody ever told you that Ms. McMillian had
8  filed a sexual harassment -- I mean, a racial
9  discrimination complaint prior to being
10 employed with DYS, did they?
11 A. I don't believe so, no, sir.
12 Q. Not even your investigator even told you
13 that, did they?
14 A. I didn't investigate the investigation, no,
15 sir.
16 Q. Well, so Ms. Spann didn't tell you that?
17 Ms. Calendar didn't tell you that?
18 A. No, sir they -- no, sir, that's correct.
19 Q. In fact, when you -- for example, looking at
20 his personnel file, which we reviewed, there
21 was never any allegation of sexual harassment
22 by any other employees in his file other than
23 McMillian. Were you aware of that?

451

1  A. I'm not sure what all might be in his
2  personnel file. I haven't looked back
3  through it lately.
4  Q. Okay.
5  A. Not that I don't think it would have mattered
6  at this point.
7  Q. It wouldn't have mattered at all, would it?
8  A. Not if I had been given a substantiated
9  allegation.
10 Q. Okay. And I appreciate that. I appreciate
11 that. Because even if in his personnel file,
12 if you look in his personnel file and you see
13 where -- for example, quick review of it, his
14 2000 -- in Plaintiff's Exhibit Number 1, his
15 personnel preappraisal dated 2/8/05 said,
16 Mr. Hardy is an asset to the Mount Meigs
17 campus. To the best of my knowledge,
18 Mr. Hardy continues to perform above average
19 as a dependable staff. He has voluntarily
20 reported to the campus to address potential
21 problems without being asked. That was dated
22 9/23/05 by Ms. Lewis.
23 A. Okay.

452

1  Q. Would it be also correct to say that in his
2  personnel file, his evaluation dated -- that
3  covered the period from 3/01/04 to 3/01/05
4  states that he exceeds standards, and he got
5  a 31.3?
6  A. On that period, yes.
7  Q. That is pretty good, isn't it?
8  A. For that period it is, yes, sir.
9  Q. But also his midappraisal that's dated
10 11/30/04 by Ms. Marcia Hutley, it said,
11 Mr. Hardy's strengths are a tremendous asset
12 to the department to include his knowledge of
13 policy and procedure and working with
14 training new staff and organization skills.
15 Do you see that? Do you see where his
16 appraisal that's dated --
17 A. That confirms that he knew proper policy and
18 procedure I think.
19 Q. Okay. And the preappraisal that's dated
20 3/4/03, you see where in there it makes
21 reference to his -- Mr. Hardy's work
22 performance. Works significantly with other
23 people. Hard -- hands-on approach. Good

473

1  (Whereupon, a brief recess was
2  had.)
3  Q. Mr. Wood, two things. Since Mr. Hardy has
4  been employed with DYS, are you aware of any
5  committees that he's been placed on?
6  A. What kind of committees?
7  Q. Like with the Career Path Committee, Security
8  Task Committee.
9  A. Oh, some of the internal campus operations?
10  I'm not aware of any, but I mean, I certainly
11  think he would be. Everybody participates in
12  those at some time or another.
13  Q. Okay. So it doesn't matter of your
14  performance or anything. They just put you
15  on.
16  A. It would be people such as Mr. Hardy who have
17  several years' experience and knows the
18  policies and procedures and how things should
19  be run, yeah.
20  Q. Okay. Now, going back to Ms. McMillian. You
21  were aware that she got a second job when
22  Ms. Calendar had mentioned in her memo that
23  Ms. McMillian had obtained a second job

474

1  somewhere in October; is that correct? Are
2  you aware of that? Going back to Agency
3  Exhibit Number 6.
4  A. It was my understanding that that was part of
5  what Mr. Staton was trying to determine as to
6  whether or not she did have a second job,
7  when she obtained that job. If my memory
8  serves me correctly, I thought -- let's see,
9  we may have determined that she subsequently
10  got a second job but may not have had it at
11  the time this complaint was filed. No, sir,
12  I don't recall all the details of that.
13  Q. But she did -- even Ms. Calendar questioned
14  this matter regarding Ms. McMillian obtaining
15  a second job; is that correct?
16  A. I can only assume that there was some
17  discussion about that in the hearing or in
18  the evidence because there is mention in this
19  December 8th memo from Marcia Calendar where
20  she addresses the issue of a second job and
21  something about, He argues -- I'm assuming
22  that's Michael. It says, He argues that she
23  had a motive to fabricate the allegation and

475

1  thereby acquire more favorable working
2  hours. Ms. Spann investigated his defense
3  and found it not credible based on
4  Ms. McMillian's denial she had a second job.
5  So yes, there was apparently some discussion
6  about that during the hearing.
7  Q. Okay. Then later on it says that, in fact,
8  she did obtain a second job; is that correct?
9  A. That's what I mentioned earlier I was trying
10  to recall. I'm not sure what the time frame
11  for that was, whether it was subsequent to
12  all of this or whether she had previously
13  been employed or was employed during this
14  period of time.
15  Q. And nobody told you that she had been seeking
16  or making application or had been seeking a
17  second job while she was working there at
18  DYS. No one told you that.
19  A. That she was attempting to obtain a second
20  job?
21  Q. Yes.
22  A. I don't believe so, no, sir.
23  Q. Okay.

476

1  A. I don't recall anything about a discussion
2  about her -- a process where she was making
3  application. I don't recall anything about
4  that.
5  Q. Nobody told you that she was --
6  A. I don't recall any discussion to that detail
7  right now.
8  Q. And when she was working on the -- nobody
9  told you that when she was working on the
10  12:00 to 8:00 shift, that would have
11  prevented her from getting a majority second
12  job that started at 8:00.
13  A. Well, I did understand that all of those
14  things put together were the context of the
15  issue that was Mr. Hardy's defense, but I
16  didn't go into any lengthy detailed
17  discussions about the specifics of who worked
18  when and where and all of that sort of thing.
19  Q. You relied on your investigator.
20  A. Certainly, yes, sir, and the recommendations
21  of the other administrators too.
22  MR. STOKES: Mr. Wood, I appreciate
23  your time.

433

1  A. The initial investigation, yes, sir.
2  Q. You didn't do any investigation of the case.
3  A. No, sir.
4  Q. Did anyone else do an investigation of the
5     case other than Ms. Spann at this time prior
6     to her writing this memo dated July --
7  A. I'm not sure at what point Mr. Staton was
8     involved to assist her, but it may have been
9     prior to this.  He was the only other person
10    involved in this besides the legal counsel.
11 Q. And you don't know when Mr. Staton was
12    involved?
13 A. No, sir, and I wasn't involved in the day-to-
14    day goings on in the investigation.
15 Q. And you assume that the findings of Ms. Spann
16    to be true?
17 A. Yes, sir.
18 Q. Okay.  Then, in turn, you got a
19    recommendation by -- you got a recommendation
20    then by --
21        MR. PERRY:  Tim Davis.
22 Q. You got a recommendation by -- Plaintiff's
23    Exhibit Number 3, you got a memo dated

434

1     November the 3rd from Mr. Tim Davis dated
2     November 3rd, 2005; is that correct?
3  A. Yes, sir, that's the memo we looked at
4     earlier.
5  Q. Okay.  And Mr. Davis did not investigate the
6     case, did he?
7  A. No, sir, I don't believe he was involved in
8     the investigation.
9  Q. Okay.  And Mr. Davis recommended that
10    Mr. Hardy be terminated, did he not?
11 A. Yes, sir, that's what the memo says.
12 Q. And Mr. Perry didn't investigate the case,
13    did he?
14 A. No, sir.
15 Q. And he was the attorney for DYS; is that
16    correct?
17 A. Yes, sir, that's correct, he's not the
18    investigator.
19 Q. And he made a recommendation that Mr. Hardy
20    be terminated; is that correct?
21 A. Yes, sir.
22 Q. Okay.  Now, those two persons made a
23    recommendation that he be terminated, and

435

1     that memo went to you on November 3rd, 2005;
2     is that correct?
3  A. Yes, sir.
4  Q. At that time, had Mr. Hardy had a hearing?
5  A. No, sir, that's the basis for our setting up
6     the hearing.
7  Q. Okay.  Then after that, there was a -- but
8     prior to that time, nobody discussed any
9     facts with you about the case, did they?
10 A. The only information or discussions I had
11    were the -- was the conversation with Tim
12    Davis about the attempt to meet with this
13    lady, which he and I talked about, and there
14    was I believe a conversation either with
15    Ms. Spann or it may have been with legal
16    counsel.  I'm not sure.
17        MR. PERRY:  Don't testify about your
18    conversations with me.
19 A. It was mentioned earlier that there was a
20    conversation about the time frame that it was
21    taken to resolve this, and it was due to
22    Mr. Staton trying to resolve the question
23    about employment.  And that was just sort of

436

1     a status report to me about what was going
2     on, but other than that, I don't know that
3     there was any conversations other than
4     correspondence from Mr. Hardy.
5  Q. Now, when you go back to the recommendation
6     that was made to you by Ms. Deborah Spann,
7     Employee's Exhibit Number 10 --
8  A. Yes, sir.
9  Q. Would you turn back to Employee's Exhibit
10    Number 10?
11 A. Okay.
12 Q. When you received this memo, no one told you
13    that the two witnesses that was listed in
14    this memo that allegedly were the persons
15    that confirmed this inappropriate behavior by
16    Mr. Hardy, no one told you that one of them
17    was the mother of Ms. McMillian, did they?
18 A. I don't know when I knew it, but I believe
19    early on, Ms. Spann when assigned this
20    mentioned to me that she was proceeding and
21    had scheduled an interview with Ms. McMillian
22    and that her mother would be present.  So
23    that's the extent of my knowledge about the

461

1     Certainly.

2 Q. Okay. Now, then you had on January the

3     6th -- would you turn to Plaintiff's Exhibit

4     Number 14? This was the termination letter

5     of Mr. Hardy; isn't that correct?

6 A. The January the 6th letter from me? Yes,

7     sir, I believe it is.

8 Q. And it was after the hearing that he had had

9     with Ms. Calendar.

10 A. Yes, sir.

11 Q. And which there were no witnesses presented

12     at that hearing with Ms. Calendar on November

13     15th from DYS, only witnesses by Mr. Hardy.

14 A. If you say so. This is my letter if that's

15     your question to me.

16 Q. Yes, this is your letter. And you made your

17     recommendation based on the testimony and

18     documents presented during the hearing. What

19     documents that were presented during the

20     hearing did you make it on?

21 A. In the previous letter that's in here

22     somewhere that lays out the allegations which

23     we sent to Mr. Hardy is a document that

462

1     specifically outlines the allegations against

2     him. Ms. Calendar's job was to take all of

3     that information and Mr. Hardy's information

4     and sift through everything in an open

5     process and make a recommendation to me. I

6     didn't conduct the hearing or participate in

7     the hearing. Whatever documents were

8     presented were a part of the record. She says

9     that she reviewed testimony and documents,

10     and that's all I needed to know from her. I

11     was -- from her recommendation, I proceeded

12     with this letter.

13 Q. Okay. So would it be correct to say then

14     that you independently did not review the

15     testimony and documents of the hearing?

16     Would that be correct to say when you wrote

17     this letter?

18 A. Yes, sir, I didn't participate in the

19     hearing, and I didn't rehear the hearing. My

20     recommendations are based on the work of the

21     people that are employed and specifically

22     have those roles to determine what's going on

23     in these circumstances and make a solid

463

1     recommendation to me.

2 Q. Okay. And then when you said based on -- in

3     the third paragraph, Based on the evidence

4     and a review of your personnel file, you are

5     hereby recommending the dismissal of

6     Mr. Hardy --

7 A. Correct.

8 Q. -- it would be correct to say then that you

9     didn't review his personnel file, did you?

10     Is that correct?

11 A. Well, I'm not implying specifically that I

12     personally reviewed his personnel file. This

13     is a general letter about testimony, about

14     documents in general terms, about evidence

15     and reviews of files in very general terms.

16     So no, I told you earlier that I did not

17     personally go run down to personnel and open

18     up his personnel file.

19 Q. Okay. All right.

20 A. I thought I made that clear earlier.

21 Q. Okay. Yes. So even when you wrote this

22     letter, you hadn't done that.

23 A. That's correct.

464

1 Q. And you relied on your folks, like

2     Ms. Deborah Spann and like Ms. Calendar.

3 A. Absolutely. Very capable, experienced

4     people.

5 Q. Very capable, very experienced. Did you know

6     Ms. Deborah Spann did not even ask

7     Ms. McMillian about her prior work

8     employment? Did you know that when she did

9     the investigation?

10 A. I wasn't involved in the discussions that she

11     had with the witnesses.

12 Q. Okay. Do you know Ms. McMillian brought

13     allegations of harassment by probably twenty

14     of your employees? Were you aware of that?

15 A. Now, you're talking about the Ms. McMillian

16     that's the subject of this complaint?

17 Q. Yes, sir.

18 A. So you're saying that she has filed

19     complaints against twenty individual

20     employees?

21 Q. Yes. When she filed the complaint, the EEOC

22     complaint, when she said co-workers, she

23     named, specifically named almost twenty of

469

1  clarifies the language where she's really
2  talking about being subjected to retaliation,
3  and then she goes on to describe that. But
4  she still does not go in and I don't think
5  present a list of who she's alleging did
6  that.
7  Q. Okay. Now, this is my question: Even
8     after -- and do you admit that you received a
9     copy of the complaint, Exhibit Number 26?
10 A. No, I don't right now recall holding this in
11    my hand. It would be -- these documents of
12    this kind that we get occasionally go out of
13    my office directly to legal within minutes of
14    coming in, so it's not something I would have
15    held on to and mulled over for any length of
16    time. I probably did see it. It was
17    probably addressed to my office, but it would
18    have gone directly to legal for proper
19    assignment for investigation.
20 Q. Okay. Do you remember talking to any
21    employee at DYS and asking them had they
22    retaliated against Ms. McMillian?
23 A. No, sir, I didn't conduct any sort of

470

1  investigation on my own.
2  Q. Okay. Would it be correct to say, Mr. Wood,
3     that if Mr. Hardy was off work, you would
4     agree that it would be difficult for him to
5     personally harass Ms. McMillian if he wasn't
6     there, wouldn't it?
7  A. No, sir, I wouldn't necessarily agree to
8     that. If he desired to in absentia
9     manipulate a harassing, hostile kind of
10    environment, he could do that and not be
11    present.
12 Q. Okay. So you're saying that it's your
13    opinion that Mr. Hardy created a hostile work
14    environment for Ms. McMillian?
15 A. No, sir. I was answering your question
16    about the -- your point blank question about
17    he could not do it if he wasn't there. And
18    my answer was, I would not say that's the
19    case. And an example I gave you was my
20    answer to your question.
21 Q. But you agree that he could not personally
22    harass her like she stated in her
23    memorandum.

471

1  A. You mean personally as in face to face?
2  Q. Face to face harass her.
3  A. Certainly if he's not face to face with her,
4     it would be difficult to have a conversation
5     with someone if you're not face to face. But
6     if you're asking if he can manipulate a
7     hostile environment, that's a different
8     question altogether.
9  Q. So would you agree that if he put
10    Ms. McMillian off -- took her off the day
11    shift and put her on the 12:00 to 8:00 shift
12    away from him, that would assist in him not
13    being able to personally harass her; is that
14    correct?
15 A. I can't answer that. I don't know what the
16    circumstances were.
17 Q. All right. And was this the first time you
18    know whether or not Ms. Marcia Calender had
19    conducted a fact-finding hearing?
20 A. No, sir, I think she's done several hearings.
21 Q. You think she's done several hearings?
22 A. Yes, sir.
23 Q. And Ms. Calender would know if she had done

472

1  several hearings, wouldn't she? You think
2  she would be aware of that fact.
3  A. Certainly.
4  Q. And are you also aware that Ms. Deborah Spann
5     testified that she did not review the
6     personnel file of Mr. Hardy.
7  A. You're asking me was I aware of Ms. Spann's
8     testimony?
9  Q. Yes.
10 A. I wasn't here. I don't --
11 Q. Are you aware of the fact that when she did
12    her investigation, she did not review the
13    personnel file of Mr. Hardy?
14 A. I think you told me that earlier today, so I
15    am aware of it now, yes, sir.
16 Q. But you wasn't aware of it prior to July the
17    6th, 2005, when you made her --
18 A. That's correct, yes, sir.
19    MR. STOKES: Could we have one break,
20    Your Honor, so I can review my questions?
21    THE COURT: In fact, if you don't mind,
22    let's just take a five-minute restroom
23    break. It's 11:25. Come back at 11:30.

473

1         (Whereupon, a brief recess was
2         had.)
3 Q. Mr. Wood, two things. Since Mr. Hardy has
4   been employed with DYS, are you aware of any
5   committees that he's been placed on?
6 A. What kind of committees?
7 Q. Like with the Career Path Committee, Security
8   Task Committee.
9 A. Oh, some of the internal campus operations?
10   I'm not aware of any, but I mean, I certainly
11   think he would be. Everybody participates in
12   those at some time or another.
13 Q. Okay. So it doesn't matter of your
14   performance or anything. They just put you
15   on.
16 A. It would be people such as Mr. Hardy who have
17   several years' experience and knows the
18   policies and procedures and how things should
19   be run, yeah.
20 Q. Okay. Now, going back to Ms. McMillian. You
21   were aware that she got a second job when
22   Ms. Calendar had mentioned in her memo that
23   Ms. McMillian had obtained a second job

474

1 somewhere in October; is that correct? Are
2   you aware of that? Going back to Agency
3   Exhibit Number 6.
4 A. It was my understanding that that was part of
5   what Mr. Staton was trying to determine as to
6   whether or not she did have a second job,
7   when she obtained that job. If my memory
8   serves me correctly, I thought -- let's see,
9   we may have determined that she subsequently
10   got a second job but may not have had it at
11   the time this complaint was filed. No, sir,
12   I don't recall all the details of that.
13 Q. But she did -- even Ms. Calendar questioned
14   this matter regarding Ms. McMillian obtaining
15   a second job; is that correct?
16 A. I can only assume that there was some
17   discussion about that in the hearing or in
18   the evidence because there is mention in this
19   December 8th memo from Marcia Calendar where
20   she addresses the issue of a second job and
21   something about, He argues -- I'm assuming
22   that's Michael. It says, He argues that she
23   had a motive to fabricate the allegation and

475

1 thereby acquire more favorable working
2   hours. Ms. Spann investigated his defense
3   and found it not credible based on
4   Ms. McMillian's denial she had a second job.
5   So yes, there was apparently some discussion
6   about that during the hearing.
7 Q. Okay. Then later on it says that, in fact,
8   she did obtain a second job; is that correct?
9 A. That's what I mentioned earlier I was trying
10   to recall. I'm not sure what the time frame
11   for that was, whether it was subsequent to
12   all of this or whether she had previously
13   been employed or was employed during this
14   period of time.
15 Q. And nobody told you that she had been seeking
16   or making application or had been seeking a
17   second job while she was working there at
18   DYS. No one told you that.
19 A. That she was attempting to obtain a second
20   job?
21 Q. Yes.
22 A. I don't believe so, no, sir.
23 Q. Okay.

476

1 A. I don't recall anything about a discussion
2   about her -- a process where she was making
3   application. I don't recall anything about
4   that.
5 Q. Nobody told you that she was --
6 A. I don't recall any discussion to that detail
7   right now.
8 Q. And when she was working on the -- nobody
9   told you that when she was working on the
10   12:00 to 8:00 shift, that would have
11   prevented her from getting a majority second
12   job that started at 8:00.
13 A. Well, I did understand that all of those
14   things put together were the context of the
15   issue that was Mr. Hardy's defense, but I
16   didn't go into any lengthy detailed
17   discussions about the specifics of who worked
18   when and where and all of that sort of thing.
19 Q. You relied on your investigator.
20 A. Certainly, yes, sir, and the recommendations
21   of the other administrators too.
22      MR. STOKES: Mr. Wood, I appreciate
23   your time.

485

Q. You did not call Mr. Hardy in and tell Mr. Hardy that he was violating any rules and regulations of DYS and for him not to discuss this matter with any other employee. You didn't call him in and tell him that, did you?

A. I did not, no, sir.

Q. As a matter of fact, you didn't put anything in writing to him, did you, regarding --

A. After he wrote a letter to Deborah Spann?

Q. Yes. You didn't put anything in writing to him --

A. The letter was not to me; it was to Deborah Spann.

Q. Okay. But you're saying you were so concerned about this, you were so concerned about all these rumors and all the discussions and concerned, but you didn't call him in and you didn't write him a memo; is that correct?

A. That's correct, yes, sir. I used the administrative channels available to me through Mr. Davis and gave directions as the

486

director of the agency for certain things to be done.

Q. Okay. And wouldn't it be correct to say that the first time that Mr. Hardy was informed that this grievance he filed on July 14, 2005, was so egregious and so wrong, the first time he received written notice about that was November 4th, 2005, when you wrote him a letter and then you allege that he had been in serious violation of the policy by retaliating against Ms. McMillian?

A. All right. Now, back up for me. You're asking me if this November 4th was the first time he was advised of this?

Q. Yes.

A. I wouldn't think so, no, because it had been going on for months.

Q. No, I'm not asking you what --

A. If you're asking me if I personally provided it, no.

Q. Did anyone put in writing to him and say, Mr. Hardy, we feel like what you did on July 14th, 2005, violated DYS rules and we're

487

going to tell you that and we want you to stop, don't do it, cease and desist? Did anybody tell him that from July 14th, 2005, up until November the 4th, 2005?

A. Well, let's look at that. I don't know. When was the -- let me see the date of that other memo over here. Let me see. See, he wrote this in a -- this is a memo --

    MR. PERRY: What number?

A. Employee's Exhibit Number 7, which was a letter to Deborah Spann. He wrote that two or three days after having been called by either Tim Davis or somebody or somebody within the administration to tell him, You will not conduct this meeting. You will not bring this lady in and conduct this meeting with her present. And so he turned around and decided that what he would do is just go on and file a grievance. Now, he's also -- if somebody had to call him and tell him this wasn't the proper procedure, you know, we're talking about a guy that's, you know, based on all his appraisal stuff and everything,

488

sort of an expert on policy and procedure. I mean, he knew exactly what the proper procedure was. So I know exactly what this was about. Now, as far as the information about him ceasing and desisting, if he didn't get the message from Mr. Davis when he -- all of this was called to a grinding halt, then he wasn't listening.

Q. Well, Mr. Wood, what you're saying, you have no evidence anywhere in here about Mr. Davis other than what you're saying that he has allegedly done. I'm asking you: You're saying that -- it's your testimony that there was nothing in writing from July 14th to November the 4th, 2005, given to Mr. Hardy that's saying his complaint that he had filed --

A. Oh, I see what you're asking. Yes, sir. I'll have to look at the other file. There's nothing from me. I'm not aware of what Mr. Davis did from his phone calls. But, yes, sir, there is information -- there is my testimony that I talked with Mr. Davis and

# HARDY V. WOOD

## BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

# EXHIBIT

# 8





*State of Alabama*
## Department of Youth Services
*Post Office Box 66*
*Mt. Meigs, Alabama 36057*

**BOB RILEY**
**GOVERNOR**

**J. WALTER WOOD, Jr**
**EXECUTIVE DIRECTOR**

July 19, 2005

MEMORANDUM

TO:        J. Walter Wood, Jr.
           Executive Director

FROM:      Debra L. Spann
           Personnel Manager

SUBJECT:   Sexual Harassment Complaint
           Tera McMillian vs. Michael Hardy

I have investigated the above complaint. I find the complaint to be valid. Two (2) witnesses heard or were asked sexually inappropriate questions concerning Ms. McMillian by Mr. Hardy. In addition, from the information provided by Ms. McMillian, I definitely feel one or more of the incidents which were described to me occurred.

Mr. Hardy is making much of the fact he has not seen or been around Ms. McMillian except for a few minutes since February, 2005 – she has been on the 12-8 a.m. shift. Ms. McMillian states these incidents occurred over the past two (2) years. Mr. Hardy also is quite concerned that confidentiality has been breached and his good name and character have been compromised.

Mr. Hardy should be disciplined for his actions. All staff should be re-trained on sexual harassment. It is apparent to me thinking has not changed in this department. We cannot condone telling staff to do one thing and doing something else ourselves (it is my understanding Mr. Hardy went over sexual harassment at every staff meeting). I have contacted Maxine Wheeler to do Sexual Harassment Training for our staff as it did not sink in with State Personnel doing it.

DLS





# HARDY V. WOOD

## BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

# EXHIBIT

# 9





State of Alabama
## DEPARTMENT OF YOUTH SERVICES
Post Office Box 66
Mt. Meigs, Alabama 36057

BOB RILEY
GOVERNOR

J. WALTER WOOD, JR.
EXECUTIVE DIRECTOR

# Memo

To:   J. Walter Wood, Jr., Executive Director

From: Tim Davis, Deputy Director

Date:  November 3, 2005

Re:    Michael Hardy

On or about June 14, 2005, Tera McMillian filed a complaint against her supervisor Michael Hardy alleging sexual harassment. Ms. Spann, pursuant to your instructions, investigated the complaint and reported her findings to the legal department on October 17, 2005. Ms. Spann found the complaint valid, based on corroboration by two witnesses. Ms. Spann concluded that Mr. Hardy should be disciplined for his actions.

I have conferred with Dudley Perry and he also recommended strong disciplinary action. Based on Ms. Spann's investigation and the advise of counsel, it is therefore my recommendation that Mr. Hardy's employment with the department be terminated.



RECEIVED
NOV 3 2005
DYS-LEGAL COUNSEL



EXHIBIT
9

# HARDY V. WOOD

## BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

# EXHIBIT

# 10

STATE OF ALABAMA



DEPARTMENT **DYS** SERVICES

POST OFFICE BOX 66
MT. MEIGS, ALABAMA 36057
November 4, 2005

**BOB RILEY**
GOVERNOR

J. WALTER WOOD, JR.
EXECUTIVE DIRECTOR

Mr. Michael Hardy


Dear Mr. Hardy:

I have received a recommendation that disciplinary action be taken regarding your employment as a Youth Services Counselor I. The recommendation reveals the following alleged inappropriate conduct and work performance as the reason for the recommendation:

Violation of the Rules of the State Personnel Board (670-X-19-.01 (1g) - disruptive conduct) and/or violation of the Rules of the State Personnel Board (670-X-19-.01 (2 e) - use of abusive or threatening language) and/or violation of the Rules of the State Personnel Board (670-X-19-.01 (2 j) - serious violation of any other department rule), and/or violation of DYS Policy (3.13.2 - Prohibition of Sexual Harassment): Specifically, you were alleged to have made sexual advances and/or to have created a hostile working environment for a subordinate employee, Tera McMillian, who filed a harassment complaint against you. In response to Ms. McMillian's harassment complaint you are alleged to have attempted, among other things, to cause an investigation against her for her having filed a complaint against you.

Based on the investigation of the complaint against you, the recommendation I have received, a review of your personnel file and a review of your past work history, it is my judgment that a hearing be held to determine whether disciplinary action is warranted.

A hearing will be conducted on Thursday, November 10, 2005, at 10:00 a.m., in the Conference Room at the Central Office on the Mt. Meigs Campus in Montgomery. The hearing will be conducted by either myself or my designee. At the hearing, you may present verbal and written information, produce witnesses and be represented by counsel if you choose. I will review the information presented and notify you of my decision regarding any possible disciplinary action. I consider your attendance to be mandatory, but if you do not attend, I will be forced to make my decision based on the information available to me.

Because this matter involves allegations of violation of the sexual harassment policy and anti-retaliation provisions of the law, I instruct you not to discuss this matter with the complaining party or any DYS Staff, nor to take any action which could in any way affect Ms. McMillian.

Sincerely,

J. Walter Wood, Jr.
Executive Director

JWW/dls

c: Mr. Tim Davis
   Mr. Wayne Booker
   Ms. Janice Coles
   Mr. T. Dudley Perry, Jr.

**EXHIBIT**
10

# HARDY V. WOOD

## BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

# EXHIBIT

# 11

COPY

1

CONFIDE...

1    STATE OF ALABAMA

2    DEPARTMENT OF YOUTH SERVICES

3    MT. MEIGS, ALABAMA

4

5

6

7    IN RE:  MICHAEL HARDY

8

9

10

11

12

13    * * * * * * * * * *

14    TESTIMONY AND PROCEEDINGS, taken before

15    the Honorable Marcia Calender, Hearing Officer,

16    at the Mt. Meigs Campus, Mt. Meigs, Alabama, on

17    Tuesday, November 15, 2005, commencing at

18    approximately 10:04 a.m., and reported by Sherry

19    Mack, Court Reporter and Commissioner for the

20    State of Alabama at Large.

21    * * * * * * * * * *

22

23

*DUNN, KING & ASSOCIATES*
*Montgomery, Alabama*
(334) 263-0261 or (800) 359-8001



EXHIBIT
11

2

CONFIDENTIAL

```
1    HEARING OFFICER:

2    Ms. Marcia Calender
     Assistant Director
3    ALABAMA DEPARTMENT OF YOUTH SERVICES
     Mt. Meigs Campus
4    ▬▬▬▬▬▬▬▬▬
     Mt. Meigs, Alabama  36057
5

6                          APPEARANCES

7    FOR THE EMPLOYEE:

8    Mr. Theron Stokes
     General Counsel
9    ALABAMA EDUCATION ASSOCIATION
     ▬▬▬▬▬▬▬▬▬)
10   Montgomery, Alabama  36103-4177

11   FOR THE DEPARTMENT OF YOUTH SERVICES:

12   Mr. T. Dudley Perry, Jr.
     Assistant Attorney General
13   ALABAMA DEPARTMENT OF YOUTH SERVICES
     Mt. Meigs Campus
14   ▬▬▬▬▬▬
     Mt. Meigs, Alabama  36057
15
                   * * * * * * * * * * * *
16
                    EXAMINATION INDEX
17
     KAREN JOHN
18        DIRECT BY MR. HARDY            31

19   VICTOR BLACK
          DIRECT BY MR. HARDY            34
20        CROSS BY MR. PERRY             38
          REDIRECT BY MR. HARDY          42
21
     ROGERS DORTCH
22        DIRECT BY MR. STOKES           45
          CROSS BY MR. PERRY             53
23        REDIRECT BY MR. STOKES         60
```

3

CONFIDENTIAL

1    JAMES MOORE
          DIRECT BY MR. HARDY          65
2
3    FRED GRANT
          DIRECT BY MR. HARDY          67
          CROSS BY MR. PERRY           69
4
5    EUGENE SMITH
          DIRECT BY MR. HARDY          71
6    JESSILYN TOWNSEND
          DIRECT BY MR. HARDY          76
7
8    BRIAN MILES
          DIRECT BY MR. STOKES         78
9    MICHAEL HARDY
          DIRECT BY MR. PERRY          88
10                  EXHIBIT INDEX

11
12   AGENCY'S EXHIBIT NO.:

13   1    7/19/05, memo            8,10,11,20
          to J. Wood from
          D. Spann
14        OFFERED:  8
          ADMITTED:  --
15
16   2    7/14/05, memo            8,10,11
          to D. Spann from
          M. Hardy
17        OFFERED:  8
          ADMITTED:  --
18
19   EMPLOYEE'S EXHIBIT NO.:

20   1    Policy and               20
          Procedures, 3.13.1
          OFFERED:  20
21        ADMITTED:  20

22

23

4

CONFIDENTIAL

| | | | |
|---|---|---|---|
| 1 | 2 | 7/14/05, memo | 20 |
| | | to D. Spann from | |
| 2 | | M. Hardy | |
| | | OFFERED:  20 | |
| 3 | | ADMITTED:  20 | |
| | | | |
| 4 | 3 | 6/21/05, memo | 20,50 |
| | | to Whom It May | |
| 5 | | Concern from Paige | |
| | | Hall Staff | |
| 6 | | OFFERED:  20 | |
| | | ADMITTED:  20 | |
| 7 | | | |
| | 4 | 6/21/05, memo | 21,22 |
| 8 | | to Whom It May | |
| | | Concern from | |
| 9 | | A. Harvest and | |
| | | J. Ellis | |
| 10 | | OFFERED:  21 | |
| | | ADMITTED:  21 | |
| 11 | | | |
| | 5 | 11/8/05, memo | 22,65,85 |
| 12 | | to Whom It May | |
| | | Concern from A. Ford | |
| 13 | | OFFERED:  22 | |
| | | ADMITTED:  22 | |
| 14 | | | |
| | 6 | Memo from R. Lee | 24 |
| 15 | | OFFERED:  24 | |
| | | ADMITTED:  24 | |
| 16 | | | |
| | 7 | 7/14/05, memo | 24 |
| 17 | | to D. Spann from | |
| | | M. Hardy | |
| 18 | | OFFERED:  24 | |
| | | ADMITTED:  24 | |
| 19 | | | |
| | 8 | 4/20/00, memo | 25 |
| 20 | | to M. Hardy from | |
| | | R. Ray | |
| 21 | | OFFERED:  25 | |
| | | ADMITTED:  25 | |
| 22 | | | |
| | | | |
| 23 | | | |

5

| | | | |
|---|---|---|---|
| 1 | 9 | 1/18/00, memo | 26 |
| | | to D. Spann from | |
| 2 | | W. Samuel | |
| | | OFFERED:  26 | |
| 3 | | ADMITTED:  26 | |
| | | | |
| 4 | 10 | 6/23/97, memo | 26 |
| | | to J. Tyler from | |
| 5 | | M. Hardy | |
| | | OFFERED:  26 | |
| 6 | | ADMITTED:  26 | |

7                    * * * * * * * * * *

8          HEARING OFFICER:  This is an

9               administrative hearing of the

10              Department of Youth Services held

11              on today, November 15th, 2005, in

12              the conference room, at the

13              central office, on the Mt. Meigs

14              complex in Montgomery, Alabama.

15                   This is a fact-finding

16              conference concerning Michael

17              Hardy.  It will be presented by

18              Deputy Attorney General Mr. T.

19              Dudley Perry, Jr.  This conference

20              is being recorded.

21                   I am Marcia Calender,

22              assistant director.  I will be

23              conducting the conference today.

6

1    Sherry Mack of Dunn, King &

2    Associates is our court reporter

3    today.

4        Attending today's conference

5    are Michael Hardy, Youth Services

6    Counselor I, Mt. Meigs Complex;

7    representing him, Mr. Theron

8    Stokes, General Counsel for the

9    Alabama Education Association; and

10   T. Dudley Perry, Jr., Deputy

11   Attorney General, State of

12   Alabama.  Witnesses may also be

13   called.

14       Mr. Hardy, as indicated in

15   your correspondence from Mr. Wood,

16   dated November 4th, 2005, during

17   this conference, you may present

18   verbal and written information,

19   produce witnesses, and be

20   represented by legal counsel, if

21   you so choose.

22       Ample time will be afforded

23   so that both parties will have an

7

| | |
|---|---|
| 1 | opportunity to present their |
| 2 | side. This is not an adversarial |
| 3 | court hearing. It is an |
| 4 | administrative fact-finding |
| 5 | opportunity for me to be apprised |
| 6 | of all facts that you wish for me |
| 7 | to know. The rules of evidence do |
| 8 | not apply. I will decide and rule |
| 9 | on any objections. |
| 10 | Disciplinary action has been |
| 11 | recommended, based on the |
| 12 | following information that |
| 13 | Mr. Perry will now present. |
| 14 | MR. PERRY: As stated in the letter |
| 15 | from Mr. Wood, dated November 4th, |
| 16 | 2005, Tera McMillan made a |
| 17 | complaint of sexual harassment |
| 18 | against Mr. Hardy. Mr. Hardy |
| 19 | supervised Ms. McMillan. |
| 20 | The personnel director, |
| 21 | Debra Spann, investigated |
| 22 | Ms. McMillan's allegations. |
| 23 | Ms. McMillan was interviewed |

8

1             during the course of the

2             investigation.

3                 Ms. Spann concluded, as a

4             matter of fact, that

5             Ms. McMillan's complaint was

6             valid. And Ms. Spann determined

7             that Mr. Hardy should be

8             disciplined as a result of his

9             actions. Exhibit #1, which I have

10            given each of y'all a copy of, is

11            Ms. Spann's finding.

12                In addition, during the

13            course of the investigation,

14            Mr. Hardy sought to initiate a

15            grievance against Ms. McMillan

16            because she had filed a

17            harassment complaint against him.

18            Exhibit #2 is a copy of the

19            grievance.

20               This so-called grievance is

21            not in compliance with the

22            procedure outlined in policy. And

23            it is a simple attempt to

9

1    retaliate against the complaining

2    party by forcing the agency to

3    investigate her.  It is and was my

4    opinion that that conduct would

5    likely have been perceived as

6    retaliatory by the agency.

7           Mr. Hardy is a supervisor

8    and is aware and knowledgeable of

9    the anti-harassment policies.  In

10   addition, he is aware and

11   knowledgeable about the

12   anti-retaliation policies.

13          Now, based on these facts

14   and others, Mr. Davis recommended

15   to Mr. Wood that disciplinary

16   action be taken.  That is

17   essentially the facts.

18          Now, the purpose of this

19   hearing, as you know, is to allow

20   Mr. Hardy to be heard and to tell

21   his side of the story before a

22   final decision is made.

23   HEARING OFFICER:  Mr. Hardy, I would

10

```
 1              like, for the record, do you have
 2              a copy of Exhibit #1 and Exhibit
 3              #2?
 4      MR. STOKES:  Well, we have just
 5              received what has been marked as
 6              Exhibit #1 and Exhibit #2.
 7      HEARING OFFICER:  All right.  Fine.
 8              Mr. Dudley, do you have any other
 9              supporting documentation that you
10              would like to present?
11      MR. PERRY:  No.
12      HEARING OFFICER:  Mr. Hardy, you now
13              have the opportunity to respond.
14              You may also present witnesses
15              and/or any supporting
16              documentation.
17      MR. STOKES:  First, for the record, we
18              were informed that, at this
19              hearing, there would be no
20              discovery allowed.  And that came
21              from Ms. Carney from the
22              Department.  So we don't know.
23              Only thing we have been
```

1        provided -- I have in front of me

2        what I just received on #1 and #2.

3            Also, we have a copy of a

4        letter dated November 4th, 2005,

5        from Mr. J. Walter Wood, Jr.,

6        where there were allegations.  The

7        contents of the letters said that

8        Mr. Hardy had violated some

9        rules -- allegedly some violations

10       of some rules in which he stated

11       one being disruptive conduct in

12       violation of the rules of the

13       State Personnel Board; use of

14       abusive, threatening language,

15       from the State Personnel Board;

16       serious violation of any other

17       Department rule or a violation of

18       prohibition of sexual harassment.

19           And it says specifically,

20       Mr. Hardy was alleged to have made

21       sexual advancement in order to

22       have created a hostile work

23       environment for a subordinate Tera

1    McMillan who had filed a

2    harassment complaint against him

3    and alleged that he caused a

4    disruption in the investigation of

5    that complaint.

6         As of the date and time of

7    this hearing, Mr. Hardy has never

8    been made aware of a specific time

9    nor place of any type of

10   inappropriate conduct in which

11   Ms. McMillan has alleged to have

12   said he made.

13        And, in fact, he has not

14   been made aware of any specific

15   witnesses in which have claimed

16   that they have either seen or been

17   present when he made any type of

18   inappropriate sexual conduct

19   against her.

20        And in fact, the

21   inappropriate language, there has

22   not been anything stated, specific

23   time, place, or date, in which he

13

1    could respond to regarding the

2    language that has been done.

3        Mr. Wood states in his

4    letter about a serious violation

5    of any other Department rules.    We

6    have absolutely no idea what that

7    means.    I assume that somewhere

8    there has to be some kind of

9    specific allegation regarding

10   that.

11       And the fact that he filed  a

12   grievance, Mr. Hardy did that

13   according to what he interpreted

14   to be proper in compliance with

15   the rules of the DYS, that

16   Mr. Hardy should not be prohibited

17   from filing any kind of necessary

18   complaint if he feels like he is

19   the alleged victim of any

20   violation of the DYS policy.

21       And according to the policy

22   stated here in policy number

23   3.13.1, Mr. Hardy has the right  to

14

CONFIDENTIAL

1    have an expeditious and systematic

2    procedure for the resolution of

3    all grievances that may arise

4    during the course of performing

5    his work.

6          Mr. Hardy is not trying to

7    say anything other than he's the

8    victim.  And specifically, I have

9    reviewed the personnel files of

10   Mr. Hardy.  And I have not found

11   anything of such nature, even

12   alleged, in his personnel file.

13         And I note that Mr. Wood

14   said based on -- he made a

15   reference to his personnel file

16   and his past work history.  And in

17   fact, what I reviewed in the

18   personnel file -- which I was not

19   given a copy of it because they

20   said they couldn't give me a copy

21   of it -- but it seemed that all

22   his evaluations exceed standards

23   and, in fact, stated that they

1    found no apparent weaknesses.

2        And I don't know what the

3    past personnel file has to do with

4    these alleged incidents, but I'm

5    just saying from what I saw in the

6    personnel file.

7        With that in mind, we'd like

8    to say that, first, Mr. Hardy

9    denies that he has done anything

10    in violation of the rules of DYS.

11    And being more specific, Mr. Hardy

12    has been put at a difficult

13    situation because, in responding

14    to allegations that has been made

15    against him, he has no -- he

16    cannot respond to any specific

17    incident because he's not been

18    made aware of any specific

19    incident and date to respond to.

20    So he can make only a general

21    response that he has not violated

22    any rules and has not done

23    anything towards Ms. McMillan that

1                 would be in violation of the rules

2                 and regulations of the Department

3                 of Youth Services.

4        MR. HARDY:  First of all, let me say

5                 that back to the grievance

6                 process, the grievance process was

7                 my only means of even addressing

8                 this.  Back in 2000, I filed a

9                 grievance, which this was

10               substantiated.  Back in 2000,

11               also, I filed a sex discrimination

12               claim, which was not anything

13               done.

14                   In knowing the policies

15               myself and reviewing policies and

16               procedure, I was looking for one

17               policy that I could use to, at

18               least, relate the information I

19               feel needed to be related; the

20               information being the fact that,

21               one, that Ms. Spann was calling

22               people that had left the

23               Department, said, come back in, do

CONFIDEN...

1       you have anything on Mr. Hardy.

2       And everybody -- I probably got 12

3       people outside now.  And three of

4       which she interviewed will testify

5       to this.  And everybody came back

6       and told me, said, well,

7       Mr. Hardy, seem like they trying

8       to set you up, you know.  Question

9       like, well, Mr. Hardy, do you sell

10      anything?  Do you sell clothes?

11      Where did you get your clothes

12      from?  Mr. Hardy, are you and

13      Mr. Smith arguing or are y'all

14      dating the same lady?  See, that

15      didn't have anything to do with

16      this particular case.

17          So the grievance -- when I

18      looked at the grievance process,

19      it says, the grievance procedures

20      are set to settle disputes and

21      breakdowns in

22      communication -- breakdown in

23      communication and job-related

18

CONFIDENTIAL

1        situations.  If this is not a

2        job-related situation, then you

3        tell me what is.

4            So the grievance process --

5        and it's not like I filed a

6        grievance through some other

7        means.  I filed it to the

8        personnel manager.  And I say,

9        here it is, I need to put it in

10       writing that here's a problem

11       because you're trying to set me

12       up.  That was my only means of

13       doing that, and that's what I did.

14   HEARING OFFICER:  Would you like to

15       enter the policy and procedure --

16   MR. HARDY:  Yes, I would.

17   HEARING OFFICER:  -- as an exhibit --

18   MR. HARDY:  Right.

19   HEARING OFFICER:  -- Mr. Hardy?  If you

20       will submit it to me, we'll mark

21       it.

22   MR. HARDY:  In addition to that, as far

23       as witnesses goes, it was -- I

19

CONFIDENTIAL

1      heard the statement that there was

2      two witnesses.  Have not anyone

3      came forth to me and said that

4      there was any witness.  As a

5      matter of fact, when I talked to

6      Ms. Spann -- which I submitted a

7      letter which I would also like to

8      enter in.

9           And can I get a copy of

10     these back?

11  HEARING OFFICER:  Certainly.

12  MR. HARDY:  In that letter, I said to

13     Ms. Spann that she's acting as an

14     impartial party.  She's not acting

15     as an impartial party.  She's

16     being biased.  She's acting as a

17     representative of Tera McMillan,

18     then being an impartial party.

19     Okay.  I would like to submit that

20     letter also.

21  HEARING OFFICER:  Okay.  Let me take a

22     break here and submit these

23     letters.  The policy and grievance

20

CONFIDENTIAL

1          procedure, 3.13.1, will be marked

2          as Defendant's Exhibit #1.

3                  This is a letter to

4          Ms. Debra Spann from Mr. Michael

5          Hardy, dated July 14th, 2005,

6          relative to the investigation that

7          Ms. Spann was completing relative

8          to Ms. McMillan's charges.  It

9          will be marked as Defendant's

10          Exhibit #2.

11     MR. HARDY:  Also, I would like to

12          submit a letter from my staff and

13          the staff stating that Mr. Hardy

14          have always acted professional,

15          have always conducted himself in a

16          professional manner.  I think the

17          personnel file would also

18          substantiate the fact that I have

19          been professional and acted

20          accordingly.  Okay.

21     HEARING OFFICER:  I'm going to mark

22          this as Defendant's Exhibit #3, a

23          memorandum from the Paige Hall

CONFIDENTIAL

21

1          staff where Mr. Hardy is the

2          supervisor, regarding an

3          information memo.

4     MR. HARDY:  I would like to also enter

5          a memo from the staff who worked

6          with Ms. Tera McMillan on the

7          12-to-8 shift during that time,

8          who also stated that she said she

9          was going to get me.  For what

10          reasons is unbeknown to me.

11     HEARING OFFICER:  I'm going to mark

12          this as Defendant's Exhibit #4, a

13          memorandum, from Mr. Arthur

14          Harvest and Mr. Jonathan Ellis,

15          employees in the Paige Hall dorm

16          where Mr. Hardy is unit manager.

17     MR. HARDY:  I would like to also enter

18          another memo from a Ms. Avis Ford

19          who came out in January, and I did

20          a pre-employment -- pre-employment

21          tour in January, who came out.

22          Ms. Tera McMillan was in the

23          dormitory at that point.  Ms. Avis

22

CONFIDENTIAL

```
 1              Ford also stated in her memo to
 2              me, which she also told --
 3              Ms. Tera McMillan told her that
 4              Mr. Hardy is a good unit manager.
 5              And this was in January of '05.
 6              Okay.
 7         HEARING OFFICER:  We're going to mark
 8              this as Defendant's Exhibit #4,
 9              memorandum from an interested
10              party.
11         MR. HARDY:  I would like to also
12              enter --
13         HEARING OFFICER:  I'm sorry.  This
14              should be #5.  Excuse me.
15              Defendant's Exhibit #5, a memo
16              from an interested party.
17         MR. HARDY:  I would also like to enter
18              another memo from Mr. Robert Lee,
19              a car salesmen at the Chrysler
20              dealership at that point, whereby,
21              I referred Ms. McMillan to her --
22              him.  She asked me about a car.  I
23              said, well, go see him, he'll
```

23

```
 1              treat you right.  This was in
 2              October of '04 who -- whereby, she
 3              was calling me back and forth,
 4              saying, what you think is a good
 5              deal, Mr. Hardy, in regards to
 6              that.
 7                   My point being is that, one,
 8              there was no hostile work
 9              environment.  There was no sexual
10              harassment there.  If it had been,
11              these memo would not exist.  And
12              all this can be substantiated
13              based on documentation.
14                   With Ms. Avis Ford, how I
15              know her is the fact that her
16              sister rented a house.  And I
17              didn't know her until September
18              1st of this year.  Had no prior
19              knowing about her.  Nothing.
20         HEARING OFFICER:  Okay.
21         MR. HARDY:  I would like to also
22              enter --
23         HEARING OFFICER:  I'm going to mark
```

24

CONFIDENTIAL

```
 1              this Defendant's #6, memorandum

 2              from Robert Lee of Reinhardt

 3              Motors, regarding Mr. Hardy.

 4       MR. HARDY:  I would like to also enter

 5              in a copy of a memo because I was

 6              as fearful on the job, based on

 7              the fact of all these things, so I

 8              took it upon myself to investigate

 9              what the fair labor -- excuse

10              me -- what the federal guidelines

11              stated there and memo based on --

12              which I sent to Ms. Spann also --

13              addressing what the federal

14              guidelines say, after 1964, stated

15              in regard to sexual harassment.

16       HEARING OFFICER:  I'm going to mark

17              this Defendant's Exhibit #7.  It's

18              a memorandum from Mr. Hardy to

19              Ms. Debra Spann, personnel

20              manager, regarding the alleged

21              sexual harassment investigation.

22       MR. STOKES:  What's the date on that?

23       HEARING OFFICER:  The date on this is
```

25

1      July 14th, 2005.

2      MR. HARDY:  And I would like to also

3           enter a memo back in April of

4           2000, whereby, I filed a grievance

5           stating that I was being

6           discriminated -- treated

7           differently than other staff on

8           campus, which was substantiated

9           by, at that point, a Mr. Richard

10          Ray.

11     HEARING OFFICER:  I'm going to mark

12          this Defendant's Exhibit #8, a

13          memorandum to Michael Hardy from

14          Richard Ray, regarding the

15          grievance procedure, dated April

16          20th, 2000.

17     MR. HARDY:  I would like to also enter

18          a memo dated July -- excuse me --

19          January 18th of 2000, whereby,

20          submitted to Ms. Debra Spann,

21          alleging sex discrimination,

22          whereby, she did not absolutely

23          nothing.

CONFIDENTIAL

1        HEARING OFFICER:  I'm going to mark

2             this Defendant's Exhibit #9, a

3             memorandum to Debra Spann,

4             personnel manager, from Michael

5             Hardy, Counsel I.  The date is

6             January 18th, 2000, regarding

7             sexual discrimination, creating a

8             hostile work environment.

9       MR. HARDY:  And finally -- hopefully

10            finally, I would like to also

11            enter -- submit a memo back in

12            June 23rd of 1997, whereby, all

13            this whole process started.

14            Excuse me.  Whereby, a

15            superintendent, whereby, I was

16            asking for -- really asking for

17            guidance.  And he wrote me back on

18            a little sticky, saying, guidance

19            bullshit.

20      HEARING OFFICER:  I'm going to mark

21            this Defendant's Exhibit #10.

22            It's a memorandum to Mr. James

23            Tyler, Youth Service Specialist,

27

```
 1              from Michael Hardy, Unit Manager

 2              of Paige Hall, dated June 23rd,

 3              1997, regarding job performance.

 4      MR. HARDY:  And finally, I would like

 5              To say that based on my

 6              understanding of our policy

 7              dealing with sexual harassment,

 8              and if you were review the tapes,

 9              every staff would say, Mr. Hardy

10              covered policy, procedure, sexual

11              harassment every staff meeting.

12              So if anybody was being sexually

13              harassed, they know the policy

14              because I discussed policy in

15              every staff meeting.  Based on the

16              definition of sexual harassment,

17              they know what to do, they know

18              when to do it, and they know how

19              to do it.

20                   This person had been --

21              changed shift on February the 5th

22              of 2005.  I saw her for a total --

23              in the present of two staff on
```

28

1    different occasions between --

2    from February 5th up until now.

3    When I was in Eufaula at a

4    leadership conference and my

5    son -- had been out from work for

6    three weeks, had not seen anybody.

7    My son been at the Children's

8    Hospital, and now here's this

9    thing about sexual harassment

10   comes up.

11       Now, anybody -- Ray Charles

12   could see this. This is not

13   sexual harassment. If anybody had

14   been sexually harassed, they would

15   have came in with dates, times,

16   and circumstances. And they would

17   not have waited all this time

18   prior to filing a sexual

19   harassment charge.

20       This is another means of

21   discrimination based on someone's

22   irritated -- based on something.

23   And what it is, I'm not sure.

29

1          Read the policy on sexual

2          harassment.  It does not meet it.

3     HEARING OFFICER:  Mr. Hardy, do you

4          have witnesses --

5     MR. HARDY:  Yes, I do.  I'd like to

6          call --

7     HEARING OFFICER:  -- that you would

8          like to present?

9     MR. HARDY:  I'd like to call -- is it

10         okay?  I'd like to call a couple.

11    HEARING OFFICER:  Do you want to bring

12         them all in and let's swear them

13         in all at one time and then send

14         them out?

15    MR. STOKES:  Yes.

16    HEARING OFFICER:  Let's do that.

17              (Brief interruption)

18    HEARING OFFICER:  Hi.  Just come in and

19         y'all can line up against the back

20         there.  We thank you for coming

21         today.

22              I'm going to ask that you

23         all stand up at one time,

CONFIDENTIAL

30

```
 1              individually state your name.  And

 2              then after everyone has stated

 3              their name, if you will raise your

 4              right hand, our court reporter

 5              will swear you in.  So if y'all

 6              will just all stand.  And

 7              beginning over here, sir, if

 8              you'll state your name.

 9     MR. ELLIS:  Jonathan Ellis.

10     MR. MILES:  Brian Miles.

11     MR. WILSON:  Shadrick Wilson.

12     MR. MOORE:  James Moore.

13     MR. DORTCH:  Rogers Dortch.

14     MS. JOHN:  Karen John.

15     MR. BLACK:  Victor Black.

16     MR. GRANT:  Fred Grant.

17     MS. BLAIR:  Jessilyn Blair.

18     MR. THAGGARD:  Tommy Thaggard.

19     MR. SMITH:  Eugene Smith.

20     HEARING OFFICER:  Now, if you will

21              raise your right hand, Ms. Mack

22              will do the swearing in.

23              (All prospective witnesses
```

31

1             sworn.)

2             (Brief interruption)

3       HEARING OFFICER:  Would you state your

4             full name?

5       MS. JOHN:  My name is Karen John.

6       HEARING OFFICER:  And what is your

7             employment?

8       MS. JOHN:  I teach at -- special

9             education down at Wallace School.

10      HEARING OFFICER:  On the Mt. Meig's

11            campus?

12      MS. JOHNS:  On the Mt. Meig's Campus,

13            yes.

14            KAREN JOHN

15      The witness, having previously been

16   sworn, testified as follows:

17            DIRECT EXAMINATION

18   BY MR. HARDY:

19   Q.   Ms. John, how long have you known me,

20        Mr. Hardy?

21   A.   I've known you, Mr. Hardy, approximately 21

22        years.

23   Q.   What do you know about my character?

32

A.    I know that you exemplify professionalism,
      that you are -- the evidence of that is from
      me knowing you basically just one on one.
      You're very -- you're punctual.  Your word
      means something.  You have outstanding
      character and a pretty good sense of humor.
              Your children, meaning the boys in the
      dorm, you can tell that they have somebody
      who's over them who sincerely cares about
      them.  They're respectful because you're
      respectful.  They have -- your demeanor has
      passed over, so to speak, with the boys.  All
      you have to do is mention that anything is
      the matter with them.  And they say, well,
      I'll tell Mr. Hardy, Mr. Hardy will fix it.
      You know, they look at him like really as a
      father figure.
              And the respect -- that kind of respect
      is not -- is earned.  And on a campus like
      this, that's hard to achieve, to get where
      the entire -- any child you ask and any adult
      you ask, he's professional.  He's -- he's a
      well-rounded individual that you can respect

33

```
 1              his opinion.  You can respect his word.  What

 2              he says, he means and he'll do.  And that's

 3              kind of hard to find nowadays.

 4    Q.   Is there anything you'd like to add,

 5         Ms. John?

 6    A.   I think that's it.

 7    Q.   Thank you.

 8              HEARING OFFICER:  Mr. Perry, do you

 9                   have any questions for this

10                   witness?

11         MR. PERRY:  No.

12              HEARING OFFICER:  Thank you so much,

13                   Ms. John.

14                   (Brief interruption)

15              HEARING OFFICER:  State your name and

16                   your occupation.

17         MR. BLACK:  Victor Black, Counselor I,

18                   Mt. Meigs Campus.

19              HEARING OFFICER:  Thank you.  You may

20                   be seated.

21                   VICTOR BLACK

22         The witness, having previously been

23    sworn, testified as follows:
```

34

DIRECT EXAMINATION

BY MR. HARDY:

Q.    How long you been working here?

A.    I been working here approximately 15, going
      on 16 years.

Q.    Fifteen, sixteen years.  What do you know
      about my character?

A.    Hard worker, like to make sure that, you
      know, things going right with the Department
      and as far as like report, counselor meeting,
      and making sure that we -- making sure that
      things are in order on campus.  I mean,
      you're a very likeable fellow.

            And I haven't had anything negative ever
      been said about Mr. Hardy.  I've been working
      along side Mr. Hardy for a very long time for
      the Department.  And I haven't -- just never
      know from Mr. Hardy to have anything negative
      to appoint for this -- about Mr. Hardy.

Q.    Have you ever been investigated, Mr. Black?

A.    Oh, I've been investigated numerous of times
      with the Department as far as, like I said,
      from me trying to do like -- you know, as far

35

| | | |
|---|---|---|
| 1 | | as trying to perform my duties back there on |
| 2 | | campus.  But for unknown reason, like I came |
| 3 | | up on a lot of investigation that been |
| 4 | | brought up on me.  But for what apparent |
| 5 | | reason, I don't know. |
| 6 | Q. | Was you ever found guilty of anything? |
| 7 | A. | No, I haven't. |
| 8 | Q. | How did you feel? |
| 9 | A. | Felt very disturbed because, like I said, by |
| 10 | | working for the Department, trying to do the |
| 11 | | right thing, you know, trying to get support, |
| 12 | | help for what I do back there.  And not to |
| 13 | | get that support, makes you feel very, very |
| 14 | | disturbed, you know.  Make you -- you know, |
| 15 | | hard for you to come to work to do your job |
| 16 | | when you know you're trying to do your best |
| 17 | | for the Department. |
| 18 | | And for someone to always to come in and |
| 19 | | try to scrutinize you for some apparent |
| 20 | | reason.  I don't know.  Maybe because your |
| 21 | | name might associate with certain people. |
| 22 | | And certain people get -- try to come on some |
| 23 | | kind of assumption of that you're trying to |

36

1          do negative things back there behind the
2          fence.
3      Q.   Does it make you feel like quitting?
4      A.   Yes, it does.
5      Q.   Giving up?
6      A.   Giving up. It really does. And I can speak
7          loudly on that because I have been through
8          more investigations on this campus than
9          anyone that's a part of the Department. And
10         I know what Mr. Hardy is going through. But
11         I never been found guilty of anything.
12              And I -- like I keep talking with
13         Mr. Hardy a lot to tell him to stay strong
14         because I don't know why do the things that
15         are being brought up against certain people
16         back there behind the fence.
17     Q.   Who do you feel is being singled out lately?
18     A.   Mostly, I think right now just the -- the
19         senior staff members that's been back there
20         more, back there behind the fence.
21     Q.   How many senior staff members do you feel are
22         being singled out?
23     A.   Mr. Black and Michael Hardy. The last --

```
 1              approximately, the last two years, that's

 2              where it been, Mr. Hardy, Mr. Black, the only

 3              two.

 4     Q.       Do you feel -- you feel you get a fair shake

 5              in the Department?

 6     A.       No, I don't feel like I get a fair shake.

 7              And then for no -- for you not to even get

 8              someone to come down and talk to you, to try

 9              to work with you.  Don't even have time to

10              sit and come back and get the understanding,

11              what are you doing.  I mean, what is your

12              job?  Only thing you hear, you hear a lot of

13              negative things from other people saying what

14              you're doing.  And you base your opinion on

15              that, and that is not fair.

16     Q.       I think I heard Mr. Perry say that Mr. Tim

17              Davis recommended some form of disciplinary

18              action.  Have we talked to Mr. Davis before,

19              Mr. Black?

20     A.       Yes, we have.

21     Q.       What did Mr. Davis tell us?

22     A.       Mr. Davis told us about that -- I know he

23              wasn't saying -- I mean, meeting met with
```

CONFIDENTIAL

38

```
 1            him, and he didn't say anything about no

 2            disciplinary hearing that would be brought up

 3            against Mr. Hardy as far as --

 4      Q.    Did he say that -- let me ask you another

 5            one.  Did -- what did he -- what was the

 6            comment about sexual harassment?

 7      A.    Oh, the comment he made about sexual

 8            harassment -- I mean, about dates, times.

 9            You know, it wasn't any dates and times.

10            This alleged sexual -- I mean, the harassment

11            charge.  And also, as far as the things that

12            were brought out in the investigation, how

13            wrongly the things that were brought up that

14            should have never been brought up in a -- in

15            a sexual harassment case.

16      Q.    Who he said should be disciplined, Mr. Black?

17      A.    Ms. Spann.

18      Q.    Thank you.

19            HEARING OFFICER:  Any other questions?

20            MR. HARDY:  That's it.

21            HEARING OFFICER:  Mr. Perry?

22            MR. PERRY:  A couple of questions.

23                      CROSS-EXAMINATION
```

39

BY MR. PERRY:

Q.  Mr. Black, you said that for some period of
    time you have felt that you and Mr. Hardy had
    been singled out.  You are senior staff, and
    y'all have felt for some time that you've
    been singled out.  How long?

A.  I said approximately two years, dating back
    two years, going back to approximately two
    years this month, November, because I
    returned back to work November the 7th.

Q.  And you and Mr. Hardy have spoken about this?

A.  Have we spoken about what we feel like we the
    ones we've been singled out?  Yes.

Q.  Yes.  For how long have y'all -- when was the
    first time y'all spoke about that?

A.  I can't recall the first -- I mean, the last
    time we spoke of we've been singled out.  But
    as time -- as -- as events are keeping
    occurring, then someone felt why.  And these
    events that happen to other staff, they're
    not singled out, just --

Q.  Over a year ago, close to two years ago?

A.  Two years, approximately two years.  I can ---

1        I can go back.

2    Q.   And y'all first started talking as far as two

3        years ago?

4    A.   That's when everything started -- been

5        coming -- start happening, approximately two

6        years ago.

7    Q.   And my question is, your discussions with

8        Mr. Hardy about this matter, did they begin

9        close to two years ago?

10   A.   As events start happening after that --

11       after they -- after the two -- after -- about

12       two -- approximately two years ago.

13       September the 30th, after that.  Events

14       started occurring after that.

15           And then that's when we knowing --

16       things start happening to me.  And then we

17       started talking about it and said why.  And

18       the reason that come up is the same events

19       happening to other people.  They're not

20       brought up.  They're not investigated.

21   Q.   I understand.  Now, you and Mr. Hardy spoke

22       some time close to two years ago about your

23       bad feelings -- about feeling bad as a result

41

1              of being investigated, right?

2    A.   Right, within the last two years.

3    Q.   Mr. Hardy, did he express an understanding

4          that it is something that affects you in a

5          negative way to be investigated?

6    A.   I didn't -- I didn't clear -- I didn't get

7          that.

8    Q.   I understand that your testimony is that it

9          affects you negatively to have been

10         investigated.

11   A.   Not just investigated.  If you constantly

12        getting investigated for certain events that

13        you see other people -- might think might

14        occur to other people, they're not

15        investigate -- being investigated.  There's

16        only two people that's being singled out,

17        that investigated so much and want to know

18        why.  And the same events that happen to

19        other staff, and they're not investigated.

20   Q.   Answer my question though.

21   A.   Okay.

22   Q.   Did you speak with Mr. Hardy about how it

23        makes you feel to be investigated?

CONFIDENTIAL

1    A.    Speak -- you know, if it constantly -- if --

2          if -- after the events kept occurring, yes.

3    Q.    You did speak with Mr. Hardy about that?

4    A.    After certain -- after just not one

5          investigation.  Constantly, has numerous

6          investigations, just keep coming.  Then, you

7          know, we spoke.  Not just one.

8    Q.    And you have never been found to have done

9          anything wrong as a result of any

10         investigations that were done?

11   A.    No.

12   Q.    Thank you.

13              HEARING OFFICER:  Mr. Hardy, do you

14                   have any other questions for

15                   Mr. Black?

16              REDIRECT EXAMINATION

17   BY MR. HARDY:

18   Q.    You want to add anything?

19   A.    And I -- I wanted, you know -- and what I'm

20         saying about the investigation, I know you

21         have to be investigated.  But let's be fair

22         about the investigation.

23   Q.    In other words, I think what Mr. Black is

CONFIDENTIAL

43

1   saying, we all got rights.

2       MR. STOKES:  No.  Let him state it.

3   A.   You know, I -- let's be fair about the

4   investigation.  Not single two senior staff

5   that been working that's on employee

6   counseling board together, trying to make

7   sure the Department heading in right

8   direction.  But every time someone accuses

9   them or makes certain allegations, it's not a

10  small frame investigation.  It get blowed way

11  out of proportion.

12       But to see some other staff members do

13  some things that should be investigated about

14  it or terminated about it, it's nothing.  It

15  seem like it just brushed under the rug.  In

16  other word, the administrator, it -- it seem

17  like never get involved.  But it seems like

18  when Mr. Hardy and Mr. Black name appear,

19  everyone gets involved in it and want to

20  know -- and trying to find some guilt there

21  some way.  For what apparent reason, I do not

22  know.

23       And that's what I would like to know.

CONFIDENTIAL

44

1    If two people that been working with this

2    Department 15, Mr. Hardy 18, and haven't done

3    nothing but the goodness for the Department,

4    have been spoken highly of, records clean,

5    haven't been wrote up for anything. But now

6    after two years ago -- it started two years

7    ago. Everything we have done been

8    scrutinized. Two years ago, it started,

9    approximately two years ago with Mr. Black.

10   And after that, it started going down from

11   Mr. Hardy. And it seemed like it was just

12   attacking Mr. Hardy and Mr. Black.

13       MR. PERRY: Mr. Stokes, is there

14           anything more from this witness?

15       MR. STOKES: No. That's it. We

16           appreciate it.

17       HEARING OFFICER: Thank you so much,

18           Mr. Black.

19       MR. BLACK: Thank you.

20           (Brief interruption)

21       HEARING OFFICER: State your name and

22           your occupation.

23       MR. DORTCH: My name is Rogers Dortch.

CONFIDENTIAL

45

1          I'm Youth Service Aide for the

2          Department of Youth Services.

3                HEARING OFFICER:  Have a seat,

4          Mr. Dortch.

5                    ROGERS DORTCH

6          The witness, having previously been

7     sworn, testified as follows:

8                    DIRECT EXAMINATION

9     BY MR. STOKES:

10    Q.    Mr. Dortch?

11    A.    Yes, sir.

12    Q.    How long you been employed with the Youth

13          Services?

14    A.    With Youth Services?  Since '90 --

15          '93 -- '92?

16                HEARING OFFICER:  '93.

17    A.    '93.

18    Q.    Since '93?

19    A.    Uh-huh.

20    Q.    And do you know Mr. Michael Hardy?

21    A.    Yes, sir.

22    Q.    Have you ever worked under his supervision?

23    A.    Yes, sir.



CONFIDENTIAL

46

1    Q.    And how long have you worked under his

2          supervision?

3    A.    Since '99.

4    Q.    Since 1999?

5    A.    Uh-huh.

6    Q.    Do y'all have staff meetings?

7    A.    Yes, sir.

8    Q.    Do y'all talk about sexual harassment?

9    A.    In the staff meeting?  Yes, sir.

10   Q.    So as you've been a member of the staff and

11         working on the staff of Mr. Hardy, if you had

12         a sexual harassment complaint, have you been

13         instructed how the -- what the process of

14         going about filing a complaint with the

15         Department?

16   A.    Yes, sir.

17   Q.    You have worked at the same time with

18         Mr. Hardy?

19   A.    Oh, yes, sir.

20   Q.    Have you ever heard him say anything

21         inappropriate to anybody regarding sexual

22         matters?

23   A.    No, sir.  That's not even his character.

47

CONFIDENTIAL

| | | |
|---|---|---|
| 1 | Q. | Have you ever heard him use any kind of |
| 2 | | abusive language towards anybody? |
| 3 | A. | No, sir. It's not even his character. No |
| 4 | | way. |
| 5 | Q. | How about inappropriate language? |
| 6 | A. | No, sir. |
| 7 | Q. | You've been in the military, haven't you? |
| 8 | A. | Yes, sir. |
| 9 | Q. | How long were you in the military? |
| 10 | A. | Twenty years. |
| 11 | Q. | You've heard of sexual, abusive language, |
| 12 | | haven't you? |
| 13 | A. | Yes, sir; I have heard of it. |
| 14 | Q. | You have heard. |
| 15 | A. | Yes. |
| 16 | Q. | All right. But you haven't heard him say -- |
| 17 | A. | No, I've never heard Mr. Hardy say anything |
| 18 | | like that. |
| 19 | Q. | Have you ever heard Mr. Hardy condone any |
| 20 | | other staff member using any kind of sexual, |
| 21 | | inappropriate language -- |
| 22 | A. | Oh, no, sir. |
| 23 | Q. | -- that he supervised? |

48

CONFIDENTIAL

1    A.   No, sir.

2    Q.   Does he allow the students to use that kind

3         of language towards the employees?

4    A.   Oh, no, sir.  No.  I don't -- I don't allow

5         it either.

6    Q.   You don't allow it.

7    A.   No, sir.

8    Q.   Have you ever had an -- and y'all go to

9         these -- and these department rules are done

10       at the staff meetings?

11   A.   Yes, sir.  Every staff meeting we have, we --

12       Mr. Hardy gets the -- gets the policies and

13       procedures of what we're supposed to do, how

14       we supposed to conduct ourselves, and goes

15       over this every -- you know, every staff

16       meeting that we have.

17   Q.   All right.  And do you know Ms. McMillan?

18   A.   Yes, sir.

19   Q.   How long have you known her?

20   A.   Since -- Ms. McMillan come there -- let's

21       see.  Mr. Hardy was in -- that team was down

22       at Holloway Hall.  So they moved back up

23       there I think about two years ago.  I think

49

CONFIDENTIAL

1           about two years ago. I been knowing her

2           about two years.

3    Q.   Did you ever work with her at any time?

4    A.   Yes, sir.

5    Q.   While Mr. Hardy was supervising?

6    A.   You mean while Mr. Hardy --

7    Q.   Was her supervisor?

8    A.   Oh, yes, sir. Yes.

9    Q.   Did you ever hear Mr. Hardy make any type of

10       inappropriate comment to Ms. McMillan?

11   A.   Oh, no, sir. No, sir. No. To nobody,

12       Ms. McMillan or nobody else.

13   Q.   Did Ms. McMillan ever tell you he made any

14       inappropriate comment, to you?

15   A.   No, she never told me.

16   Q.   Did you talk to her on a regular basis when

17       you worked with her?

18   A.   Well, just, you know, duty wise.

19   Q.   Now, have there been any other females that

20       worked on the staff with you since Mr. Hardy

21       been employed as a supervisor?

22   A.   Yes.

23   Q.   Has any other female ever told you Mr. Hardy

50

CONFIDENTIAL

1        made any type of inappropriate comment,

2        suggestion towards them?

3  A.  No, sir.

4  Q.  Mr. Dortch, has Mr. Hardy promised you

5        anything to come here and testify today?

6  A.  Oh, no, sir.  No.  No.

7  Q.  Let me show you what is a copy of a

8        memorandum that's marked as Exhibit #3 and

9        dated June 21st, 2005.

10  A.  I remember this one.

11  Q.  Is your signature on that document?

12  A.  Yes, sir.

13  Q.  Did anybody make you sign that document?

14  A.  No, sir.

15  Q.  Is that true what's contained on that

16        document?

17  A.  Very true.

18  Q.  Do you feel like Mr. Hardy is a good

19        supervisor?

20  A.  Yes, sir.  No doubt about that.

21  Q.  Have you worked with other supervisors?

22  A.  Well, I never worked with anybody else down

23        here but Mr. Hardy.  I was at Autauga with

CONFIDENTIAL

1         Ms. Calender and Ms. Spillers up there.

2   Q.   So you have worked with other supervisors but

3         not on this campus?

4   A.   Right.

5   Q.   But when you compared Mr. Hardy to other

6         supervisors, you'd consider him a good

7         supervisor?

8   A.   Yes, sir. Outstanding. And I'm not saying

9         it for nothing. He's just -- he's

10        outstanding. He's a good supervisor. No

11        doubt about it. And he goes out his way for

12        people if -- well --

13   Q.   Based on what you know, based on your

14        experience with him, would you believe

15        anybody that said he had made inappropriate

16        sexual comment towards them?

17   A.   No, sir, I sure -- I would not. Not -- not

18        since I been knowing him. No, I would not.

19   Q.   Now, have you been told if somebody does

20        something inappropriate or you didn't like

21        what a supervisor does, did he ever tell you

22        that you could file a grievance on it?

23   A.   Right. Yes.

52

CONFIDENTIAL

| | | |
|---|---|---|
| 1 | Q. | Did he tell you, you have to wait a year or |
| 2 | | two years before doing it? |
| 3 | A. | A year or two years before doing it? |
| 4 | Q. | Filing a grievance. |
| 5 | A. | No. |
| 6 | Q. | Did he tell you, you had a right to |
| 7 | | immediately file a grievance on anything that |
| 8 | | anybody done to you that you felt like -- |
| 9 | A. | Right. |
| 10 | Q. | -- was inappropriate? |
| 11 | A. | Yes.  Uh-huh. |
| 12 | Q. | You don't have to get his permission -- |
| 13 | A. | No, I don't. |
| 14 | Q. | -- to file a grievance, do you? |
| 15 | A. | No.  All -- all I have to do is go through |
| 16 | | the proper procedure, the grievance procedure |
| 17 | | that we have in the Department.  And I'm -- |
| 18 | | I'm thinking I'm supposed to go through the |
| 19 | | chain.  I'm -- I'm not sure about it.  But |
| 20 | | I'm thinking I'm supposed to go to whoever, |
| 21 | | to him, or Mr. Hartley and Ms. Cole and all. |
| 22 | | I -- I guess that's what's supposed to be |
| 23 | | done.  It's the same in the military. |

CONFIDENTIAL

53

| | | |
|---|---|---|
| 1 | Q. | All right.  But no one told you or prohibited |
| 2 | | you or told you, you didn't have a right to |
| 3 | | file a grievance against anybody if you |
| 4 | | wanted to? |
| 5 | A. | No, nobody never told me that I couldn't do |
| 6 | | that. |
| 7 | Q. | Nobody ever told you that you had to wait a |
| 8 | | year or two to file a grievance, did they? |
| 9 | A. | No. |
| 10 | Q. | Thank you, Mr. Dortch.  You can answer -- |
| 11 | | MR. HARDY:  Can I ask him one question? |
| 12 | | (Off-the-record discussion) |
| 13 | | MR. STOKES:  I appreciate it, |
| 14 | | Mr. Dortch. |
| 15 | | HEARING OFFICER:  Mr. Perry? |
| 16 | | MR. PERRY:  Quickly. |
| 17 | | CROSS-EXAMINATION |
| 18 | BY MR. PERRY: | |
| 19 | Q. | Did I understand you to say that Mr. Hardy |
| 20 | | has trained you with regard to the policy for |
| 21 | | filing grievances, sexual harassment |
| 22 | | complaints? |
| 23 | A. | Well, we -- we discuss it in every staff |

54

CONFIDENTIAL

1    meeting because that's one of the -- one of

2    the requirements for us to do in staff

3    meetings.  We also, you know, go to training

4    for the same thing, and we discuss the policy

5    and procedures in the staff meetings.

6  Q.   And did I understand you to say that it's

7    your understanding that for a sexual

8    harassment complaint, you should go through

9    the chain of command?

10 A.   That's what I -- yes.  I -- I think I -- as

11   far as -- for the -- know that's what I'm

12   supposed to do.  If I'm going to file a

13   grievance, I'm supposed to go through a chain

14   of command.

15 Q.   On a sexual harassment charge?

16 A.   I guess I could just file one, I suppose.

17 Q.   Now, let me ask you this.  You know

18   Ms. McMillan?

19 A.   Yes.

20 Q.   And you've worked with Ms. McMillan.  Are you

21   aware of any reason why Ms. McMillan would

22   make a false allegation against Mr. Hardy,

23   that he had made sexual advances and created

55

CONFIDENTIAL

1              hostile working environment for her?

2    A.    Yes, sir, I sure do.

3    Q.    Why?

4    A.    All right.  It started back in January.  We

5          had to -- Mr. Hardy had to put another staff

6          on the 12-to-8 shift.  And we was at a staff

7          meeting, and Ms. McMillan volunteered to go

8          to the 12-to-8 shift.

9                At this particular time, Ms. McMillan

10         didn't have an extra job.  So once

11         Ms. McMillan got an extra job, the 12-to-8

12         shift became a problem for her going to her

13         other job.  Because if you've got to be at

14         work at six o'clock in the morning -- six

15         o'clock in the morning, our 12-to-8 shift

16         goes from 12 to 8.  And she had to be at work

17         around six, seven o'clock.  So we were short

18         staff anyway.  She wanted --

19   Q.    Short staffed on?

20   A.    Short staff.  You know, staff -- we don't

21         have -- we short staff.

22   Q.    On which shift?

23   A.    Throughout the whole shift.

000297

CONFIDENTIAL

56

1    Q.    Overall.

2    A.    Yeah.  And this was interfering with her

3          other job.  And she had -- asked Mr. Hardy,

4          talking about she wanted to --

5    Q.    How do you know this?

6    A.    Well, she did tell me.

7    Q.    She told you this?

8    A.    Right.  And --

9    Q.    When did she tell you this?

10   A.    Well, I think it was about some time in

11         January, December, something like that.

12   Q.    Go ahead.

13   A.    About her other job.  And I told her, I said,

14         well, you -- you need to talk to Mr. Hardy

15         about it.  But I don't think it's going to

16         work because we have to make sure that the

17         dorm is covered.  And you -- you can't get

18         off at -- you can't get off at six o'clock in

19         the morning because it's two people here, you

20         and another staff.  So on her other job --

21         the other --

22   Q.    I'm sorry.  Make sure I understand.  What was

23         it that you told her wouldn't work?

57

CONFIDENTIAL

1   A.   Oh, about covering the shift.  You can't get

2        off at -- you can't -- the shift is 12 to 8.

3        That's it, 12 to 8.  You can't get off at six

4        o'clock so you can get to your other job by

5        leaving here.  We got to make sure the shift

6        is covered.

7   Q.   Two more hours.

8   A.   Right.  So that created a problem for her.

9        So I -- she had told me she was going to

10       Mr. Hardy to get time so she can go to her

11       other job.  But that wasn't -- that didn't

12       work.

13            So my thing is that only way for her to

14       get out of that dorm was, was to come up with

15       some type something against him so she could

16       get pulled out -- so she could get out of the

17       dorm.  So she used the opportunity when they

18       had went down to training, and that

19       opportunity came when she went and made a

20       false claim against Mr. Hardy so she could be

21       removed from that dorm.  And that's the only

22       way for her to get removed from the dorm is

23       through him.

CONFIDENTIA

58

1        Now, if anything, what should have

2    happened was, if -- I thought maybe she would

3    try and file something on me.  But it didn't

4    happen that way because she knew if she filed

5    it on me, then it wouldn't have helped her

6    out anyway.  So she just gone come up with

7    some stuff against Mr. Hardy so she could get

8    out of the dorm so she can go to ITU to get a

9    ten-to-six shift.

10        If you get a ten-to-six shift, that

11    means you can get off at six o'clock, and you

12    can be at your other job.  Mr. Hardy wasn't

13    going to go for that because he's got his

14    responsibility, is to make sure that Paige

15    Hall is covered.  You got another outside

16    job, that's your business.  But you got to

17    maintain your job in here and --

18   Q.   Have you ever spoken with Ms. McMillan about

19        this?  Has she ever said anything to you?

20   A.   About?

21   Q.   To confirm that she made this allegation in

22        order to change her shift?

23   A.   Oh, no.  No.  That -- no.  No.  She never --

CONFIDENTIAL

59

| | | |
|---|---|---|
| 1 | Q. | Have you ever confronted her? |
| 2 | A. | No, I haven't confronted her since then. |
| 3 | | I -- I have never confronted her any more |
| 4 | | anyway. I haven't seen her since she left. |
| 5 | | I know one thing though. We had a staff |
| 6 | | meeting one time, and she was -- she was a |
| 7 | | little hostile and -- |
| 8 | Q. | When was this? |
| 9 | A. | Let's see. I can't remember when -- when it |
| 10 | | was. |
| 11 | Q. | What year? |
| 12 | A. | It was this year. |
| 13 | Q. | Summer? Spring? |
| 14 | A. | Yeah, summertime I think. And she -- |
| 15 | Q. | To whom was she hostile? |
| 16 | A. | Well, to me. To me. It was -- I made her |
| 17 | | cry in a staff meeting. |
| 18 | Q. | And how? What happened? |
| 19 | A. | Because Mr. Hardy had come up with some dos |
| 20 | | and don'ts, what we not supposed to do and |
| 21 | | more to what we're supposed to do in the |
| 22 | | dorm; such as, not having cell phones, not |
| 23 | | going to another dorm, spending time and |

60

CONFIDENTIAL

1    stuff like that.

2         So I'm kind of boisterous a little bit.

3    And I -- and I told her, I said -- I told

4    her -- it was another female staff, too.

5    This was Ms. Williams.  They both got upset

6    with me.  And I one -- I was the one that

7    made her -- made her cry.

8         Mr. Hardy had put me in check because I

9    was getting ready to -- you know, so he put

10   me in check.  So he thought that I'm

11   disrespecting them, but he never had

12   disrespect to anybody.  So you know,

13   basically, at that time, I -- I'm the one

14   that got that started about --

15   Q.  Thank you.

16              REDIRECT EXAMINATION

17   BY MR. STOKES:

18   Q.  Mr. Dortch, let's go back a little bit.  You

19       said you were working with her prior to --

20       what shift were you working on, 12 to 8?

21   A.  No.  She was on the 4-to-12 shift, too, prior

22       to -- Ms. Howard left.  So she had moved

23       somewhere in January, something like that.

61

CONFIDENTIAL

```
 1            But she was working on the 4-to-12 shift,

 2            too, and then she went to the 12-to-8 shift.

 3            Then I don't -- if she was going to 12 to 8,

 4            I don't see her no more.

 5     Q.     So you were working 4 to 12?

 6     A.     Well, actually, I worked two to ten.

 7     Q.     Two to ten.

 8     A.     Right.

 9     Q.     But she was working 4 to 12?

10     A.     Uh-huh.

11     Q.     Then she volunteered to go to the --

12     A.     To the 12-to-8 shift.

13     Q.     -- 12-to-8 shift.

14     A.     Right.

15     Q.     She volunteered to do that.

16     A.     Right.

17     Q.     Now, if you don't like working in a dorm, can

18            you ask to be transferred somewhere else?

19     A.     You can ask to be transferred somewhere else,

20            but that doesn't mean you're going to get

21            transferred.

22     Q.     But now, you can ask.

23     A.     You can ask, right.
```

CONFIDENTIAL

62

Q.   And you can voice your opinion about certain
     things.  So if you say, I don't want to be
     here, I want to go somewhere, you can put in
     a request.

A.   Right.

Q.   But she requested voluntarily to go to 12 to
     8.

A.   Right.

Q.   And who did she make that request to?

A.   Mr. Hardy.

Q.   Was her request granted?

A.   I don't think so.

Q.   She didn't go to 12 to 8?

A.   Well, she went to 12 to 8.

Q.   So in order for her to go to 12 to 8,
     Mr. Hardy would have to approve her going to
     12 to 8; is that correct?

A.   Right.

Q.   So when she went to 12 to 8, everything was
     all right with her?

A.   Right.

Q.   Did you ever hear her, at that time,
     complaining about any kind of sexual

CONFIDEN

1    harassment?

2 A. No.  Everything was fine until she got --

3   until she got another job.

4 Q. Then when she got another job, that's when

5   the problem --

6 A. Right.

7 Q. -- started and she wanted to change?

8 A. Right.

9 Q. Now, the dorm she at now, at ITU, what time

10   she have to go to work?

11 A. Ten to six.

12 Q. From ten to six.

13 A. Right.

14 Q. So that accommodated her other job situation?

15 A. Right.  Right.

16 Q. And she talked to you about -- and you found

17   out about her other job; is that correct?

18 A. Yeah.  Yeah.

19 Q. But she never talked to you about any sexual

20   harassment?

21 A. No.  No.

22 Q. Let me ask you, Mr. Dortch.  Since you worked

23   on the staff with her, did she ever cause any

64

CONFIDEN

```
 1         problem or tell anything that, in your
 2         opinion, was not true or make any statement
 3         that was not true?
 4    A.   Who, Ms. McMillan?
 5    Q.   Yes, Ms. McMillan.
 6    A.   Yes.  A lot of times, she was -- she was --
 7         lied about not coming to work or lied about
 8         what she got to do, want to leave and --
 9         and -- you know, she's an habitual liar.
10    Q.   She is in your opinion?
11    A.   In my opinion, she's an habitual liar.
12              MR. STOKES:  Those are all the
13                   questions I have.
14         HEARING OFFICER:  Mr. Perry?
15         MR. PERRY:  No questions.
16         HEARING OFFICER:  Mr. Dortch, thank you
17                   so much for coming today.
18                   (Brief interruption)
19         HEARING OFFICER:  State your name and
20                   occupation.
21         MR. MOORE:  James Moore and Youth Aide
22                   Worker.
23         HEARING OFFICER:  At what dorm?
```

65

CONFIDENTIAL

1          MR. MOORE:  Oh, Paige Hall.

2          HEARING OFFICER:  Thank you.

3          MR. PERRY:  You're YSA?

4          MR. MOORE:  Beg your pardon?

5          MR. PERRY:  Youth Services Aide?

6          MR. MOORE:  Yes.

7                    JAMES MOORE

8          The witness, having previously been

9    sworn, testified as follows:

10                 DIRECT EXAMINATION

11   BY MR. HARDY:

12   Q.    How long have you been working here?

13   A.    Eight months.

14   Q.    How long have you known me?

15   A.    I've known you that length of time.

16   Q.    So you didn't know me prior to eight months?

17   A.    No.

18   Q.    Did you sign this memo marked as Exhibit #5?

19   A.    Yes, sir.

20   Q.    And this memo states that Mr. Hardy is

21         professional, concerned for students,

22         teaching policy, and highest level of

23         professionalism and integrity.  Do you

CONFIDENTIAL

1       consider that a true statement?

2  A.  Without question.

3  Q.  Do you have anything to gain here?

4  A.  Beg your pardon?

5  Q.  Do you have anything -- do you have anything

6       to gain from being here?

7  A.  Oh, no.  No, definitely not.

8  Q.  And you've been here for how many months?

9  A.  Eight months.

10  Q.  Eight months.  So you're new staff?

11  A.  Exactly.

12        HEARING OFFICER:  Is that all,

13           Mr. Hardy?

14      MR. PERRY:  No questions.

15      MR. STOKES:  Thank you, sir.

16         (Brief interruption)

17      HEARING OFFICER:  Would you please

18          state your name and your

19          occupation.

20      MR. GRANT:  Fred Grant, Unit Manager.

21      HEARING OFFICER:  What dorm?

22      MR. GRANT:  Phyfer Hall, B dorm.

23         FRED GRANT

67

CONFIDENTIAL

1          The witness, having previously been

2     sworn, testified as follows:

3                    DIRECT EXAMINATION

4     BY MR. HARDY:

5     Q.    Mr. Grant, how long you been working here?

6     A.    Twenty-two years.

7     Q.    Twenty-two years.  Have you known me to be

8           professional towards you?

9     A.    Of course, very professional.

10    Q.    Policy person?

11    A.    Yes.

12    Q.    Follow policy?

13    A.    Yes.

14    Q.    Teach policy?

15    A.    Yes.

16    Q.    Mr. Grant, have you ever been investigated

17          before?

18    A.    Well, somewhat, a couple of years ago.  A

19          statement was made about my job performance

20          and about some other things that were not

21          true.  It was pretty stressful.

22    Q.    You said pretty stressful.  How did you feel?

23    A.    I'm still going through it.  It was stressful

000309

68

CONFIDENTIAL

1    because in those 22 year, I've -- I've always

2    exceeded standards, and I tried to get along

3    and work to the best of my ability. So it's

4    kind of -- kind of stressful when you -- when

5    you go through it.

6    Q.    Did you think about quitting?

7    A.    Of course I did. Well, I thought about --

8          I'm pretty close to retirement. I thought

9          about maybe early retirement or, you know,

10         find another job. But then I thought about

11         it that, you know, I've given 22 years of my

12         life to this Department. So, you know,

13         there's no sense in letting somebody

14         defeating me over it, something that was not

15         true. So, you know, I'm still here.

16    Q.    Did I hear you say you're still going through

17         it now?

18    A.    I mean, it's just -- just a backlash,

19         just a -- it's always on your mind.

20    Q.    Do you feel you're getting support from the

21         Department?

22    A.    Well, I just somewhat put it behind me and

23         try not to even, you know, think about it,

69

CONFIDENTIAL

1        just look forward to my retirement.

2    Q.   So you're ready to leave then?

3    A.   Oh, yeah.

4    Q.   Thank you, Mr. Grant.  Have you heard of

5        anyone stated that I've used any type of

6        inappropriate language, statement towards mee?

7    A.   No, not that I know of.

8    Q.   Thank you, Mr. Grant.

9    A.   I appreciate it.

10           HEARING OFFICER:  Thank you.

11              Mr. Perry?

12           CROSS-EXAMINATION

13   BY MR. PERRY:

14    Q.   Have you only been investigated once?

15    A.   It really wasn't say investigation.  They

16        looked into some allegations that were made

17        about my job performance.

18    Q.   And that was just once?

19    A.   Yeah.

20    Q.   And that's over 22 years?

21    A.   It was about two years ago.

22    Q.   And that one investigation made you think

23        about quitting?

70

CONFIDENTIAL

1    A.    Well, it wasn't so much the investigation as

2          the whole -- the whole thing about how it

3          came about and some of the statements that

4          were made and that sort of thing.

5    Q.    It was stressful for you?

6    A.    Very, very.

7    Q.    Now, you've known Mr. Hardy --

8    A.    About -- about 20 years.

9    Q.    Did you discuss with him back when this

10         investigation was being done that involved

11         you?

12   A.    I -- we talked about, you know, how stressful

13         it was and about how it came about and some

14         of the things you need to do avoid that type

15         situation.

16   Q.    That's all I've got.   Thank you.

17   A.    Thank you.

18              HEARING OFFICER:   Thank you so much,

19                 Mr. Grant.

20                    (Brief interruption)

21              HEARING OFFICER:   Would you please

22                 state your name.

23         MR. SMITH:   Eugene Smith.

71

CONFIDENTIAL

```
1        HEARING OFFICER:  And your employment.

2        MR. SMITH:  I'm Youth Service Aide,

3            shift supervisor.

4        HEARING OFFICER:  Have a seat.

5            Mr. Hardy?

6            EUGENE SMITH

7        The witness, having been previously

8    sworn, testified as follows:

9            DIRECT EXAMINATION

10   BY MR. HARDY:

11   Q.   How long you been working here, Mr. Smith?

12   A.   Department?

13   Q.   Department.

14   A.   Ten years as of the 27th of this month.

15   Q.   Have I ever written you up for anything?

16   A.   Yeah.  Yeah, you've written me up.

17   Q.   So I've written you up.

18   A.   Yes.

19   Q.   How do you feel about it?

20   A.   About what?

21   Q.   About the write-up at that time.

22   A.   Oh, I was -- I was a little --

23        MR. GRANT:  I can speak the way I want
```

72

CONFIDENTIAL

1           to speak.

2           HEARING OFFICER:   Certainly.

3   A.    I was pissed.  You know, and who wouldn't,

4           you know.  I thought I did a good thing, and

5           it turned out to be a bad thing.  And instead

6           of -- I felt like you could've handled it by

7           in-house, more or less, you know, maybe wrote

8           me a memo or something.  But instead of

9           writing a memo, he went on and handled it on

10          top, where it could've been, you know, under

11          the table type thing.  And I didn't feel like

12          it was -- it was warranted that much

13          punishment, which was a letter to go in my

14          file, a letter of reprimand.

15  Q.    Do you recall talking to Ms. Spann about

16          sexual harassment charge?

17  A.    Yeah.

18  Q.    What was your testimony to Ms. Spann?

19  A.    I said something to the effect of -- well,

20          pretty much, I said -- she asked me did

21          she -- did I feel -- did I feel that you

22          sexually harassed Ms. McMillan.  And I don't

23          think so.  I don't feel that way.

CONFIDENTIAL

1          I worked for Mr. Hardy for a number of

2     years, and I don't work for him anymore.  But

3     I've never seen him come at nobody that way.

4     Talk to -- you know, not going to nobody,

5     talking that way.  And as a matter of fact,

6     he's not -- he's not an aggressive person as

7     far as -- towards you where I would even

8     believe that.

9   Q.  You really could've gotten me then, couldn't

10      you?

11  A.  Yeah.  I could -- to be honest with you, I

12      could've put the knife in and turned it.  At

13      that point, I could've lied and said, well,

14      yeah, I seen him do this and that.  But I

15      would be lying, and I've got to live right

16      with myself.  So being honest, you know,

17      that's the main -- I ain't never seen him

18      talk nothing like that nasty at a woman or

19      saying anything to make her feel as though

20      she's threatened, powerless, or whatever for

21      lack of way to say it.

22  Q.  How do you -- how do you feel about Ms. Spann

23      questioning to you?

CONFIDENTIAL

74

A.    I -- I was a little uncomfortable.  And the

reason I was uncomfortable with the question

because I felt like -- well, I -- I had -- at

that point, again, what was that date?  July

or June or something like that when she

questioned me?  Maybe August.

        I hadn't worked for Mr. Hardy then,

since November the year before.  And I just

really felt like it was kind of silly, you

know.  Well, not silly.  Kind of out there,

for lack of a better way to say it.  I just

don't feel like he'd do none of that.

Q.    Did she ask you questions related to sexual

harassment?

A.    Yeah.  Yeah, she did.  She did.  She asked me

did -- did I -- have I ever seen you make an

advancement at any women.  And then she asked

me about Ms. Howard.  She asked me about

Ms. McMillan.

        And like I told her honestly, you know,

no, I've never seen him do that.  I've never

seen him go -- go at them in any shape, form,

or fashion.  She asked me did I understand

CONFIDENTIAL

1    sexual harassment. And yes, I do understand

2    sexual harassment, you know.

3    Q.  Did she ask you any questions that were not

4    related to sexual harassment?

5    A.  Yes. She asked me had you been soliciting

6    sales on campus. She asked me about that.

7    And when she asked me that, I told her no.

8    Then she asked me, well, haven't you bought

9    clothes from Mr. Hardy. I told her no

10    because I've never bought any clothes from

11    Mr. Hardy before. So that was the answer to

12    that question.

13    Q.  Thank you, Mr. Smith.

14    A.  That's it?

15         HEARING OFFICER: Mr. Perry, do you

16              have any questions?

17         MR. PERRY: No questions.

18         HEARING OFFICER: Thank you,

19              Mr. Smith.

20                  (Brief interruption)

21         HEARING OFFICER: Please state your

22              name.

23         MS. TOWNSEND: Jessilyn Townsend.

CONFIDENTIAL

76

| | |
|---|---|
| 1 | HEARING OFFICER: And your occupation. |
| 2 | MS. TOWNSEND: Case Manager. |
| 3 | HEARING OFFICER: Mr. Hardy? |
| 4 | JESSILYN TOWNSEND |
| 5 | The witness, having previously been |
| 6 | sworn, testified as follows: |
| 7 | DIRECT EXAMINATION |
| 8 | BY MR. HARDY: |
| 9 | Q.   Ms. Townsend, how long you been with the |
| 10 | Department? |
| 11 | A.   About eight years. |
| 12 | Q.   Eight years? |
| 13 | A.   Uh-huh. |
| 14 | Q.   And when you first came in, what dorm -- on |
| 15 | whose supervision did you come in under? |
| 16 | A.   When I first came in, I was under |
| 17 | Ms. Calender's supervision at ITU. |
| 18 | Q.   And from there -- and from there, you went |
| 19 | to -- came to?  Excuse me. |
| 20 | A.   Your supervision, Paige Hall. |
| 21 | Q.   So when you supervised me, did you know me to |
| 22 | be professional or not professional?  How did |
| 23 | you know me to be? |

77

CONFIDENTIAL

1     A.   Professional always.

2     Q.   Then so you came in -- when you first came

3         in, what was your position when you first

4         came in?

5     A.   Was a youth service aide.

6     Q.   And you went from youth service aide to

7         what?

8     A.   Presently, I'm a case manager.

9     Q.   Okay.  Were you a childcare worker?

10    A.   Yes.  I was youth service aide, to a

11        childcare worker, then to a case manager.

12    Q.   So you kind of worked your way up?

13    A.   Yes, sir.

14    Q.   Have I ever said anything inappropriate to

15        you?

16    A.   No.

17    Q.   In your presence?

18    A.   No, sir.

19    Q.   Thank you.  Well, how long did you work for

20        me?

21    A.   About nine months.  About nine months.

22    Q.   That's it.

23           MR. PERRY:  Thank you.

78

CONFIDENTIAL

1          HEARING OFFICER:  Thank you,

2              Ms. Townsend.

3                  (Brief interruption)

4          HEARING OFFICER:  If you would, state

5              your name and occupation.

6          MR. MILES:  Brian Miles, Youth Service

7              Aide, DYS.

8          HEARING OFFICER:  Brian?

9          MR. MILES:  Miles, M-I-L-E-S.

10         HEARING OFFICER:  Miles.  Okay.  Thank

11             you.  Have a seat, Mr. Miles.

12                  BRIAN MILES

13         The witness, having been previously

14     sworn, testified as follows:

15                  DIRECT EXAMINATION

16     BY MR. STOKES:

17     Q.  Mr. Miles, you're employed with DYS?

18     A.  I am.

19     Q.  How long you been employed with DYS?

20     A.  It be four years in June.

21     Q.  And what's your position with DYS?

22     A.  Youth service aide.

23     Q.  And who is your supervisor as youth service

79

CONFIDENTIAL

| | | |
|---|---|---|
| 1 | | aide? |
| 2 | A. | Mr. Hardy. |
| 3 | Q. | And has he been supervising you for four |
| 4 | | years? |
| 5 | A. | Yes. |
| 6 | Q. | Now, since that time, have you worked -- have |
| 7 | | you had females that worked on the same shift |
| 8 | | with you? |
| 9 | A. | I have. |
| 10 | Q. | And during the time that Mr. Hardy been |
| 11 | | supervising you? |
| 12 | A. | Uh-huh. |
| 13 | Q. | Have you ever heard him say anything |
| 14 | | inappropriate to the females that worked on |
| 15 | | the staff with you? |
| 16 | A. | I have not. |
| 17 | Q. | Have you ever seen him make any gestures or |
| 18 | | make any action towards a female that you |
| 19 | | consider to be inappropriate? |
| 20 | A. | No. |
| 21 | Q. | Do you go to staff meetings with Mr. Hardy? |
| 22 | A. | Yes, we do. |
| 23 | Q. | Do y'all go over the policy and procedures of |

80

CONFIDENTIAL

1          DYS?

2     A.   Yes.

3     Q.   Do y'all talk about sexual harassment?

4     A.   Yeah, that's one of the topics.

5     Q.   And in these staff meetings, are there other

6          female staffers present?

7     A.   Yes.  Yes.

8     Q.   Did he tell y'all about filing a -- if you

9          didn't like something going on and you felt

10         like you had been done wrong that you could

11         file a grievance?

12    A.   Yes.  We went over all the procedures as far

13         as grievance, sexual harassment.  Our policy

14         and procedure manual, it's always right there

15         behind the desk.  It's always readily

16         available.

17              Sometimes other administration come in

18         the staff meetings.  And they also send you

19         like invitation.  If you got any problems,

20         come see them.  Everything is pretty much

21         open door.  If you've got something going on,

22         come see him.  If you don't think you can

23         talk to that person or trust that person,

81

CONFIDENTIAL

| | | |
|---|---|---|
| 1 | | come see him. |
| 2 | Q. | So you have not only Mr. Hardy but other |
| 3 | | higher staff -- |
| 4 | A. | Yes. |
| 5 | Q. | -- people from DYS that will come and talk to |
| 6 | | you about the policy and procedure.  So if |
| 7 | | you had a problem, say, like with Mr. Hardy, |
| 8 | | you're aware that you can go to somebody |
| 9 | | else and file -- |
| 10 | A. | Correct. |
| 11 | Q. | -- a grievance; is that correct? |
| 12 | A. | Correct. |
| 13 | Q. | Did anybody ever tell you, you have to wait a |
| 14 | | year or two years to file a grievance? |
| 15 | A. | No.  My understanding of it was if you got a |
| 16 | | problem, whenever you think it's appropriate, |
| 17 | | just come in and go -- go talk to somebody. |
| 18 | | I mean, it's -- it's plenty people you can go |
| 19 | | and talk to. |
| 20 | Q. | So now let me ask you, did you ever work with |
| 21 | | Ms. Tera McMillan? |
| 22 | A. | Yes. |
| 23 | Q. | How long did you work with her? |

82

CONFIDENTIAL

1   A.   Probably up until she moved.

2   Q.   Now, during the time that you worked, what

3        shift was that?

4   A.   I worked 4 to 12.

5   Q.   Did you ever hear Mr. Hardy say anything to

6        Ms. Tera McMillan when you were working with

7        her that was inappropriate?

8   A.   No, never.

9   Q.   Did you talk to her about things that went

10       on, on the shift?

11  A.   Yeah.

12  Q.   You have to talk to her about what the boys

13       are doing?

14  A.   Yeah.

15  Q.   Keeping a check on them?

16  A.   Yeah.  When you work with them, yeah, you

17       talk.  Yeah.

18  Q.   Did you ever tell her not to mention anything

19       to you about Mr. Hardy?

20  A.   No.

21  Q.   Now, did she ever tell you that the working

22       environment -- she was in a hostile work

23       environment?

83

CONFIDENTIAL

| | | |
|---|---|---|
| 1 | A. | No, she never stated that to me. |
| 2 | Q. | Did she ever tell you that she didn't want to |
| 3 | | work under the supervision of Mr. Hardy? |
| 4 | A. | No. |
| 5 | Q. | Did she ever give you any indication that she |
| 6 | | didn't want to work under the supervision of |
| 7 | | Mr. Hardy? |
| 8 | A. | No. |
| 9 | Q. | Did she ever give you any indication she was |
| 10 | | in a hostile work environment? |
| 11 | A. | No. Quite the opposite really. |
| 12 | Q. | Why do you say, quite the opposite? |
| 13 | A. | Pretty much -- we got pretty much the best |
| 14 | | dorm on campus. Well, we do have the best |
| 15 | | dorm on campus. You got -- I mean, you got |
| 16 | | co-workers. If you need to be off, you know, |
| 17 | | somebody could swap with you. You got |
| 18 | | open-door policy. |
| 19 | | To the best of ability -- I mean, it's |
| 20 | | less stressful. I mean, the job itself, I |
| 21 | | don't care what you're doing. If you're |
| 22 | | dealing with 24 children, it's going to be |
| 23 | | stressful anyway. But I mean, as -- as much |

CONFIDENTIAL

84

1    as it can be, it's like, what can I do to

2    make you happy?  If you can't work it out

3    with this person, come and I see what I can

4    do.  I mean, it's flexible.  Everything is

5    flexible.

6        And it's not a thing you have to be here

7    ten years.  I ain't been there but three and

8    a half, going on four years.  It's not like

9    that.

10   Q.   Now, are you aware if you don't like being at

11        one dorm, you can request to be transferred

12        to another dorm?

13   A.   Yeah, you got that option also.

14   Q.   Ms. McMillan, she changed shifts, did she

15        not?

16   A.   Yes, she did.

17   Q.   Did she ever tell you why she was changing

18        shift?

19   A.   No, she never really stated.

20   Q.   She never told you?

21   A.   Unh-unh.

22   Q.   And then she went to another shift.  Do you

23        know whether she was made to go to another

CONFIDENTIAL

85

1    shift?

2    A.    No.   No.   It wasn't indication to me that she

3          was made.   She didn't tell like she was not

4          made.   But no, I wasn't saying that she was

5          made.

6    Q.    All right.   Those are all the questions I

7          have.

8                    HEARING OFFICER:   Mr. Perry?

9                    MR. PERRY:   No questions.   Thank you.

10                   HEARING OFFICER:   Thank you so much,

11                        Mr. Miles.

12   Q.    Just one other question.   Did you sign this

13         document marked Defendant's Exhibit #5?

14   A.    Yeah, right here at the bottom.

15   Q.    Were you made to sign that?

16   A.    No.   One thing about it, you know, you ain't

17         never made to do anything.   I mean, everybody

18         grown.   You -- you can't be made to do -- you

19         can't be made to do anything.   And it's a --

20         I mean, you got this office.   You got another

21         office down there full of everybody that you

22         can go and talk to.

23   Q.    And what's said on this memo is correct, that

327

CONFIDENTIAL

```
 1            Mr. Hardy was a very professional person at

 2       all --

 3    A.    He is very professional at all time.  I mean,

 4       he really is.

 5    Q.    Those are all the questions I have.

 6               MR. PERRY:  Mr. Stokes, how many more

 7                  have you got?

 8               MR. STOKES:  How many you got,

 9                  Mr. Hardy?

10               MR. HARDY:  I don't know.

11                  (Off-the-record discussion)

12               MR. STOKES:  We would like to state

13                  that they basically are going to

14                  say the same thing that these have

15                  said before.  We're not trying to

16                  be overly redundant, but we just

17                  want to make sure the record is

18                  perfectly clear regarding that.

19                  So we don't want to unnecessarily

20                  prolong it.

21               MR. PERRY:  You want to just proffer

22                  what the other witnesses would

23                  say?
```

000328

CONFIDENTIAL

1    MR. STOKES:  Yeah.  We want to make a

2         proffer that the other witnesses

3         are going to say basically the

4         same thing, that they worked under

5         the supervision of Mr. Hardy.

6         There were no other -- they never

7         heard of any statements made

8         regarding sexual statement toward

9         any female employee that worked on

10        there.

11             He's always professional at

12        all times.  There was no hostile

13        working environment that they know

14        of while they've been working

15        there.  And it would be quite the

16        contrary.  He always worked hard.

17        He always provided them with

18        assistance.  And he always tried

19        to be professional and above board

20        with them at all times.

21             That's what they would be

22        expected to testify.

23    HEARING OFFICER:  Mr. Perry.

88

CONFIDENTIAL

```
 1          MR. PERRY:  If I could just ask one

 2              question of Mr. Hardy.

 3              MICHAEL HARDY

 4      The witness testified as follows:

 5              DIRECT EXAMINATION

 6  BY MR. PERRY:

 7  Q.   Mr, Hardy, you either made reference or

 8       offered a memo from April 2000 I believe in

 9       regard to a grievance that you filed that

10       Mr. Richard Ray heard?

11  A.   Uh-huh.

12  Q.   And Mr. Ray agreed with you?

13  A.   Right.

14  Q.   Is that correct?  I assume you were satisfied

15       with what he did?

16  A.   At that point, yes.

17  Q.   Thank you.

18          HEARING OFFICER:  Please allow me to

19              change my designation of

20              Defendant's Exhibit to Employee's

21              Exhibit since you are not a

22              defendant, Mr. Hardy.  This is my

23              first hearing, and that was a
```

89

1   mistake that I made.  So please

2   allow me to change the designation

3   of Defendant's Exhibit to

4   Employee's Exhibit.

5       This information will be

6   collected and reviewed, and a

7   report will be presented to the

8   executive director.  You will be

9   contacted, Mr. Hardy, by mail

10  regarding the decision.

11      Do you have any questions?

12  MR. HARDY:  No.  I just want to say,

13  thank you, guys, for this

14  opportunity.  This has been

15  extremely stressful for it.  When

16  I say stressful, I mean extremely

17  stressful to have a wife and have

18  children and have a sick child and

19  for this to come up and be back

20  and forth to Children's Hospital.

21  Someone intentionally took

22  advantage of a situation.

23      But I still say I trust in

CONFIDENTIAL

000331

CONFIDENTIAL

1    God.   I know that everything is

2    going to be okay, and that's where

3    my faith lies.

4    HEARING OFFICER:   Thank you so much for

5    coming.   This conference is

6    concluded.

7        (The proceedings concluded at

8        11:32 a.m.)

9    * * * * * * * * * * *

10   END OF PROCEEDINGS

11   * * * * * * * * * * *

12

13

14

15

16

17

18

19

20

21

22

23

REPORTER'S CERTIFICATE

STATE OF ALABAMA

MONTGOMERY COUNTY

      I, Sherry Mack, Court Reporter and Commissioner for the State of Alabama at Large, hereby certify that on Tuesday, November 15, 2005, I reported the TESTIMONY AND PROCEEDINGS in the matter of the foregoing cause, and that pages 5 through 90 contain a true and accurate transcription of said proceedings.

      I further certify that I am neither kin nor of counsel to the parties to said cause, nor in any manner interested in the results thereof.

      This 2nd day of December, 2005.

*Sherry Mack*
SHERRY MACK, COURT REPORTER
Commissioner for the
State of Alabama at Large

MY COMMISSION EXPIRES:  1/06/08

# HARDY V. WOOD

## BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

# EXHIBIT

# 12


**BOB RILEY
GOVERNOR**

*State of Alabama*
## Department of Youth Services
*Post Office Box 66
Mt. Meigs, Alabama 36057*


**WALTER WOOD,
ECUTIVE DIRECT**

December 8, 2005

MEMORANDUM

TO:          J. Walter Wood, Jr.
             Executive Director

FROM:        *Marcia Calendar*
             Marcia Calendar
             Executive Assistant

RE:          Findings and Recommendations based on Administrative Fact Finding Hearing
             held at Mt. Meigs on November 15, 2005 for Michael Hardy

ALLEGATIONS:

An Administrative Fact Finding Hearing was held on November 15, 2005, at the Central Office
at Mt. Meigs for Michael Hardy. You requested the hearing to determine whether disciplinary
action is warranted based upon the following alleged inappropriate work conduct:

> Violation of the Rules of the State Personnel Board (670-X-19-.01 (1g) -
> disruptive conduct) and/or violation of the Rules of the State Personnel Board
> (670-X-19-.01 (2 e) - use of abusive or threatening language) and/or violation of
> the Rules of the State Personnel Board (670-X-19-.01 (2 j) - serious violation of
> any other department rule), and/or violation of DYS Policy (3.13.2 - Prohibition
> of Sexual Harassment): Specifically, you were alleged to have made sexual
> advances and/or to have created a hostile working environment for a subordinate
> employee, Tera McMillan, who filed a harassment complaint against you. In
> response to Ms. McMillan's harassment complaint you are alleged to have
> attempted, among other things, to cause an investigation against her for her having
> filed a complaint against you.

~~On June 14, 2005, Ms. Tera McMillan made a complaint of sexual harassment against Mr.~~
Hardy. Mr. Hardy supervises Ms. McMillian. You assigned Ms. Spann to investigate the
allegations. Ms. Spann concluded, based on corroborating evidence, as a matter of fact that the
complaint was valid. Ms. Spann recommended disciplinary action. Attached hereto is a copy of
Ms. Spann's finding and recommendation.

In addition, in response to Ms. McMillian's complaint against Mr. Hardy, Mr. Hardy sough[ ]
have Ms. McMillian investigated. Mr. Hardy filed with Ms. Spann a "grievance" agai[ ]
McMillian, contrary to the grievance procedure. Moreover, the subject of the "gri[ ]

**EXHIBIT**
**12**

not an issue covered by the grievance procedure. Attached hereto is a copy of the "grievance" filed by Mr. Hardy against Ms. McMillian.

Individuals present during the November 15, 2005 hearing were: Ms. Karen John, Mr. Victor Black, Mr. Rogers Dortch, Mr. James Monroe, Mr. Fred Grant, Mr. Eugene Smith, and Mr. Brian Miles.

FINDINGS:

The following findings were determined based upon a review of the testimony, documents presented during the hearing, a review of the employee's personnel file, and additional efforts to verify the testimony of the witnesses.

All allegations against Mr. Hardy are found to be substantiated.

RECOMMENDATIONS:

Upon a review of the evidence presented during the hearing and a review of Mr. Hardy's personnel file including past performance evaluations, the following recommendation is made:

Terminate Mr. Hardy's employment as a Youth Services Counselor I for the stated allegations which were found to be substantiated. This employee was the complaining party's supervisor. He was aware of the prohibitions against sexual harassment and he was well aware of the anti-retaliation policy.

The employee denies that he sexually harassed Ms. McMillian as Ms. Spann concluded. He argues that Ms. McMillian was working a second job with a Hyundai supplier and that her second job shift began before her DYS shift ended. He argues that she had a motive to fabricate the allegation and thereby acquire more favorable working hours. Ms. Spann investigated his defense and found it not credible, based in part on Ms. McMillian's denial that she had a second job. I now have reason to doubt Ms. McMillian. Specifically, Ms. McMillian recently informed Ms. Spann that she does have a second job, but she stated it began within the past two months--well after she made her sexual harassment complaint against Mr. Hardy. The existence of a possible motive for fabrication which has come to light since Ms. Spann's investigation thus creates a question whether Ms. Spann's conclusion was correct.

However, that doubt is insufficient to cause me to contradict Ms. Spann or to recommend disciplinary action less than termination. Mr. Hardy clearly attempted to retaliate against Ms. McMillian for filing the complaint against him. Mr. Hardy is, or should be, familiar with the grievance procedure which requires grievances to follow the chain of command, yet he filed this "grievance" with the personnel director. Moreover, the substance of this "grievance" was neither within the scope of the grievance procedure nor within the scope of the anti-discrimination complaint procedure--which requires complaints to be directed to the personnel director. Mr.

2

CC1.3

Hardy is well aware how personally disturbing it is to be investigated by DYS. Witnesses confirmed that Mr. Hardy had discussed this with them prior to Mr. Hardy's retaliatory "grievance" against Ms. McMillian. I find that Mr. Hardy initiated the "grievance" to retaliate against Ms. McMillian. This Agency can no more tolerate retaliation than sexual harassment itself.

Enclosures

3

004431

# HARDY V. WOOD

## BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

# EXHIBIT

# 13

## BEFORE THE STATE PERSONNEL BOARD
## IN THE MATTER OF

MICHAEL HARDY,                     )
                                   )
    Employee, appellant,       )
                                   )
v.                                 )  Case No.: 06-004-JJW
                                   )
ALABAMA DEPARTMENT OF              )
YOUTH SERVICES,                    )
                                   )
    Appellee.                  )

## RECOMMENDED ORDER TO THE STATE PERSONNEL BOARD

The undersigned conducted a hearing on May 8, 2006 and June 10, 2006 at the offices of the Alabama State Personnel Department in Montgomery, Alabama. Theron Stokes, Esq. and Monica Arrington, Esq. appeared as counsel on behalf of Michael Hardy (hereinafter "Hardy" or "the Employee"). T. Dudley Perry, Esq. appeared on behalf of the Department of Youth Services (hereinafter "DYS"). Following the hearing, the parties requested permission to file post-trial briefs. Briefs were filed on or about July 25, 2006. The parties also requested a transcript of the proceedings which was provided to the undersigned around April 10, 2007.

DYS introduced seven exhibits numbered 1-7. The Employee introduced 30 exhibits numbered 1-30.[1]

---

[1] Employee's Exhibit 14, which are the private personnel records of another employee, were excluded. Furthermore, the exhibits in this cause contain unredacted confidential and privacy protected information. Accordingly, all exhibits in this case, both those submitted by



EXHIBIT
13

DYS called as witnesses:

(1) the Employee;

(2) Tera McMillian, a DYS employee;

(3) Birdie Montgomery, (by deposition), McMillian's mother;

(4) Veronica Harris, a Youth Services Aide at DYS; and

(5) Walter Wood, Director of DYS.

The Employee called as witnesses:

(1) Eugene Smith, a DYS Employee;

(2) Rashin Farley a DYS Employee; and

(3) Rogers Leon Dortch, a DYS Employee.

## I. PROCEDURAL HISTORY AND CHARGES

The Department of Youth Services employed Hardy beginning in 1987 as a

Youth Services Child Care Worker. He became a Youth Services Counselor I in

1994. He remained in that position until his dismissal, which was effective on

January 6, 2006. He received an "Exceeds Standards" performance appraisal

rating every year, except for two wherein he received a "Meets Standards" rating.

---

the Employee and the Department, are placed UNDER SEAL and may not be viewed by the
public for any reason absent the appropriate court order. Also in the Employee's exhibits are the
depositions of witnesses Debra Spann, Derrick Bolling, Vanessa Hall, Sylvesta Lee, Reginald
Boswell and Elijah Hood, Jr.

Tera McMillian, one of Hardy's subordinates, filed a complaint alleging that Hardy sexually harassed her and later retaliated against her after she filed a complaint. DYS investigated this complaint. In a letter to Hardy, Director Wood advised:

> Dear Mr. Hardy:
>
> I have received a recommendation that disciplinary action be taken regarding your employment as a Youth Services Counselor I. The recommendation reveals the following alleged inappropriate conduct and work performance as the reason for the recommendation:
>
> Violation of the <u>Rules of the State Personnel Board</u> 670-X-19-.01(1g)- (disruptive conduct); and/or violation of the <u>Rules of the State Personnel Board</u> 670-X-19-.01(2e) (use of abusive or threatening language) and/or violation of the <u>Rules of the State Personnel Board</u> 670-X-19-.01(2j- serious violation of any other department rule); and/or violation of *DYS Policy* 3.13.2 - Prohibition of Sexual Harassment: Specifically, you were alleged to have made sexual advances and/or to have created a hostile working environment for a subordinate employee, Tera McMillian, who filed a harassment complaint against you. In response to Ms. McMillian's harassment complaint you are alleged to have attempted, among other things, to cause an investigation against her for having filed a complaint against you. ...[2]

DYS held the pre-disciplinary conference on or about November 15, 2005, giving the Employee an opportunity to present any relevant or mitigating circumstances regarding his proposed termination.

---

[2] Employee Exhibit 11.

On December 8, 2005, Marcia Calendar, Executive Assistant to Director

Walter Wood wrote memorandum summarizing the matter:

ALLEGATIONS

An administrative Fact Finding Hearing was held on November 15, 2005, at the Central Office at Mt. Meigs for Michael Hardy. You requested the hearing to determine whether disciplinary action is warranted based upon the followed alleged inappropriate work conduct:

Violation of Rules of the State Personnel Board (670-X-19-.01(1g)-disruptive conduct) and or violation of the Rules of the State Personnel Board (670-X-19-.01(2e)-use of abusive or threatening language) and/or violation of the Rules of the State Personnel Board (67–X-19-.01 2j) serious violation of any other department rule), and/or violation of DYS Policy 3.13.2 Prohibition of Sexual Harassment): Specifically, you were alleged to have made sexual advances and/or to have created a hostile working environment for a subordinate Tera McMillian, who filed a harassment complaint against you. In response to Ms. McMillian's harassment complaint you are alleged to have attempted to, among other things, to cause an investigation against her for having filed a complaint against you.

On June 14, 2005, Ms. Tera McMillian made a complaint of sexual harassment against Mr. Hardy. Mr. Hardy supervises Ms. McMillian. You assigned Ms. Spann to investigate the allegation. Ms. Spann concluded, based on corroborating evidence, as a matter of fact that the complaint was valid. Ms. Spann recommended disciplinary action. Attached hereto is a copy of Spann's finding and recommendation.

In addition, in response to Ms. McMillian's complaint against Mr. Hardy, Mr. Hardy sought to have Ms. McMillian [sic] investigated. Mr. Hardy filed with Ms. Spann a "grievance" against Ms. McMillian [sic] contrary to the grievance procedure. Moreover, the subject of the "grievance" was not an issue covered by the grievance procedure. Attached hereto is a copy of the "grievance" filed by Mr. Hardy against Ms. McMillian. ...[3]

FINDINGS:

The following findings were determined based upon a review of the testimony, documents presented during the hearing, a review the employee's personnel file, and additional efforts to verify the testimony of the witnesses. All allegations against Mr. Hardy are found to be substantiated.

RECOMMENDATIONS:

Upon a review of the evidence presented during the hearing and a review of Mr. Hardy's personnel file including past performance evaluations, the following recommendation is made:

Terminate Mr. Hardy's employment as a Youth Services Counselor I for the stated allegations which were found to be substantiated. This employee was the complaining party's supervisor. He was aware of the prohibitions against sexual harassment and was well aware of the anti-retaliation policy.

The employee denies that he sexually harassed Ms. McMillian as Ms. Spann concluded. He argues that Ms. McMillian was working a second job with a Hyundai supplier and that her second job shift began before her DYS shift ended. He argues that she had a motive to fabricate the allegation and thereby acquire more favorable working hours. Ms. Spann investigated his defense and found this not credible, based in part on Ms. McMillian's denial that she had a

---

[3] Bold emphasis supplied.

second job. I now have reason to doubt Ms. McMillian. Specifically, I was recently informed by Ms. Spann that she <u>does</u> have a second job, but stated that it began within the past two months – well after she made her sexual harassment complaint against Mr. Hardy. The existence of a possible motive for fabrication which has come to light since Ms. Spann's investigation thus creates a question whether Ms. Spann's conclusion was correct.

However, that doubt is insufficient to cause me to contradict Ms. Spann or to recommend disciplinary action less than termination. Mr. Hardy clearly attempted to retaliate against Ms. McMillian for filing the complaint against him. Mr. Hardy is, or should be, familiar with the grievance procedure which requires grievances to follow the chain of command, yet he filed this "grievance" with the personnel director. Moreover, the substance of this "grievance" was neither within the scope of the grievance procedure nor within the scope of the anti-discrimination complaint procedure–which requires complaints to be directed to the personnel director. Mr. Hardy is well aware how personally disturbing it is to be investigated by DYS. Witnesses confirmed that Mr. Hardy had discussed this with them prior to Mr. Hardy's retaliatory "grievance" against Ms. McMillian. I find that Mr. Hardy initiated the "grievance" to retaliate against Ms. McMillian. This Agency can no more tolerate retaliation than sexual harassment itself.

Following the pre-dismissal conference, DYS Director, Walter Wood advised Hardy of his termination effective January 6, 2006, in a letter dated the same.[4] The letter explained that Hardy was being terminated for violation of the rules set forth above. Hardy timely appealed his termination to the Alabama State Personnel Board on January 12, 2006. The matter was originally set in March,

---

[4] Employee Ex. 14.

2006, but continued at the request of the parties until May, 2006. The hearing did not conclude in May as scheduled and was reconvened at the request of the parties in June of 2006. Additionally, the parties requested an additional opportunity to submit briefs, transcripts and further evidence, as set forth above. Finally, some question existed as to whether a witness had recorded his testimony over a cell phone during the hearing and sent it to another witnesses. That issue was examined, as well.

## II. FACTUAL BACKGROUND

Having reviewed the documentary evidence and having heard the testimony presented at the hearing and having observed the witnesses' demeanor and assessed their credibility, the undersigned finds the weight of the evidence supports the following findings of fact.

### A. DYS Policy and State Personnel Board Rules

#### (1) Grievances

Generally, the grievance procedure within DYS is employed when a subordinate employee has a complaint against a supervisor. In this event, the subordinate employee follows the chain of command and files the grievance with the person who supervises the employee he or she claims has been the source of the grievance action. In no event is the grievance filed with the Personnel

Director.

DYS Policy Number 3.13.1 states as follows:[5]

## I. POLICY

It is recognized that conflicts will develop between employee and employer. It shall be the policy of DYS to provide its employees an expeditious and systematic procedure for the resolution and alleviation of grievances as the might arise during the course of performing work-related activities. The grievance procedure is a method of settling disputes and break-downs in communication in a job-related situation. Suspensions and dismissals are not covered by this procedure.

...

## III. PROCEDURES

Step A: Within five days of the event, **the aggrieved employee[6] should discuss the matter with his immediate supervisor.** If not resolved, the written documentation of the discussion must be maintained.

Step B: In the event that the employee is not satisfied with the decision of the supervisor, he may request the review by the departmental administrator in charge of his respective area. The request must be in writing and within 10 days of the decision of his supervisor. The matter should be heard within 10 days or as soon as practicable. A decision will be rendered in writing.

Step C: If the employee still feels that the decision rendered is not equitable, he may request a review by the Executive Director of DYS. This request must be in writing and filed within 10 days of receipt of the administrator's written decision. The director should reply in

---

[5] Employee Exhibit 3.

[6] Emphasis supplied.

writing within 10 days of receipt of the request or as soon as practicable.

Step D:  The department considers the decision of the Executive Director as final.  However, the State Personnel Board may elect to consider certain matters upon appeal to that body.

Institutions

Step A:  The aggrieved employee should within five working days of the event discuss the matter with his immediate supervisor.  Written documentation of the discussion must be maintained.

Step B:  If in the opinion of the aggrieved employee satisfactory corrective measures have not been implemented, he should request a review of the grievance by the facility superintendent.  This request must be in writing, accompanied by supportive documentation and made within ten working days of his supervisor's final decision.  The superintendent should respond in writing within ten working days or as soon as practicable after receiving the request.

Step C:  If still dissatisfied, the aggrieved employee may request a review of the grievance by the administrator of institutional services. This request must be in writing accompanied by supportive documentation and made within ten working days of the superintendent's written decision.  The administrator should respond in writing with ten working days or as soon as practicable after receiving the request.

Step D:  If the employee still feels that the decision rendered is not equitable, he may request a review by the Executive Director of DYS. This request must be in writing and filed within ten days of receipt of the administrator's written decision.  The Director should reply in writing ten days of receipt of the request or as soon as practicable.

## (2) Sexual Harassment

DYS Policy 3.13.2[7] states in pertinent part as follows:

### I. POLICY

Harassment on the basis of sex is a violation of Section 703 of Title VII.  The Department of Youth Services will take any steps possible to prevent sexual harassment by its employees on its premises.  If such harassment occurs the department will take immediate and appropriate corrective action.   ...

### III. PROCEDURES

Complaint should be made to the Departmental Personnel Manager.  S/he will request that the Executive Director designate a non-biased investigator.  Written records will be kepts of the complaint and investigation.  The complainant and accused will be interviewed.  If no violation is found both parties are notified and complainant is advised that if dissatisfied with the decision they have additional internal and external appeal routes.  If sexual harassment is suspected or probable cause of violating the sexual harassment policy is found, refer complaints to the Executive Director for a hearing before him or his designee.  The two parties may resolve the problem in a written statement of agreement acceptable to both.  Appropriate disciplinary or personnel action may be taken.

## (3) Retaliation and/or Disruptive Conduct

State Personnel Board Rule 670-X-19-.01 General Work Rule provides:

(1) In addition to any special rules issued by the various appointing

---

[7] Employee Exhibit 2.

authorities for the guidance of their employees, the following standard general work rules shall apply to all classified employees:

(a) Violations that normally result in disciplinary actions of increasing severity: ...

7. Disruptive conduct of any sort.

(b) More serious violations that may result in suspension or discharge on the first offense, considering work record and length of service. ...

5. Use of abusive or threatening language. ...

10. Serious violation of any other department rule.

## B. The Basis for the Dismissal

DYS initially employed Hardy beginning in July, 1987 as a Youth Services Child Care worker.[8] In 1994, DYS promoted Hardy to the position of Youth Services Counselor I.

DYS also employed a woman by the name of Tera McMillian (hereinafter "McMillian") at Mount Meigs for approximately 4 years at the time of this hearing in the ITU (Intensive Treatment Unit). Prior to that time, McMillian worked in two dormitories on the Mount Meigs Campus: Paige Hall and prior to that, Holloway Hall. While working at both Paige and Holloway Hall, Hardy

---

[8] Hardy has been employed with the state for nearly 18 ½ years. After obtaining a BS degree Hardy testified that he took counseling courses from Troy State but did not complete the program. His first job with the state began in 1987 as a Mental Health Worker before coming to DYS as a Youth Services Child Care Worker to supervise students. He has also worked as a Youth Services Counselor.

supervised McMillian either directly or indirectly, however, McMillian

encountered very little contact with Hardy while in Holloway Hall. McMillian

explained that from October of 2002, Hardy was her Unit Manager and she

worked with him occasionally. At some point in time, the entire dormitory staff

transferred from Holloway Hall to Paige Hall. Only two employees (Estes and

Duchett) remained at Holloway Hall. No one told McMillian that she would be

required to transfer to Paige Hall in May of 2003, however, she transferred with

the rest of the group. Prior to this point, she had very little direct day-to-day

contact with Hardy.

    At the hearing, McMillian testified she first remembered being harassed by

Hardy while working in Paige Hall. The first incident occurred when she went to

speak to Hardy about processing some accreddation paperwork. At that time,

according to McMillian, Hardy told her that there were potential perks to her job

such as coming in late and leaving early. He also talked to McMillian about

scripture, claiming he had the gift of prophecy. However, he confessed that he

still had some "yokes." Then McMillian states that he began making sexual

remarks, such as that he said he had a fantasy for her to "s*** his d***" while the

others were in the dining hall. McMillian stated Hardy held a gold necklace in his

hand twirling while he talked. McMillian stated she refused Hardy's offer and

left the room by telling Hardy she needed some air.  After McMillian allegedly

refused Hardy, she reported many other occasions wherein Hardy would say "Mac,

I need to talk to you out on the porch."    McMillian speculates that Hardy

threatened to "write her up" later for an incident in retaliation for her refusal of

Hardy's advances.  However, no evidence suggests that Hardy actually ever

disciplined McMillian.

After the first harassment incident, Hardy asked McMillian if she refused

him because she was involved with another man.  McMillian described a second

incident when Hardy was on duty one night.  McMillian stated that she sat at a

desk when Hardy reached over to her and said "I want you."

On a third occasion, McMillian stated that she and Hardy were in the same

building.  She had just returned from lunch after stopping at Subway.  She sat

down at desk and began eating her sandwich.  Hardy came out of his office,

walked up to desk and grabbed her breast.  Hardy said to McMillian "I just

wanted to get a little feel before Smitty gets here because I like big t***s."

McMillian contends she told him not to do this.

Another time, McMillian testified that Hardy asked her how much her child

support payments were and offered to pay them along with upkeep of her car and

yard for the prospect of getting a key to her home.  McMillian stated that Hardy

would call her at home on her off days for just conversation. McMillian stated

that during these phone calls, Hardy would ask her to go to a hotel with him to just

have some drinks and talk. One time when Hardy called home phone number,

McMillian was in the restroom. McMillian's mother answered the phone and gave

it to her. Her mother sat at the kitchen table during this conversation. This is the

conversation which included the "is it another man..." question. Her mother asked

her who it was and she said it was her boss. Her mother overheard the entire

conversation on McMillian's end.[9]

Veronica Harris (hereinafter "Harris") has worked with DYS since

December of 2001. Harris presented herself as poised, well spoken and articulate.

Although Harris has been childhood friends with McMillian for many years, she

appeared very reluctant to have become involved in this matter and her testimony

carried a great deal of credibility. Having worked in the dormitories at Mt.

Meigs, Harris was very familiar with Hardy. Harris testified that she had one

conversation with Hardy and during that conversation he asked her, "What would

it take for Mac?" Harris understood Hardy to be talking about money. She did not

believe that Hardy was talking about sex at that point, but instead she thought that

Hardy was asking McMillian for some sort of favor. Harris only replied "I don't

---

[9] Employee Exhibit 18; Deposition of Birdie Montgomery, pages 22-46.

know." They talked bit more while standing in front of Harris Hall.   Harris

testified that this conversation took place a couple of months before December

2004.

One of the most significant events, according to McMillian, occurred a few

days after Christmas of 2004, when she returned home after shopping.  That day,

Hardy called her cell phone. ·He said that someone was not "respecting"

McMillian at work.  Harris and McMillian were returning to McMillian's home to

wrap presents.   As McMillian talked to Hardy on the phone, McMillian and

Harris went inside to "make drinks," according to McMillian.  A few minutes after

McMillian hung up the phone, Hardy arrived.  McMillian also testified that Hardy

claimed that he had to bring her a·check from work, however, McMillian stated

her salary is generally paid by direct deposit.[10]   Nevertheless, McMillian admitted

to allowing Hardy to come to her home and offering him an alcoholic drink.

Hardy specifically requested a specialty drink, a Long Island iced tea, which

McMillian testified she had on hand and provided to Hardy.  She stated this was

the·type of mixed drink which she purchased premixed from the liquor store.   The

---



[10]  Hardy testified that he went to McMillian's home to deliver an envelope that included
a check because she called the dormitory and asked for someone to bring her a check.    The shift
ends at 4 o'clock and a staff member asked him to bring the check to her home.  He does not
normally do this for staff, however, he considered "Mac" a special friend and agreed to deliver
the check to her.

testimony demonstrated that a Long Island iced tea was the only alcoholic drink that Hardy enjoyed.

After McMillian gave Hardy the Long Island iced tea, Hardy and McMillian sat together in the living/den area to talk while Harris went to another room to giftwrap presents. McMillian admitted to also having "a couple of drinks" while she was with Hardy. Harris testified that Hardy remained at the house for at least an hour. Harris testified that she went to sleep for a portion of the time.

At some point in the conversation between Hardy and McMillian, McMillian claims that Hardy stated the temperature in the room was hot. Then, McMillian testified Hardy pulled up his shirt and asked McMillian to "lick his chest."[11] Harris happened to observe Hardy raise his shirt while in the other room, but did not hear the conversation. Harris did not state that McMillian asked her to come in the room at that point, nor did McMillian leave the room. However, Harris did stay in the house, but not in the living/den area, until after Hardy left.

Before the incident in December, 2004, McMillian worked 4 p.m. to 12 a.m. and occasionally worked the "second shift" from 2 p.m. to 12:00 a.m. After the December 2004 incident, around January 2005, Hardy changed McMillian's

---

[11] McMillian testified she was aware that Hardy suffered from high blood pressure, however, she did not anticipate this event. She stated that she was not aware of what medications Hardy was taking.

schedule to 12 a.m. to 8 a.m. (third shift). On this shift, McMillian almost never saw Hardy. The reason for this shift change was to supposedly to accommodate staffing requirements. Two males and one female are required to be on each shift. In January of 2005, the third shift had three males, thus the second shift would have to move one of its second shift females to the third shift. McMillian discussed the shift change with Hardy and because only two females were available, Hardy gave McMillian the choice of whether she or the other second shift female would be moved to the third shift. McMillian volunteered to move third shift instead of her colleague, Ingria Williams. McMillian knew that at that time, the third shift would present a conflict for Williams because she teaches school during the day and could not work until 8 a.m. Hardy and McMillian had little or no contact on a daily basis.[12]

McMillian testified that she did not apply for a transfer to a different dormitory in December because she did not want to "challenge" Hardy at that time. She did not seem appeased by the fact that she was given a shift change in

---

[12] McMillian testified that the 4 p.m. to 12 a.m. shift in January included Miles, Williams, Wilson, Farley, Dorthch, Cullam and Moore. There were at least 4 or 5 people on the shift at the time, yet it only takes three. The 12 a.m. to 8 a.m. shift was made up of only three employees–Harvis, Ellis, and Howard. When one person on the night shift left, adjustments had to be made. Three people wanted the night shift. Miles, Wilson and Farley all wanted the night shift because they had discussed it with everyone when Bernice Howard reported that she was leaving.

January where she had almost no contact with Hardy after that point.

McMillian contends that in March or April of 2005, Hardy made a sexually harassing statement to her when she took a book back to him and he said that they could go to a hotel to have some drinks.

McMillian and Hardy's final contact occurred sometime in May. McMillian asked to meet Hardy for the purpose of discussing a transfer to another shift. She told Hardy that she had another job and needed a shift change. He told her that a shift change could take some time to work out. McMillian contends that Hardy never referred her to anyone else that she could talk to about a transfer to another shift. McMillian admits that she did not really have a second job at that time but stated that she may have told Hardy this as an excuse simply to attempt to be removed from under his supervision to another shift. She stated that she wanted to leave in good standing without angering Hardy.

She contends that later in June, she simply had enough and wanted to be out of Hardy's dorm so she went to talk to an EEOC counselor in June, 2005.[13] However, McMillian also admitted that she knew that Hardy's son had been ill and that Hardy had been away from DYS for most of May through September of 2005. Nevertheless, at the time McMillian reported the alleged harassment, she

---

[13] Employee Ex. 13.

also told Phyllis Rankins about the alleged harassment and requested to be transferred to another area of the campus.    When Rankins asked why McMillian was requesting the transfer, McMillian first said that she simply needed a "change of pace."  Later, McMillian told another employee, Debra Spann (hereinafter "Spann"), her motive for the transfer was to avoid Hardy.  McMillian offered little to explain her conflicting reasons as to why she waited so long to report the alleged harassment.    When counsel inquired why McMillian waited so long after the alleged sexual advances began or the December incident to report the harassment, McMillian replied that she did not want any backlash.  McMillian alleged that Hardy always said that his power base was "on the hill," (meaning the Mt. Meigs campus) and she believed him.  McMillian filed a complaint with the EEOC on or about July 12, 2005 which was not received by DYS legal counsel until July 25, 2005.[14]

---

[14] Department Exhibit 1.  The Complaint states as follows:
1.  My name is Tera McMillian and I am employed by the Respondent at its Mount Meigs campus.  I was first hired by the Respondent in October 2002 and since that time I have always performed my duties and responsibilities in a satisfactory manner.  Since May of 2003, I have been subjected to a sexually hostile work environment by my supervisory and my co-workers.

2.  Beginning in May of 2003, I have persistently been propositioned for sex and sexual favors by my immediate supervisor Michael J. Hardy.  On an almost daily basis, Hardy has requested that I "s*** his d***"  He has offered me money and other material objects if I would perform this act of oral sex on him.  Furthermore, Hardy has almost on a daily basis talked about his sexual prowess with other female workers at the Respondent's Mount Meigs campus.  For example, Hardy has stated to me that he can not "f*** all night like he used to" and that he can "only f*** real hard for 5 or 6 minutes" at this time in his life.  Also, Hardy grabbed both my breasts while I

After she reported the matter, DYS immediately reassigned McMillian to ITU where she was no longer under Hardy's supervision. When McMillian was initially hired with DYS, she admitted that she may have had sexual harassment training. She also admitted that she may have had other sexual harassment training while at DYS, although she did not readily recall the training.

Prior to working with DYS, McMillian worked with Call Points as a Senior Teleconferencing Operator. McMillian admitted that she had been terminated from that position. She also admitted that after being terminated, she and other employees instituted a lawsuit against Call Points wherein she alleged, *inter alia*, that she was the victim of race discrimination.[15] That lawsuit later settled out of

---

sat a desk [sic]in the facility. All of this behavior was uninvited and unwelcome and I asked Hardy to stop harassing me, but he did not. Hardy also stated that he loved big "t******" and requested that [sic] be allowed to suckle my breast in the office. Again, I declined his invitation. Hardy also spoke regularly of his abilities with regard to oral sex and asked me to allow him to try such with me. As before I declined his invitation and requested that he leave me alone.

3. During this time of almost constant harassment, I began seeing a doctor for anxiety and depression regarding these issues. My treating position [sic] placed me on medication and referred me to a therapist to help me deal with these issues.

4. In March of 2005, Hardy began asking for me to go to hotels with him for sex and offered to buy me a car, tires and other goods in exchange for my compliance. I did not go along with his request. Hardy's harassment of me continued until I reported him on June 16, 2005. After I reported Hardy, I was made to transfer to another Department within the Mount Meigs facility. Since arriving in the new department, I have been subject to retaliation in the form of personnel not willing to help me learn the new position and I have been threatened with being disciplined for no reason.

[15] Employee's Ex. 30. (a copy of a docket sheet from the Federal court.)

court.

McMillian admitted she did not report most of the events she alleged against Hardy at the time they occurred. Specifically, when Hardy touched her breasts, she did not report it, although she knew she could. Likewise, when Hardy called her at home, she did not report those incidents right away. Although, at the hearing, McMillian contended that Hardy asked her for a sexual relationship daily, beginning around May 2003 until she transferred to the 12 a.m. to 8 a.m. shift (which would have been in January 2005). She waited to contact a lawyer until July 12. To the contrary, on cross examination, McMillian appeared surprised when asked why she told the EEOC that she was *not* harassed on a daily basis from January 2005 until July 2005. McMillian attempted to avoid this question by trying to ask another question.[16]

McMillian testified that her evaluations from Hardy were average or above average. The only other witnesses to the alleged harassment by Hardy were Harris and her mother. Despite any training she may have received at DYS, and the knowledge she may have acquired in any previous litigation experience,

---

[16] Employee's Ex. 28. McMillian stated that she did not prepare this EEOC document but she gave the information to a legal secretary. McMillian testified that she signed the EEOC statement under the penalty of perjury that the information she provided was correct and that she was not providing misleading information. She stated that from January through May, Hardy was not abusing her as he had before.

McMillian testified that she did not decide to file a complaint until after she saw a show on Oprah one day.

On July 14, 2005, Michael Hardy in turn filed a grievance against his former subordinate, Tera McMillian, on the basis that she had made unsubstantiated derogatory statements referencing him.[17]  The "grievance": stated as follows:

> Please consider this memo pursuant to DYS policy 3.13.1 i.e. filing of a grievance.  Ms. Tera McMillian, a former Paige Hall Staff, has continued to make unsubstanted [sic] derogatory statement [sic] referencing the writer.  Additionally, she has encouraged past and present employees (Some of which have been disciplined by the writer) to interfere with an ongoing investigation and file false claims.  Due to the fact that this investigation is ongoing, I am filing this claim with your office for assignment to proper authority.
>
> MJH/dm
>
> cc: J. Walter Wood
> Tim Davis
> G. Wayne Booker
> Janice Coles

Attached to this document were several pages of allegations Hardy made against McMillian.  Hardy filed this alleged grievance, not in accordance with the grievance procedure, but rather, with Debra Spann, the Personnel Manager, who had handled portions of McMillian's harassment complaint and transfer.  Spann, did not investigate or handle grievance matters.  He also copied persons who were

---

[17] Employee Exhibit 7.

not within the appropriate chain of command according to the grievance procedure. His actions could have been perceived as purely responsive to McMillian, rather than following any policy or procedure of DYS.

Wood testified that it is not appropriate under any circumstances, much less for a supervisor, to file a grievance against a subordinate in a sexual harassment investigation. Even if the circumstance was grievable, it should have followed the chain of command, not given to Spann. Sexual harassment is not a grievable issue when the grievant is the alleged sexual harasser. There is not a policy or procedure wherein the harasser can turn the tables and have the victim investigated. The grievance, had it been a legitimate offense, would go to a specialist in the unit (such as the unit manager), to the facility administrator and then to the director. Spann is not in the chain of command, she is the Personnel Manager for DYS. When the matter arose, Wood discussed the matter with Tim Davis. Wood then acted upon several pieces of information that came to him. The grievance procedure was being discussed on campus and Wood became concerned that Hardy's actions were retaliatory, even though McMillian was no longer under Hardy's supervision. Wood then contacted the State Personnel Department to ask for assistance in conducting training specifically addressing these issues as to instruct all employees, including McMillian and Hardy, regarding appropriate

behavior and appropriate mechanisms to handle these types of situations. The Personnel Department brought in someone from the Attorney General's Office to assist with instruction.

Director Wood also testified that Debra Spann investigated the sexual harassment complaint made by McMillian.[18] Spann's investigation found as follows:

> I have investigated the above complaint. I find the complaint to be valid. Two (2) witnesses heard or were asked sexually inappropriate questions concerning Ms. McMillian by Mr. Hardy. In addition, from the information provided by Ms. McMillian, I definitely feel one or more of the incidents which were described to me occurred.
> Mr. Hardy is making much of the fact that he has not seen or been around Ms. McMillian except for a few minutes since February, 2005 - she has been on the 12p.m.-8a.m. shift. Ms. McMillian states these incidents occurred over the past two (2) years. Mr. Hardy also is quite concerned that confidentiality has been breached and his good name and character have been compromised.
> Mr. Hardy should be disciplined for his actions. All staff should be retrained on sexual harassment. It is apparent to me thinking has not changed in this department. We cannot condone telling staff to do one thing and doing something else ourselves (it is my understanding Mr. Hardy went over sexual harassment at every staff meeting). I have contacted Maxine Wheeler to do Sexual Harassment Training for our staff as it did not sink in with State Personnel doing it.

---

[18] Employee Exhibit 10.

DLS[19]

Hardy presented the testimony of three witnesses.  The first witness was a friend and former co-worker, Eugene Smith (hereinafter "Smith").  Smith has been employed with DYS for ten and a half years.  Smith became a Shift Supervisor about six years ago.   Smith usually supervises the 4 p.m. to 12 a.m. shift.  Smith testified that Hardy was the manager of Paige Hall at the time.  Smith has worked with McMillian on the 2 p.m. to 10 p.m. shift, as well at the 8 a.m. to 4 p.m. shift and the 4 p.m. to 12 a.m. shift. If staff has a problem, Smith was usually the first person they could talk to.  He talked to all the staff at Holloway Hall or Paige Hall. Smith testified that McMillian never complained that Hardy made any sexual advances toward her.  She got mad at him when he told her to fill out the log book, but otherwise she seemed happy.   She never said anything about Hardy groping her. The modular area where she and other employees worked is a wide open space and voices carry.  Smith also testified that McMillian was trained and told about the DYS Sexual Harassment policy every year.   Smith admitted that he and McMillian did not necessarily have a cordial relationship after she sold him a truck but he refused to pay her the price she demanded.  Following the sale, their relationship soured and turned "nasty."   Smith, who appeared to be colleagues

---

[19] Employee Ex. 10.

and friends with Hardy, described McMillian in such a crude and derogatory manner, that his perceptions lost credibility.[20] Smith has worked with Hardy for many years and had talked with him prior to coming to the hearing.

At the time of the hearing Rashin Farley (hereinafter "Farley") had been employed with DYS for about three years. He was originally assigned to Holloway Hall at Mt. Meigs and then to Paige Hall. Hardy was his supervisor. When Hardy moved, Farley moved with him. He moved only one time. When he was working with him, he was working on the evening shift 4 p.m. to 12 a.m. Farley worked with McMillian at times. Farley never recalled any instance in which Hardy made a request to McMillian of a sexual nature. Likewise, Farley testified that he did not perceive McMillian as being sexually aggressive with him or anyone else that he knew. Finally, Hardy called Rogers Leon Dortch (hereinafter "Dortch"). Dortch has been employed with DYS for 13 years. Prior to his DYS employment, he served in the United States Army for twenty years and retired as a SGT 1st Class. Dortch, at the time of the hearing, was a Shift Supervisor. The unit manager has the power to change the off-days of employees.

---

[20] Smith described some sexual contact which allegedly occurred between himself and McMillian. Smith stated that he did not complain about it, nor did he "brag" about it. He also stated that he did not complain or feel harassed. He also did not object when she asked him to take her to an adult "toy store" and purchase specific "lifelike" items which he described in detail. Smith then went on to say how he was a Christian and went to church. Then Smith looked at the undersigned as if these two contradictory actions bolstered his credibility.

Unit managers have the ability to change or call an employee and ask them to cover a shift.  When he first came to DYS, he was assigned to Paige Hall and Hardy was his supervisor.  Dortch worked with McMillian for a little over two years.  He testified that their shifts overlapped.  Specifically, he arrived 2 hours before she would and left 2 hours before her.  Dortch testified that McMillian had poor work habits.  Dortch also testified that McMillian volunteered to change shifts in January.  Dortch also confirmed that McMillian would have been well aware of the sexual harassment policy and that staff is well trained every year.

### C. The Employee's Personnel File

A review of the Employee's personnel file reflects overall ratings throughout his career in the "Exceeds Standards" category with overall scores averaging around 28.  There were two exceptions wherein the Employee received a "Meets Standards" rating.

### III. ISSUE

Did DYS produce sufficient evidence to warrant dismissal of the Employee for violations of DYS's grievance procedure, retaliatory or disruptive type conduct, prohibition of DYS sexual harassment policy and/or State Personnel Board Rules regarding the use of abusive or threatening language?

## IV. DISCUSSION

The purpose of the Administrative Appeal is to determine if the termination of the Employee is warranted and supported by the evidence. *Kucera v. Ballard*, 485 So. 2d 345 (Ala. Civ. App. 1986); *Thompson v. Alabama Dept. of Mental Health*, 477 So. 2d 427 (Ala. Civ. App. 1985); *Roberson v. Personnel Bd. of the State of Alabama*, 390 So. 2d 658 (Ala. Civ. App. 1980). In determining whether employee's dismissal is warranted, the departmental agency bears the burden of proving the charges warrant termination by a "preponderance of the evidence." The law is well settled that a "preponderance of the evidence" standard requires a showing of a *probability* that the Employee is guilty of the acts as charged. Thus, there must be more than a mere possibility or one possibility among others that the facts support the disciplinary action at issue, the evidence must establish that *more probably than not*, the Employee performed, or failed to properly perform, as charged. *See Metropolitan Stevedore Co. v. Rambo*, 521 U.S. 121, 117 S. Ct. 1953, 138 L. Ed. 2d 327 (1997), holding that a "significant possibility" falls far short of the APA's preponderance of the evidence standard; *See also Wright v. State of Tex.*, 533 F.2d 185 (5th Cir. 1976)[21]

---

[21]*Bonner v. City of Pritchard*, 661 F.2d 1206, 1209 (11th Cir.1981) the Eleventh Circuit adopted as binding precedent all Fifth Circuit decisions handed down prior to the close of business on September 30, 1981.

**Violations of DYS Sexual Harassment Policy**

Based upon the evidence presented, the undersigned was convinced that Hardy had more than a work-related relationship with McMillian and violated the DYS sexual harassment policy. The testimony of Harris also convinced the undersigned that Hardy made comments to McMillian which were inappropriate for the workplace. However, the undersigned was NOT convinced that McMillian was the victim of sexual harassment. While Hardy's conduct as a supervisor was subject to disciplinary action, the undersigned does not believe that Hardy's advances were unwelcome. McMillian's testimony was exaggerated and lacked complete credibility and candor. Clearly, McMillian possessed a host of other personal motivations for her testimony. While McMillian and Hardy had some sort of relationship for some period of time, any relationship between the two involved McMillian's complicity. Nevertheless, that does not excuse Hardy for engaging in what he should have known could have been misconstrued as an inappropriate verbal exchange with a subordinate. Therefore, the undersigned does find that Hardy's verbal conduct supports termination.

Regardless of Hardy's relationship with McMillian, his most egregious offense however, is the manner in which he handled the investigation of

Page 29 of 32

McMillian's EEOC and sexual harassment complaint, as hereinafter discussed.

**Violations of the Grievance Procedure and Disruptive Conduct**

Despite the fact that McMillian's credibility has questionable merit, equally or more serious than the sexual harassment charge is the disruptive conduct, potential retaliation, and Hardy's violation of the grievance procedure. Employees must be allowed the freedom to have civil rights actions investigated, even if questionable, without the fear of retaliation. If McMillian's allegations proved to be meritless, the inquiry ends there.

In the present action, Hardy admitted he provided training on the sexual harassment policy on numerous occasions. He also admitted to instructing his employees on the proper procedure to follow when filing claims. McMillian followed the procedures as she had been trained to do.

Flying in the face of this policy, Hardy also admitted to filing a "grievance" against her for following the very procedure he trained her to follow. As a supervisor, he knew better than to conduct himself in such a harassing fashion. He knew he was not following policy, nor was he following the chain of command as proscribed in DYS Grievance Procedure 3.13.1 Since McMillian had filed a claim with the Personnel Manager, Debra Spann, Hardy in turn filed his "grievance" with Debra Spann. This type of threatening behavior, in and of itself, merited

dismissal and was uncharacteristic of a supervisor with his training, background and experience. Such conduct is clearly disruptive and in violation of the <u>Rules of the State Personnel Board</u> 670-X-19-.01(1g)- (disruptive conduct), the <u>Rules of the State Personnel Board</u> 670-X-19-.01(2e)- (use of abusive or threatening language) and/or violation of the <u>Rules of the State Personnel Board</u> 670-X-19-.01(2j)-(serious violation of any other Department Rule). Further, such conduct could also be potentially perceived as retaliatory. This one violation alone, was sufficient to warrant Hardy's dismissal.

Since the above-referenced rules are sufficient to warrant dismissal in this cause, the issue of whether the conduct actually reaches the level of retaliation is moot and shall not be addressed in this forum.

Accordingly, the undersigned finds the totality of the evidence warrants dismissal in this cause. Therefore, the undersigned recommends to the State Personnel Board that the dismissal be UPHELD

Done, this the 1ST day of August, 2007.

JULIA JORDAN WELLER
Administrative Law Judge
State of Alabama Personnel Department
64 North Union Street
Montgomery, Alabama 36130
(334) 242-3451
(334) 353-4481

Page 31 of 32

VIA FACSIMILE AND UNITED STATES MAIL

Dudley Perry, Esq.
Alabama Department of Youth Services
P. O. Box 66
Mt. Meigs, AL 36057
FAX: 215-3872

Theron Stokes, Esq.
Monica Arrington, Esq.
Alabama Education Association
P. O. Box 4177
Montgomery, AL 36103-4177
FAX: 262-8377

# HARDY V. WOOD

## BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

# EXHIBIT

# 14

## BEFORE THE PERSONNEL BOARD OF THE STATE OF ALABAMA

### IN THE APPEAL OF

### MICHAEL HARDY

OCT 19 2007

### OCTOBER 17, 2007

This matter came before the Board upon the dismissal of the Employee from his employment with the Department of Youth Services. The Employee was dismissed effective January 6, 2006 based upon charges contained in a letter to the Employee dated the same. This matter was assigned to Administrative Law Judge Julia J. Weller, as Hearing Officer for the State Personnel Board and a hearing was held on this matter on May 8, 2006 and June 10, 2006. The Administrative Law Judge's Report is now before the Board for consideration. The Board has also had the benefit of oral argument.

Essentially the charges against Hardy are a result of a harassment complaint which was filed by one of his subordinate employees. Hardy allegedly made sexual advances and created a hostile working environment for a subordinate employee. The subordinate employee filed a harassment complaint against Hardy. In response, Hardy attempted to cause an investigation against the complaining employee for having filed a complaint against him. The Department alleges that Hardy violated State Personnel Board Rules 670-X-19-.01 (1a)(7)—Disruptive Conduct; (1b)(6)—Use of Abusive or Threatening Language; (1b)(10)— Serious Violation of any Other Department Rule and DYS Policy 3.13.2— Prohibition of Sexual Harassment.

The Administrative Law Judge found that the totality of the evidence warrants dismissal in this cause and recommended that the Employee's dismissal be sustained. The Board hereby adopts by reference the


EXHIBIT

14

findings of fact and conclusions of law as found by the Administrative Law Judge as a part of this Order as if fully set forth herein. The Board finds that the testimony of the alleged victim is not credible and her complaints of sexual harassment are unfounded; however, the Employee's response to these allegations as a supervisor were inappropriate.

The Board has carefully considered the Administrative Law Judge's Report in this case and is of the opinion that the decision of the appointing authority to dismiss the Employee is supported by the evidence and that the termination is warranted.

It is therefore the Order of this Board that the decision of the appointing authority to dismiss the Employee is hereby affirmed,

JACKIE GRAHAM
SECRETARY

JOE N. DICKSON
CHAIRMAN

JOHN MCMILLAN
MEMBER

JOYCE P. O'NEAL
MEMBER

ELLEN G. MCNAIR
MEMBER

JAMES H. ANDERSON
MEMBER